United States Bankruptcy Court
Southern District of Texas

**ENTERED**

June 03, 2026

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| SHANNON WIND, LLC, | Case No. 26-90124 (ARP) |
| Debtor.[1] | |

**ORDER (I) AUTHORIZING THE SALE OF ALL OR
SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR
OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (II)
AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND
(III) GRANTING RELATED RELIEF**
(Relates to Docket Nos. 55, 66, 92, 115, 140, 146, 152, 157, 163, 184, 201, 203)

Upon the motion (the "**Motion**")[2] of Shannon Wind, LLC, as debtor and debtor in possession in the above chapter 11 case (the "**Debtor**" or "**Seller**"), for entry of an order (this "**Order**"), pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Section B of Procedures for Complex Chapter 11 Cases in the Southern District of Texas (the "**Complex Case Procedures**"), authorizing (a) the sale (the "**Sale**") of all or substantially all of the Debtor's assets (the "**Acquired Assets**") free and clear of all Encumbrances (other than Permitted Encumbrances and Assumed Liabilities), on the terms set forth in that certain asset purchase agreement (the "**Asset Purchase Agreement**") by and among

---

[1]   The last four digits of the Debtor's federal tax identification number are 3562. For the purpose of this chapter 11 case, the Debtor's address is 1920 McKinney Ave, Suite 950, Dallas, TX, 75201. Additional information regarding the Debtor's case can be found on the website of the Debtor's proposed claims and noticing agent at https://www.veritaglobal.net/shannon.

[2]   Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to them in the Motion or the Asset Purchase Agreement, as applicable.

Shannon Wind, LLC, and 1370 Clean Energy LLC (together with its affiliated Designated Buyer as provided in Section 8.4 of the Asset Purchase Agreement, the "**Purchaser**"), annexed hereto as **Exhibit 1**, (b) the assumption and assignment of the Assigned Contracts and the Assumed Real Property Interests  in connection therewith, and (c) granting related relief, each as more fully set forth in the Motion; and the Debtor having determined, after a sale and marketing process in accordance with the bidding procedures (the "**Bidding Procedures**") approved by the Bidding Procedures Order, that the Purchaser has submitted the highest or otherwise best bid for the Acquired Assets and is the successful bidder (the "**Successful Bidder**"); and this Court having provided the opportunity for a hearing to consider the transactions contemplated under the Asset Purchase Agreement (the "**Transaction**") on June 3, 2026 (the "**Sale Hearing**"), at which all interested parties were offered an opportunity to be heard with respect to the Transaction; and upon consideration of the *Declaration of John Shepherd in Support of Debtor's Designation of Stalking Horse Bidder* [Docket No. 146, Exhibit C] and *Declaration of Komu Kumar in Support of the Debtor's Proposed Sale Transaction* [Docket No. 203]; and all objections to the Transaction and this Sale Order having been withdrawn, resolved, or overruled on the merits; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the matter being a core proceeding within the meaning of 28 U.S.C. § 157(b)(2); and venue of this proceeding and the Motion in this district being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court being able to issue a final order consistent with Article III of the United States Constitution; and due and sufficient notice of the Motion having been given under the particular circumstances; and it appearing that no other or further notice is necessary; and it appearing that the relief requested in the Motion is in the best interests of the Debtor, its estate, its creditors, and other parties-in-interest; and after due deliberation thereon; and good and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS AND DETERMINES THAT**:[3]

A.      *Fed. R. Bankr. P. 7052.*  The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.  This Court's findings shall also include any oral findings of fact and conclusions of law made by this Court during or at the conclusion of the Sale Hearing.

B.      *Jurisdiction and Venue.*  Pursuant to 28 U.S.C. §§ 1334(b) and 157, this Court has jurisdiction over this matter and over the property of the Debtor's estate, including the Acquired Assets to be sold, transferred, and conveyed pursuant to the Asset Purchase Agreement.  Without limiting the generality of the foregoing, this Court has exclusive in rem jurisdiction over the Acquired Assets pursuant to 28 U.S.C. § 1334(e), as such Acquired Assets are property of the Debtor's chapter 11 estate and, as a result of such jurisdiction, this Court has all necessary power and authority to grant the relief contained herein.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order hereon under Article III of the United States Constitution.  Venue of this Chapter 11 Case and approval of the Transaction contemplated by the Asset Purchase Agreement is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      *Statutory Predicates.*  The statutory authorization for the relief granted herein is found in sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004,

---

[3]   The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.  This Court's findings shall also include any oral findings of fact and conclusions of law made by this Court during or at the conclusion of the Sale Hearing.

6006, and 9014, and the Complex Case Procedures.

D.     *Sale and Marketing Process.*  The Debtor and its professionals marketed the Acquired Assets in accordance with the Bidding Procedures Order.  The sale and marketing process set forth in the Bidding Procedures Order afforded all potential bidders a full, fair, and reasonable opportunity to submit a higher or otherwise better offer to purchase the Acquired Assets and participate in the Transaction contemplated hereby.

E.     *Selection of Successful Bidder.*  Pursuant to the Bidding Procedures, on April 30, 2026, the Debtor filed a *Notice of Filing of Stalking Horse Designation* [Docket No. 146] and on May 1, 2026, filed a *Notice of Schedule Supplement to Stalking Horse Agreement* [Docket No. 152]. On May 7, 2026, the Court entered the *Order (I) Approving (A) Designation of Stalking Horse Bidder and (B) Stalking Horse Bid Protections and (II) Granting Related Relief* [Docket No. 163] (the "**Stalking Horse Approval Order**"), designating the Purchaser as the Stalking Horse Bidder.  The Debtor did not receive any competing Qualified Bids by the deadline established in the Bidding Procedures Order and, accordingly, on May 15, 2026, the Debtor designated the Purchaser as the Successful Bidder and filed a *Notice of Cancellation of Auction* [Docket No. 184].

F.     *Incorporation by Reference.*  Findings of fact and conclusions of law in the Bidding Procedures Order and Stalking Horse Approval Order are incorporated herein by reference.

G.     *Adequate and Reasonable Notice.*  As evidenced by the affidavits of service filed with this Court, and based upon the record in this Chapter 11 Case, and as previously determined by this Court in the Bidding Procedures Order, (i) due, proper, timely, adequate, and sufficient notice of the Motion, the Sale Hearing, the Asset Purchase Agreement, and the

Transaction has been provided to all parties in interest; (ii) such notice was and is good, sufficient, and appropriate under the circumstances and reasonably calculated to reach and apprise all holders of liens, claims, encumbrances, and other interests, including, without limitation, rights or claims based on any successor, transferee, derivative, or vicarious liabilities of their right to appear and be heard, and was provided in accordance with the applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the procedural due process requirements of the United States Constitution; and (iii) no other or further notice of, opportunity to object to, or other opportunity to be heard regarding the Motion, the Sale Hearing, the Asset Purchase Agreement, the Transaction, or of the entry of this Sale Order is necessary or shall be required.

H.     *Final Order.*  This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and authorizes the closing of all transactions contemplated hereby without regard to any stay or delay in its implementation.

I.     *Good Faith Purchaser.*  The Debtor, the Purchaser, and their respective agents, representatives, employees, officers, counsel and advisors, have negotiated, proposed, and entered into the Asset Purchase Agreement and the Transaction contemplated thereby in good faith, without collusion, and from arm's-length bargaining positions.  The Purchaser is a "good faith purchaser" and is acting in good faith within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to all the protections afforded thereby.  The Purchaser has proceeded in good faith in all respects.  The terms of the Transaction, including the consideration in respect of the Acquired Assets as set out in Section 2.1 of the Asset Purchase Agreement (the "**Purchase**

**Price**"), were not controlled by any agreement among potential bidders and neither the Debtor, the Purchaser, nor any other parties in interest have engaged in collusion or any conduct that would cause or permit the Asset Purchase Agreement to be challenged, avoided, or costs and damages to be imposed under section 363(n) of the Bankruptcy Code or any other applicable law.  The Asset Purchase Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under applicable law.  The Purchase Price represents fair and reasonably equivalent value for the Acquired Assets. Neither the Debtor nor the Purchaser are entering into the Asset Purchase Agreement or consummating the Transaction with any fraudulent or otherwise improper purpose.  The Purchaser is not an "insider" or "affiliate" of the Debtor, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders exists between the Purchaser and the Debtor.

J.      The Transaction, which includes the transfer of the Acquired Assets pursuant to the Asset Purchase Agreement and all covenants in and conditions thereto, is an integrated transaction, meaning that each component is an essential part of every other component and that the Transaction can be consummated only if all of the components are consummated. Accordingly, each component of the Transaction is subject to, and is protected by, the provisions of section 363(m) of the Bankruptcy Code.

K.      *Highest or Otherwise Best Offer.*  The Asset Purchase Agreement constitutes the highest or otherwise best offer for the Acquired Assets.  No other person, or group of persons, has offered to purchase the Acquired Assets for an amount that would give equal or greater value to the Debtor than the value provided by the Purchaser pursuant to the Asset Purchase Agreement. The Asset Purchase Agreement is the best means available to the Debtor to maximize the return to its stakeholders and limit losses.  No alternative to the Transaction exists that would provide a

6

greater value to the Debtor, its creditors, or other parties in interest.

L.     The Debtor has demonstrated good, sufficient, and sound business purposes and justifications for consummation of the Transaction pursuant to the Asset Purchase Agreement and all other Transaction Documents (as defined in the Asset Purchase Agreement, collectively, the "**Transaction Documents**"), outside of the ordinary course of business and in accordance with the requirements of section 363(b) of the Bankruptcy Code.

M.     The Debtor's decision to enter into the Asset Purchase Agreement with the Purchaser was a due and proper exercise of the Debtor's business judgment and was authorized pursuant to the Bidding Procedures Order.

N.     The Sale of the Acquired Assets pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code upon the terms and conditions set forth in the Asset Purchase Agreement is the optimal means to create value for the benefit of the Debtor's estate.  The Transaction maximizes the value of the Acquired Assets for the benefit of all creditors and parties in interest. Unless the Sale is concluded expeditiously, as provided for in the Motion and the Asset Purchase Agreement, creditor recoveries may be substantially diminished.

O.     *Fair Purchase Price.*  The consideration provided by the Purchaser pursuant to the Asset Purchase Agreement (i) is fair and adequate; (ii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia (including the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and similar laws); and (iii) will provide an equal or greater recovery for the Debtor's stakeholders than would be provided by any other reasonably practicable available alternative.  The terms of the Asset Purchase Agreement, the Transaction Documents, and the Transaction are fair and reasonable under the circumstances of the Debtor's

chapter 11 case, and the Debtor's determination to proceed with such Transaction constitutes a valid and sound exercise of the Debtor's business judgment.

P. *Sale Free and Clear under Section 363(f).* The Debtor is authorized to sell the Acquired Assets free and clear of any liens, claims, defenses (including rights of setoff and recoupment), and interests, in each case, in, on, or related to the Acquired Assets, including security interests of whatever kind or nature, mortgages, conditional sales or title retention agreements, pledges, deeds of trust, hypothecations, mechanics' and materialman's liens, assignments, preferences, debts, easements, charges, suits, licenses, options, rights of recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, taxes (including foreign, state, and local taxes), licenses, covenants, restrictions, indentures, instruments, leases, options, off-sets, causes of action, contract rights and claims, to the fullest extent of the law, in each case, of any kind or nature in, on, or related to the Acquired Assets (including all "claims" as defined in section 101(5) of the Bankruptcy Code), known or unknown, whether prepetition or postpetition, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, statutory or non-statutory, matured or unmatured, legal or equitable, including any and all such liabilities, causes of action, contract rights and claims arising out of the Debtor's continued operations following the Closing Date including any Encumbrances as defined in the Asset Purchase Agreement (collectively, "**Encumbrances**"), other than as expressly contemplated by the Asset Purchase Agreement, including Permitted Encumbrances and Assumed Liabilities. The Purchaser would not have entered into the Asset Purchase Agreement and would not consummate the transactions contemplated thereby if the Sale to the Purchaser and the assumption of any Assumed Liabilities

by the Purchaser were not free and clear of all Encumbrances other than the Assumed Liabilities and Permitted Encumbrances. The Debtor may sell the Acquired Assets free and clear of any Encumbrances of any kind or nature whatsoever (other than Permitted Encumbrances and Assumed Liabilities) because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Each entity with an Encumbrance in the Acquired Assets to be transferred on the Closing Date: (i) has, subject to the terms and conditions of this Sale Order, consented to the Sale or is deemed to have consented to the Sale; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Encumbrance; or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code. Those holders of such Encumbrances who did not object, or withdrew their objections, to the Motion are deemed, subject to the terms of this Sale Order, to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. All holders of Encumbrances (other than the Assumed Liabilities and Permitted Encumbrances) are adequately protected, and will not suffer any undue burden or prejudice, by having their Encumbrances attach to the proceeds received by the Debtor that are ultimately attributable to the property against or in which such Encumbrances are asserted, subject to the terms of such Encumbrances, with the same validity, force, and effect, and in the same order of priority, which such Encumbrances now have against the Acquired Assets or their proceeds, if any, subject to any rights, claims, and defenses the Debtor or its estate may possess with respect thereto. The Purchaser shall have no obligations with respect to any Encumbrances against the Debtor (other than Permitted Encumbrances and Assumed Liabilities).

Q. *No Successor, Transferee, or Similar Liability.* By virtue of the consummation of the transactions contemplated under the Asset Purchase Agreement: (a) the Purchaser is not a continuation of the Seller and its respective estate, there is not substantial continuity between the

9

Purchaser and the Seller, and there is no continuity of enterprise between the Seller and the Purchaser; (b) the Purchaser is not holding itself out to the public as a continuation of the Debtor or its estate; (c) the transactions do not amount to a consolidation, merger, or de facto merger of the Purchaser and the Debtor and/or the Debtor's estate; and (d) the Purchaser is not a successor or assignee of the Debtor or its estate for any purpose including, but not limited to, under any federal, state or local statute or common law, or revenue, pension, ERISA, tax, labor, employment, environmental, escheat or unclaimed property laws, or other law, rule or regulation (including. without limitation, filing requirements under any such laws, rules, or regulations), or under any products liability law or doctrine with respect to the Debtor's liability under such law, rule or regulation or doctrine or common law, or under any product warranty liability law or doctrine with respect to the Debtor's liability under such law, rule or regulation or doctrine, and the Purchaser shall have no liability or obligation under the Workers Adjustment and Retraining Act (the "**WARN Act**"), 29 U.S.C. §§ 2101 et seq. or the Comprehensive Environmental Response Compensation and Liability Act and shall not be deemed to be a "successor employer" for purposes of the Internal Revenue Code of 1986, Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act, the Americans with Disability Act, the Family Medical Leave Act, the National Labor Relations Act, the Labor Management Relations Act, the Older Workers Benefit Protection Act, the Equal Pay Act, the Civil Rights Act of 1866 (42 U.S.C. 1981), the Employee Retirement Income Security Act, the Multiemployer Pension Protection Act, the Pension Protection Act, and/or the Fair Labor Standards Act. Except for the Assumed Liabilities and Permitted Encumbrances, (i) the transfer of the Acquired Assets to the Purchaser and (ii) the assumption and assignment to the Purchaser of the Assigned Contracts and Assumed Real Property Interests  do not and will not subject the Purchaser to any liability whatsoever with respect to the

operation of the Debtor's business before the Closing Date or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based on, in whole or in part, directly or indirectly, any theory of law or equity including, without limitation, any theory of antitrust or successor or transferee liability.

R.      The Purchaser and the Debtor are not entering into the Asset Purchase Agreement and Transaction Documents or consummating the Transaction for the fraudulent purpose of escaping liability for the Debtor's obligations or to defraud creditors in any way.

S.      *Order Required by the Purchaser.*  Entry of this Sale Order approving the Asset Purchase Agreement is a requirement of the Asset Purchase Agreement and such requirement is an appropriate condition precedent to the Purchaser's consummation of the Transaction.

T.      *Property of the Estate.*  The Acquired Assets are owned by the Debtor and constitute sole and lawful property of the Debtor and the Debtor's estate and title thereto is vested in the Debtor's estate within the meaning of section 541(a) of the Bankruptcy Code.  The Debtor has all title, interest, and/or rights in the Acquired Assets required to transfer and to convey the Acquired Assets to the Purchaser, as required by the Asset Purchase Agreement.

U.      *Corporate Authority.*  Subject to the entry of this Sale Order, (i) the Debtor has full corporate power and authority to perform all of its obligations under the Asset Purchase Agreement and the Transaction Documents, and the Debtor's prior execution and delivery of, and/or performance of obligations under, the Asset Purchase Agreement and the Transaction Documents is hereby ratified; (ii) the Debtor has all of the corporate power and authority necessary to consummate the Transaction; (iii) the Debtor has taken all corporate actions necessary to authorize, approve, execute, and deliver the Asset Purchase Agreement and the Transaction Documents and to consummate the Transaction, except for the closing conditions expressly

11

provided in the Asset Purchase Agreement and the Transaction Documents; and (iv) no consents or approvals are required to consummate the Transaction or otherwise perform the obligations under the Asset Purchase Agreement or the Transaction Documents, except for the closing conditions expressly provided therein.

V.      *Sale in Best Interests.*   The relief requested in the Motion and set forth in this Sale Order is in the best interests of the Debtor, its creditors, estate, and all other parties in interest in the Debtor's chapter 11 case.

W.      *Prompt Consummation.*   To maximize the value of the Acquired Assets it is essential that the Transaction occur within the timeframe set forth in the Asset Purchase Agreement.   Time is of the essence in consummating the Transaction and the Debtor and the Purchaser intend to close the sale as soon as possible.   Accordingly, there is cause to lift the stays established by Bankruptcy Rules 6004 and 6006 with regards to the Transaction and the assignment of the Acquired Assets.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.      *Motion is Granted.*   The Motion and the relief requested therein is GRANTED and APPROVED, as set forth herein, and the Transaction contemplated by the Asset Purchase Agreement are hereby approved, subject to the terms and conditions contained herein.

2.      *Objections Overruled.*   Except as expressly stated herein, all objections to, or reservation of rights regarding, the relief requested in the Motion, the entry of this Sale Order, or the relief granted herein that have not been withdrawn, waived, settled, or adjourned as provided below or otherwise, or that have not otherwise been resolved pursuant to the terms hereof are hereby denied and overruled on the merits with prejudice.  All persons that failed to timely object, or withdrew their objections, to the Motion or the entry of this Sale Order are deemed to consent to the relief granted herein for all purposes, including, without limitation, pursuant to section

363(f)(2) of the Bankruptcy Code.  No appeal, motion to reconsider, or similar pleading has been filed with respect to the Bidding Procedures Order or Stalking Horse Approval Order, and such orders are final orders of this Court, have not been vacated, withdrawn, rescinded, or amended and remain in full force and effect.

3.       *Notice.*  Notice of the Motion and Sale Hearing was adequate, appropriate, fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006 and the Bidding Procedures Order, and as such no further or other notice is required or appropriate.

4.       *Approval and Authorization.*  The sale of the Acquired Assets to the Purchaser on the terms and conditions contained herein and in the Asset Purchase Agreement and the Transaction Documents is hereby approved in all respects pursuant to sections 105(a), 363(b), (f), and 365 of the Bankruptcy Code (including the transfer of the Debtor's right, title and interest to the Purchaser, on an "as is where is" and "with all faults" basis).  Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtor is authorized to perform all obligations under and make all payments required or contemplated by the Asset Purchase Agreement and the Transaction Documents as and when due thereunder without further order of this Court.  The Debtor, the Purchaser, and each of their respective officers, employees, and agents are hereby authorized to (i) execute the Asset Purchase Agreement and the Transaction Documents, and any prior execution of such agreements, documents, and instruments, including the Transaction Documents, is hereby ratified; (ii) perform all obligations under or related to the Asset Purchase Agreement and the Transaction Documents, including, without limitation, to consummate any required deeds, assignments, and other instruments of transfer, and to consummate the Transaction, and any prior performance of such obligations or any prior consummation of such Sale is hereby ratified; and

(iii) take all other and further actions as may be reasonably necessary or appropriate (as determined in good faith by the Purchaser) to consummate and implement the Transaction and to perform all obligations under the Asset Purchase Agreement and the Transaction Documents, without any further corporate action or order of this Court.

5.      Except as otherwise expressly provided in the Asset Purchase Agreement, all persons presently on or after the Closing Date in possession of some or all of the Acquired Assets are directed to surrender possession of the Acquired Assets to the Purchaser on the Closing Date or at such time thereafter as the Purchaser may request.  All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtor to transfer the Acquired Assets to Purchaser in accordance with the Asset Purchase Agreement and this Sale Order.

6.      *No Sub Rosa Plan.*  The sale of the Acquired Assets pursuant to the Asset Purchase Agreement is contemplated by the Debtor's proposed chapter 11 plan and neither impermissibly restructures the rights of the Debtor's creditors nor impermissibly dictates the terms of the Debtor's chapter 11 plan.  Neither the Asset Purchase Agreement nor the Transaction constitutes a sub rosa chapter 11 plan.

7.      *Valid Transfer; Free and Clear.*  As of the Closing Date, the consummation of the Transaction shall effect a legal, valid, and enforceable transfer of the Acquired Assets to the Purchaser, and shall vest the Purchaser with all legal, equitable, and beneficial right, title, and interest in and to the Acquired Assets, free and clear of all Encumbrances (other than Permitted Encumbrances and Assumed Liabilities) pursuant to section 363(f) of the Bankruptcy Code, notwithstanding any requirement for approval or consent by any person.   The Encumbrances shall attach to the proceeds of the Transaction with the same nature, validity, priority, extent, perfection,

and force and effect that such Encumbrances encumbered the Acquired Assets immediately prior to the entry of this Sale Order, subject to any claims, defenses, and objections the Debtor or its estate may possess.  The Asset Purchase Agreement, the Transaction Documents, and the Transaction itself shall be specifically enforceable against and binding upon (without posting any bond) the Debtor, its estate, its creditors, all counterparties to the Acquired Assets, all parties in interest, and any chapter 11 or chapter 7 trustee, and shall not be subject to rejection or avoidance by any party.

8.       *Release of Encumbrances.*  On, before, or after the Closing Date, each of the Debtor's creditors are authorized and directed to execute such documents, releases, or terminations, and take all other actions as may be necessary, desirable, or appropriate (as determined by the Purchaser) to release, effective as of the Closing Date, their respective Encumbrances of any kind against the Acquired Assets, as such Encumbrances may have been recorded or may otherwise exist.  If any person or entity that has filed financing statements, mortgages, mechanic's liens, or other documents or agreements evidencing any Encumbrances against or on the Acquired Assets and shall not have delivered to the Debtor on or prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of all liens, and any other documents necessary, desirable, or appropriate (as determined by the Purchaser) for the purpose of documenting the release of all Encumbrances that the person or entity has or may assert with respect to the Acquired Assets, the Debtor and the Purchaser are hereby authorized to execute and file such statements, instruments, releases, terminations, and other documents on behalf of the person or entity with respect to the Acquired Assets.  The Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order or any other appropriate or desirable documents, which,

15

once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Liens, Claims, Interests, encumbrances, or liabilities against the Acquired Assets.

9.      *Injunction.*  All persons holding Encumbrances of any kind or nature whatsoever against or in the Debtor or the Acquired Assets (whether known or unknown, legal or equitable, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of the Debtor's chapter 11 case, whether imposed by agreement, understanding, law, equity, or otherwise), arising under or out of, in connection with, or in any way relating to the Debtor, the operation of the Debtor's business prior to the Closing Date, the Acquired Assets, or the transfer of the Acquired Assets to the Purchaser (including any rights or claims based on any successor, transferee, derivative, or vicarious liabilities), shall be and hereby are forever barred, estopped, and permanently enjoined from (a) asserting, prosecuting, or otherwise pursuing any Encumbrances against the Purchaser, the property of the Purchaser, or the Acquired Assets transferred to the Purchaser,  (b) interfering with the Purchaser's title to, or use and enjoyment of, the Acquired Assets, and (c) taking any actions or steps in furtherance of items (a) and (b) of this sentence.  All persons and entities are further prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtor to sell and transfer the Acquired Assets to the Purchaser in accordance with the Asset Purchase Agreement, the Transaction Documents, and this Sale Order.

10.     *No Successor, Transferee, or Similar Liability.*   (a) The Purchaser is not a continuation of the Seller and its respective estate, there is not substantial continuity between the Purchaser and the Seller, and there is no continuity of enterprise between the Seller and the Purchaser; (b) the Purchaser is not holding itself out to the public as a continuation of the Debtor or its estate; (c) the transactions do not amount to a consolidation, merger, or de facto merger of

the Purchaser and the Debtor and/or the Debtor's estate; and (d) the Purchaser is not a successor or assignee of the Debtor or its estate for any purpose including, but not limited to, under any federal, state or local statute or common law, or revenue, pension, ERISA, tax, labor, employment, environmental, escheat or unclaimed property laws, or other law, rule or regulation (including. without limitation. filing requirements under any such laws, rules. or regulations), or under any products liability law or doctrine with respect to the Debtor's liability under such law, rule or regulation or doctrine or common law, or under any product warranty liability law or doctrine with respect to the Debtor's liability under such law, rule or regulation or doctrine, and the Purchaser shall have no liability or obligation under the WARN Act, 29 U.S.C. §§ 2101 et seq. or the Comprehensive Environmental Response Compensation and Liability Act and shall not be deemed to be a "successor employer" for purposes of the Internal Revenue Code of 1986, Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act, the Americans with Disability Act, the Family Medical Leave Act, the National Labor Relations Act, the Labor Management Relations Act, the Older Workers Benefit Protection Act, the Equal Pay Act, the Civil Rights Act of 1866 (42 U.S.C. 1981), the Employee Retirement Income Security Act, the Multiemployer Pension Protection Act, the Pension Protection Act, and/or the Fair Labor Standards Act. Except for the Assumed Liabilities and Permitted Encumbrances, (i) the transfer of the Acquired Assets to the Purchaser and (ii) the assumption and assignment to the Purchaser of the Assigned Contracts and Assumed Real Property Interests do not and will not subject the Purchaser to any liability whatsoever with respect to the operation of the Debtor's business before the Closing Date or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based on, in whole or in part, directly or indirectly, any theory of law or equity including, without limitation, any theory of antitrust or

17

successor or transferee liability. The transfer of title and possession of the Acquired Assets shall be free and clear of any Encumbrances (other than Permitted Encumbrances and Assumed Liabilities) pursuant to any successor or successor-in-interest liability theory, and the Purchaser and each of its affiliates, successors, assigns, members, partners, officers, directors, principals, and shareholders shall have no liability whatsoever for any Encumbrances, whether known or unknown, now existing or hereafter arising, whether fixed or contingent, liquidated or unliquidated, asserted derivatively or vicariously, or asserted based on Purchaser's status as a transferee, successor, or otherwise.

11.     Other than Assumed Liabilities and Permitted Encumbrances, the Purchaser is not assuming, and shall not be liable or responsible for, as a successor or otherwise, any liabilities of the Debtor, including any liabilities relating to or arising from the Debtor's ownership or use of the Acquired Assets prior to the Closing Date, any liabilities calculable by reference to the Debtor or its operations, or any liabilities relating to conditions existing on or prior to the Closing Date, which liabilities are hereby extinguished insofar as they may give rise to liability against the Purchaser or any affiliate of the Purchaser.  Except as otherwise provided in the Asset Purchase Agreement, pursuant to sections 105 and 363 of the Bankruptcy Code, all persons—including the Debtor, all debt holders, equity security holders, employees or former employees, governmental entities, lenders, parties to or beneficiaries under any benefit plan, and all other creditors—holding an Encumbrance against, in, or with respect to the Debtor or the Acquired Assets, shall be forever barred and estopped from asserting such Encumbrance, including any right of setoff or subrogation, against the Purchaser or any of its affiliates, successors, assigns, or their respective officers, directors, employees, partners, or representatives, with respect to the Acquired Assets. All persons, governmental entities, and units (as defined in sections 101(27) and 101(41) of the

18

Bankruptcy Code), and all holders of liens based upon or arising out of liabilities retained by the Debtor, may not take any action against the Purchaser or the Acquired Assets to recover on account of any liabilities of the Debtor.

12.     *Release, Discharge, and Termination of Encumbrances.*  This Sale Order shall be effective as a determination that, on the closing of the Sale, all Encumbrances with respect to the Acquired Assets of any kind or nature whatsoever existing prior to the closing of the Transaction have been unconditionally released, discharged, and terminated as to the Acquired Assets (other than the Interests that attach to the net proceeds of the Sale) and that the conveyances described herein have been effected.

13.     *Assumption and Assignment of Assigned Contracts and Assumed Real Property Interests.*  Pursuant to sections 105(a) and 365 of the Bankruptcy Code, the Debtor is authorized to assume and assign the Assigned Contracts and Assumed Real Property Interests to the Purchaser, and the assumption and assignment of such Assigned Contracts and Assumed Real Property Interests is hereby approved.  The Debtor or Purchaser shall pay, or cause to be paid, all Cure Costs related to the Assigned Contracts and Assumed Real Property Interests in accordance with the Asset Purchase Agreement.  For the avoidance of doubt, the Purchaser shall have no obligation to pay the Cure Costs to the counterparties and its only obligation to pay Cure Costs to the Debtor shall be in an amount up to the Cure Cost Cap. Upon the Closing Date, the Debtor and the Purchaser shall be deemed to have cured all defaults under and provided adequate assurance of future performance under the Assigned Contracts and Assumed Real Property Interests within the meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code.

14.     The Cure Costs designated in the notices filed at Docket Nos. 115, 140, and 168 are deemed the amounts necessary to "cure" (within the meaning of Bankruptcy Code section

365(b)(l)) all "defaults" (within the meaning of Bankruptcy Code section 365(b)) under the Assigned Contracts and Assumed Real Property Interests listed thereon. Any objections to such Cure Costs, to the extent not otherwise resolved, are hereby overruled. The Court finds that with respect to all Assigned Contracts and Assumed Real Property Interests, the payment of the Cure Costs, as provided herein and in the Asset Purchase Agreement, is reasonable and appropriate and is deemed to fully and finally satisfy the Debtor's obligations under Bankruptcy Code sections 365(b) and 365(f).

15. Upon assignment of the Assigned Contracts and Assumed Real Property Interests to Purchaser in accordance with the terms of the Asset Purchase Agreement and this Sale Order, the Assigned Contracts and Assumed Real Property Interests shall be deemed valid and binding, in full force and effect in accordance with their terms, and the Debtor shall have no further liability or obligation under such Assigned Contracts and Assumed Real Property Interests. Without limiting the foregoing, each and every provision of the Assigned Contracts and Assumed Real Property Interests or applicable non-bankruptcy law that purport to prohibit  restrict, or condition, or could be construed as prohibiting, restricting, or conditioning, assignment of any Assigned Contracts or Assumed Real Property Interests has been or will be satisfied or is otherwise unenforceable under Bankruptcy Code section 365. Upon the reasonable request of Purchaser, as applicable, all counterparties to the Assigned Contracts and Assumed Real Property Interests shall cooperate and expeditiously execute and deliver, and shall not charge the Debtor or the Purchaser for, any instruments, applications, consents, or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Transaction.

16. Other than with respect to Assumed Liabilities and Permitted Encumbrances, the

Purchaser shall have no liability or obligation for any (a) defaults or breaches under any Assigned Contracts or Assumed Real Property Interests that relate to acts or omissions that occurred in the period, or otherwise arose, prior to the Closing, or (b) claims, counterclaims, offsets, setoffs, or defenses (whether contractual or otherwise, including, any right of recoupment) with respect to any Assigned Contracts or Assumed Real Property Interests that relate to any acts or omissions that arose or occurred prior to the Closing.

17.     The failure of the Debtor or the Purchaser to enforce at any time one or more terms or conditions of any Assigned Contracts or Assumed Real Property Interests shall not be a waiver or amendment of such terms or conditions, or of the Debtor's or Purchaser's respective rights to enforce every term and condition of such Assigned Contracts or Assumed Real Property Interests.

18.     *Continuation of Existing Approvals.*  The Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, certificate of occupancy, registration, and governmental authorization or approval of the Debtor with respect to the Acquired Assets (subject, in each case, to the terms of the Asset Purchase Agreement), and all such licenses, permits, registrations, and governmental authorizations or any other approvals are deemed to have been, and hereby are, directed to be transferred to the Purchaser as of the Closing Date.  To the maximum extent permitted by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend, or in any way challenge or fail to consent to any renewal of any permit or license relating to the operation of the Acquired Assets because of the filing or pendency of the Debtor's chapter 11 case or the consummation of the Transaction.

19.     *General Assignment.*  As of the Closing Date, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Acquired Assets and/or a bill of sale or assignment transferring indefeasible

title and interest in the Acquired Assets to the Purchaser. Each and every federal, state, and local governmental agency or department is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the Transaction and to reflect the effectiveness of the transfer.

20.     *Recording and Release of Liens*.  If any person or entity that has filed financing statements, mortgages, deeds of trust, mechanic's liens, *lis pendens*, or other documents or agreements evidencing interests with respect to the Debtor and/or the Acquired Assets shall not have delivered to the Debtor or Purchaser prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of any Encumbrances which the person or entity has with respect to the Debtor, the Acquired Assets, or otherwise (except Assumed Liabilities and Permitted Encumbrances) then (a) the Purchaser is hereby authorized and directed to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Acquired Assets and (b) the Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of (but not a necessary condition to) the release of all such Encumbrances, against, or with respect to the Debtor and/or the Acquired Assets. This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, and local governmental agency, department, or office. Notwithstanding the foregoing, the provisions of this Sale Order and the transfer of the Acquired Assets to the Purchaser free and clear of all Encumbrances (other than Assumed Liabilities and Permitted Encumbrances) shall be and are self-executing without the necessity of any recording or filing of any document.

21.     *Exemption from Recording, Stamp, and Similar Taxes*.  Notwithstanding anything

to the contrary in the Asset Purchase Agreement, the transactions contemplated by the Asset Purchase Agreement and this Sale Order, and the execution, delivery, and/or recordation of any and all documents or instruments necessary or desirable to consummate the Transaction, are exempt from any and all stamp taxes, and/or sales, transfer, or other similar taxes, and any transfer fees or other similar costs incurred or assessed by any federal, state, local, or foreign taxing authority (including interest and penalties, if any) to the maximum extent permitted by applicable law, including section 1146 of the Bankruptcy Code.  Pursuant to sections 105(a) and 363 of the Bankruptcy Code, all governmental units and persons (as defined in sections 101(27) and 101(41) of the Bankruptcy Code, respectively) are hereby enjoined from taking any action against the Purchaser or the Acquired Assets to recover any claim which such person or governmental unit has or may assert against the Debtor (as such claims exist immediately prior to the Closing Date) relating to a stamp, transfer tax, or similar tax arising from the transfer of the Acquired Assets to the Purchaser.  The so-called "bulk sales," "bulk transfer," or other similar laws (i) do not apply to the transactions contemplated by the Asset Purchase Agreement and this Sale Order and the execution, delivery, and/or recordation of any and all documents or instruments necessary or desirable to consummate the Transaction or (ii) the Debtor complied with such laws.

22.     *Good Faith of the Purchaser.*  The Transaction specified in the Asset Purchase Agreement and herein is undertaken by the Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Transaction contemplated by the Asset Purchase Agreement shall not affect the validity of the sale.  The Purchaser is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

23

23. *No Avoidance of Asset Purchase Agreement.*  Neither the Debtor nor the Purchaser have engaged in any conduct that would cause, allow or permit the Asset Purchase Agreement to be avoided or for costs and damages to be imposed under section 363(n) of the Bankruptcy Code. Accordingly, the Asset Purchase Agreement and the Transaction contemplated thereby shall not be avoidable under section 363(n) of the Bankruptcy Code,  and  no party shall be entitled to any damages or other recovery pursuant to section 363(n) of the Bankruptcy Code in respect of the Asset Purchase Agreement.

24. *Clay County Appraisal District*.  Notwithstanding anything in this Sale Order or the Asset Purchase Agreement, the secured taxes for tax years 2025 and 2026 (the "**Clay CAD Tax Claims**") owing to Clay County Appraisal District ("**Clay CAD**") shall remain attached to the taxable property until the Clay CAD Tax Claims are paid in full. The Debtor shall pay the 2025 taxes in full at closing together with applicable statutory interest. In the event that any of the 2025 Clay CAD Tax Claims are disputed, funds sufficient to pay the disputed Clay CAD Tax Claim, along with applicable interest, shall be placed in a segregated account and shall not be paid to any other party until the dispute is resolved by agreement of the parties or by order of this Court.  The Purchaser shall assume full responsibility for the 2026 taxes and shall pay the 2026 taxes in full when due.  If not timely paid, the Clay CAD may proceed with non-bankruptcy collections against the Purchaser and the property, without leave or approval of the Court. All parties' rights to object to the priority, validity, amount and extent of the Clay CAD Tax Claims and the asserted liens are fully preserved.

25. Real and personal property Taxes and assessments shall be prorated between the Debtor and Purchaser as provided in the Asset Purchase Agreement.

26. *GE Vernova International LLC*. Notwithstanding the foregoing, and based upon

24

representations made on the record by counsel for the parties, the Court finds that (i) the Debtor has received and properly applied all liquidated damages credits or other credits to which it is entitled under the GEVI Agreement (hereinafter defined) for the reference period of January 1, 2025 - December 31, 2025; (ii) the Debtor has paid all amounts due to GE Vernova International LLC ("**GEVI**") under the GEVI Agreement through the date of entry of this Order; (iii) there are no defaults, pending disputes, or other claims held by the parties arising under or related to the GEVI Agreement with respect to the application of liquidated damages credits and payments referenced in the preceding (i) and (ii); and (iv) the Debtor has provided GEVI with adequate assurance of future performance by the Purchaser.  On that basis, GEVI announced its withdrawal of its Limited Objection to Cure Amount [Doc. No. 155] and Response to Notice of Stalking Horse Bidder [Doc. No. 156].   Accordingly, the Debtor is authorized to assume and assign to the Purchaser (i) the Full Service Agreement dated October 1, 2019 (as amended, "**GEVI Agreement**"), by and between the Debtor and GEVI (formerly known as General Electric International, Inc.), and (ii) the Contract for Sale of Power Generation Equipment and Related Services Dated July 18, 2014 (as amended).   The Purchaser shall assume all obligations arising under the GEVI Agreement on the Closing Date.

27.     *Payment of Prepetition Secured Obligations.*  On the Closing Date, the Debtor shall satisfy the Allowed Prepetition Secured Obligations (as defined in the *Amended Combined Disclosure Statement and Chapter 11 Plan* [Docket No. 209]) from the proceeds of the Transaction.

28.     *Binding Effect.*  This Sale Order and the Asset Purchase Agreement shall be binding upon and shall govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of

25

deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Acquired Assets.  The terms and provisions of the Asset Purchase Agreement, the Transaction Documents, the Bidding Procedures Order, and this Sale Order shall be binding in all respects upon the Debtor and its affiliates and subsidiaries and such parties' successors and assigns, the Debtor's estate, all creditors thereof (whether known or unknown), all holders of equity interests in the Debtor, holders of Encumbrances in, against, or on all or any portion of the Acquired Assets, all non-Debtor parties to the Acquired Assets, the Purchaser, and their respective successors and assigns, and any and all third parties, notwithstanding any subsequent appointment of any trustee, examiner, "responsible person" or other fiduciary (collectively, the "**Trustee**") of the Debtor under any chapter of the Bankruptcy Code, as to which Trustee such terms and provisions likewise shall be binding, and the Asset Purchase Agreement (including the Acquired Assets) shall not be subject to rejection or avoidance under any circumstances.

29.     *Subsequent Order and Plan Provisions.*  Notwithstanding anything to the contrary contained in any chapter 11 plan confirmed in the Debtor's chapter 11 case or any subsequent order of this Court, including, without limitation, any order confirming any such chapter 11 plan, any order authorizing the sale of assets of the Debtor pursuant to any section of the Bankruptcy Code, and any order approving the wind-down or dismissal of the Debtor's chapter 11 case or any subsequent chapter 7 case, nothing in such plan or order shall change, supersede, abrogate, nullify, restrict, or conflict with the provisions of the Asset Purchase Agreement, the Transaction Documents, or this Sale Order, or in any way prevent or interfere with the consummation or

performance of the Transaction contemplated therein.  All net proceeds of the Sale shall be subject to and distributed in accordance with the terms of any chapter 11 plan confirmed in the Debtor's case. Notwithstanding anything herein or in any chapter 11 plan to the contrary or the Asset Purchase Agreement, at the Closing, the Debtor shall cause the Escrow Agent (as defined in the Asset Purchase Agreement) to retain from the Deposit (as defined in the Asset Purchase Agreement) an amount to be agreed by the Purchaser and the Debtor prior to Closing (which amount shall, in no event, be more than $200,000.00) (the "**Post-Closing Credits Adjustment Fund**") to secure Seller's obligations under Section 2.3(i) of the Asset Purchase Agreement; provided Purchaser shall have a valid and automatically perfected first-priority security interest in the Post-Closing Credits Adjustment Fund solely to the extent necessary to secure payment of any Post-Closing Adjustment ultimately determined to be owing to Purchaser pursuant to Section 2.3 of the Asset Purchase Agreement,  which funds may be held by the Escrow Agent. Within five (5) Business Days (as defined in the Asset Purchase Agreement) following the Seller's delivery of a Statement of Objections (if any) pursuant to Section 2.3(e) of the Asset Purchase Agreement, any excess funds in the Post-Closing Credits Adjustment Fund which are not needed to satisfy any Post-Closing Adjustment (as defined in the Asset Purchase Agreement) payable or purportedly payable to Purchaser (if any) and which are not subject to a good-faith dispute shall be distributed to the Debtor or the Liquidation Trust under the Debtor's confirmed chapter 11 plan (as applicable), free and clear of any claims or liens of the Purchaser. Any excess amounts remaining in the Post-Closing Adjustment Fund following the payment of any Post-Closing Adjustment to the Purchaser shall be distributed to the Debtor or the Liquidation Trust under the Debtor's confirmed chapter 11 plan (as applicable), free and clear of any claims or liens of the Purchaser and Purchaser's security interest therein shall automatically terminate without further action by

any party as soon as reasonably practicable following such payment to the Purchaser. Any dispute over the amount or existence of any Post-Closing Adjustment shall be resolved pursuant to the procedures provided in Section 2.3 of the Asset Purchase Agreement. Purchaser shall have no allowed administrative expense claim, secured claim, deficiency claim, or other recourse against the Debtor, the Liquidation Trust, or any assets thereof with respect to any Post-Closing Adjustment except solely from the Post-Closing Credits Adjustment Fund. At Closing, subject to reconciliation under Section 2.4 of the Asset Purchase Agreement, the Closing Date Payment shall be increased or decreased by the net amount of the prorations determined pursuant to Section 2.4 of the Asset Purchase Agreement.

30.     *Failure to Specify Provisions.*   The failure to specify or include any particular provisions of the Asset Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of this Court that the Asset Purchase Agreement and the assignment of the Acquired Assets be authorized and approved in their entirety.

31.     *Automatic Stay.*   The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted to the extent necessary to (i) allow the Purchaser to deliver any notice provided for in the Asset Purchase Agreement, (ii) allow the Purchaser to take any actions to enforce the Asset Purchase Agreement and (iii) allow the Purchaser to take any and all actions permitted under the Asset Purchase Agreement in accordance with the terms and conditions thereof.  The automatic stay imposed by section 362 of the Bankruptcy Code shall be modified solely to the extent necessary to implement the preceding sentence, and this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

32.     *Bankruptcy Rules Satisfied or Waived.*   The requirements set forth in Bankruptcy Rules 6004 and 6006 have been satisfied or are otherwise deemed to be waived.  The terms of this

Sale Order shall be effective and enforceable immediately upon entry, and shall not be subject to stay provisions contained in Bankruptcy Rules 6004(h) and 6004(d).  Time is of the essence in closing the Transaction and the Debtor and the Purchaser intend to close the sale as soon as possible.

33.     *Conflicts Between Order and Asset Purchase Agreement.*  To the extent anything contained in this Sale Order conflicts with a provision in the Asset Purchase Agreement or Transaction Documents, this Sale Order shall govern and control.  Notwithstanding the foregoing, nothing in this Sale Order shall modify or waive any closing conditions or termination rights in the Asset Purchase Agreement, and all such conditions and rights shall remain in full force and effect in accordance with their terms.

34.     *Provisions Nonseverable and Mutually Dependent.*  The provisions of this Sale Order, the Asset Purchase Agreement, and the Transaction Documents are non-severable and mutually dependent.

35.     *Retention of Jurisdiction.*  This Court shall retain exclusive jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of the Asset Purchase Agreement, the Transaction Documents, the Bidding Procedures Order, and this Sale Order, and each of the agreements executed in connection therewith to which the Debtor is a party or which has been assigned to the Purchaser by the Debtor, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Transaction, the Assigned Contracts, the Assumed Real Property Interests, or the Acquired Assets.  This Court retains jurisdiction to compel delivery of the Acquired Assets, to protect the Purchaser and its assets, including the Acquired Assets, against any Encumbrances or successor or transferee liability and to enter orders, as appropriate, pursuant to sections 105(a), 363, or 365 (or other applicable sections) of the

Bankruptcy Code necessary to transfer the Acquired Assets to the Purchaser.  In the event this Court abstains from exercising or declines to exercise jurisdiction with respect to any matter referenced in this paragraph or is without jurisdiction, such abstention, refusal, or lack of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.

36.     *Conditions Precedent.*   Neither the Purchaser nor the Debtor shall have an obligation to close the Transaction until all conditions precedent in the Asset Purchase Agreement to each of their respective obligations to close the Transaction have been satisfied or waived in accordance with the terms of the Asset Purchase Agreement.

Signed: June 03, 2026

Alfredo R Pérez
United States Bankruptcy Judge

**EXHIBIT 1**

**ASSET PURCHASE AGREEMENT**

by and between

**1370 CLEAN ENERGY LLC,**

as Purchaser,

and

**SHANNON WIND, LLC,**

as Seller

**DATED AS OF APRIL 29, 2026**

Table of Contents

Page

ARTICLE I PURCHASE AND SALE OF ACQUIRED ASSETS;  ASSUMPTION OF
ASSUMED LIABILITIES..................................................................................................1
    Section 1.1    Purchase and Sale of the Acquired Assets ...................................................1
    Section 1.2    Excluded Assets ..........................................................................................3
    Section 1.3    Assumed Liabilities ....................................................................................4
    Section 1.4    Excluded Liabilities ....................................................................................6
    Section 1.5    Assumption/Rejection of Certain Contracts ...............................................6

ARTICLE II PURCHASE PRICE; DEPOSIT; ADJUSTMENT; PRORATIONS; AND
CLOSING ........................................................................................................................7
    Section 2.1    Purchase Price..............................................................................................7
    Section 2.2    Deposit .........................................................................................................7
    Section 2.3    Purchase Price Adjustment ..........................................................................9
    Section 2.4    Prorations ...................................................................................................11
    Section 2.5    Closing .......................................................................................................12
    Section 2.6    Closing Deliveries by Seller .....................................................................12
    Section 2.7    Closing Deliveries by Purchaser................................................................13
    Section 2.8    Closing Deliveries by Escrow Agent. ........................................................14
    Section 2.9    Withholding ...............................................................................................14

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER...............................14
    Section 3.1    Organization and Qualification..................................................................15
    Section 3.2    Authorization of Agreement ......................................................................15
    Section 3.3    Conflicts; Consents ....................................................................................15
    Section 3.4    Title to Assets ............................................................................................15
    Section 3.5    Assigned Contracts and Assumed Real Property Interests........................15
    Section 3.6    Brokers.......................................................................................................16
    Section 3.8    No Other Representations or Warranties ...................................................16

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER.......................16
    Section 4.1    Organization and Qualification..................................................................16
    Section 4.2    Authorization of Agreement ......................................................................17
    Section 4.3    Governmental Approvals............................................................................17
    Section 4.4    Conflicts; Consents ....................................................................................17
    Section 4.5    No Foreign Government Ownership............................................................18
    Section 4.6    Sufficiency of Funds .................................................................................18
    Section 4.7    Brokers.......................................................................................................18
    Section 4.8    Solvency.....................................................................................................18
    Section 4.9    ERCOT Representations .............................................................................19
    Section 4.10    AS IS, WHERE IS BASIS........................................................................19
    Section 4.11    No Other Representations or Warranties ...................................................20

ARTICLE V COVENANTS AND AGREEMENTS ................................................................20
    Section 5.1    Conduct of Seller .......................................................................................20
    Section 5.2    Bankruptcy Actions ...................................................................................21

i

Table of Contents (continued)

| | | Page |
|---|---|---|
| Section 5.3 | Alternative Transactions | 24 |
| Section 5.4 | Cure Costs | 25 |
| Section 5.5 | Sale Order | 25 |
| Section 5.6 | Bankruptcy Court Milestones | 25 |
| Section 5.7 | Approval | 25 |
| Section 5.8 | Further Assurances | 25 |
| Section 5.9 | Tax Matters | 26 |
| Section 5.10 | Access to Information | 27 |
| Section 5.11 | ERCOT and QSE Covenants | 28 |
| Section 5.12 | CFIUS | 29 |
| Section 5.13 | Title Insurance | 30 |
| Section 5.14 | Insurance Claims and Proceeds | 30 |
| **ARTICLE VI CONDITIONS TO CLOSING** | | 31 |
| Section 6.1 | Conditions Precedent to the Obligations of Purchaser and Seller | 31 |
| Section 6.2 | Conditions Precedent to the Obligations of Purchaser | 31 |
| Section 6.3 | Conditions Precedent to the Obligations of Seller | 32 |
| Section 6.4 | Waiver of Conditions | 32 |
| **ARTICLE VII TERMINATION** | | 32 |
| Section 7.1 | Termination of Agreement | 32 |
| Section 7.2 | Effect of Termination | 34 |
| **ARTICLE VIII MISCELLANEOUS** | | 35 |
| Section 8.1 | Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers | 35 |
| Section 8.2 | Expenses | 36 |
| Section 8.3 | Notices | 36 |
| Section 8.4 | Binding Effect; Assignment | 37 |
| Section 8.5 | Amendment and Waiver | 37 |
| Section 8.6 | Third-Party Beneficiaries | 38 |
| Section 8.7 | Non-Recourse | 38 |
| Section 8.8 | Severability | 38 |
| Section 8.9 | Construction | 38 |
| Section 8.10 | Complete Agreement | 38 |
| Section 8.11 | Jurisdiction and Exclusive Venue | 39 |
| Section 8.12 | Governing Law; Waiver of Jury Trial | 39 |
| Section 8.13 | No Right of Set-Off | 40 |
| Section 8.14 | Counterparts and PDF | 40 |
| Section 8.15 | Publicity | 40 |
| Section 8.16 | Bulk Sales Laws | 40 |
| Section 8.17 | Fiduciary Obligations | 41 |
| Section 8.18 | Seller's Representative | 41 |
| Section 8.19 | Disclosure Schedules. | 41 |
| Section 8.20 | Releases | 42 |
| Section 8.21 | Mutual Drafting | 42 |

ii

Table of Contents

Table of Contents (continued)

Page

ARTICLE IX ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS ...................43
    Section 9.1    Certain Definitions.................................................................................43
    Section 9.2    Rules of Interpretation ...........................................................................53

iii

Table of Contents

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of April 29, 2026, is made by and between, 1370 Clean Energy LLC, a Delaware series limited liability company ("Purchaser") and Shannon Wind, LLC, a Delaware limited liability company ("Seller"). Purchaser and Seller are referred to herein individually as a "Party" and together as the "Parties." Capitalized terms used herein shall have the meanings set forth herein including Article IX.

WHEREAS, Seller has filed a voluntary petition and commenced a case (the "Chapter 11 Case") under chapter 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court");

WHEREAS, Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from Seller, and Seller desires to sell, convey, assign, and transfer to Purchaser, the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and subject to the entry and terms of the Sale Order; and

WHEREAS, in connection with the Chapter 11 Case and subject to the terms and conditions contained herein, following entry of the Sale Order finding Purchaser as the Successful Bidder at the Auction, Seller shall sell and transfer to Purchaser, and Purchaser shall purchase and acquire from Seller, pursuant to, *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, the Acquired Assets, and Purchaser shall assume from Seller the Assumed Liabilities, all as more specifically provided herein and in the Sale Order.

NOW, THEREFORE, in consideration of the agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties hereby agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF ACQUIRED ASSETS;
## ASSUMPTION OF ASSUMED LIABILITIES

**Section 1.1** **Purchase and Sale of the Acquired Assets**. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Sale Order at the Closing, Seller shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Seller, all of Seller's right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances. "Acquired Assets" means all of Seller's right, title and interest in and to the assets, properties and rights of Seller, to the extent such assets, properties, and rights relate to or arise out of the operation of Seller's wind energy project in Clay County, Texas (the "Project"):

(a)	Subject to modification in accordance with Section 1.5, all Contracts listed on Section 1.1(a) of the Disclosure Schedules (collectively, the "Assigned Contracts") and all rights and benefits thereunder;

(b)	The wind turbine generator equipment as more particularly described in Section 1.1(b) of the Disclosure Schedules and all related equipment and infrastructure, including blades, nacelles, towers and foundations;

(c)	All roads owned by Seller, if any;

(d)	All monitoring and metering equipment at the substation used in connection with the Project;

(e)	All of Seller's rights in and to any software and hardware used in connection with or located at the Project, if any;

(f)	All cables, converters, transformers, collection and transmission lines, interconnect, and similar equipment and electrical infrastructure used in connection with the Project;

(g)	All forklifts identified on Section 1.1(g) of the Disclosure Schedules;

(h)	All spare parts of Seller located at and which relate to the Project, to be substantially similar to those referenced in Seller's 2026 Unaudited Consolidated Balance Sheet;

(i)	All goodwill which relates to the Acquired Assets and the Project;

(j)	The real estate leases (the "Real Estate Leases") and the easement (the "Easement") described on Section 1.1(j) of the Disclosure Schedules (collectively, the "Assumed Real Property Interests"), and together with (to the extent of Seller's interest therein) the buildings, fixtures and improvements, including tenant improvements, located on or attached to the underlying real property, the substation used in connection with the Project, and all rights and benefits arising thereunder, and all tenements, hereditaments, appurtenances and other real property rights appertaining thereto;

(k)	Except for prepaid insurance, prepaid bank fees, retainers held by Seller's Representatives to secure payment for services rendered or to be rendered to Seller, prepaid board member fees, and deposits for utilities used in connection with the Acquired Assets, all prepaid expenses, credits, advance payments, security, deposits, charges, sums and fees of Seller to the extent related to the Acquired Assets, including any and all Annual Land Fees for which Purchaser has paid Seller pursuant to Section 2.3 hereof;

(l)	Solely to the extent transferable, all Permits issued to, or for the benefit of, Seller, all rights and benefits thereunder, and all pending applications or filings therefor and renewals thereof, which relate to the Project and which include the material Permits set forth on Section 1.1(l) of the Disclosure Schedules;

(m)      All Accounts Receivable which relate to the Acquired Assets or the Project, including (i) all GE Liquidated Damages and (ii) ERCOT Short-Pay Amounts, owed to or accruing for the benefit of Seller as of the Closing;

(n)      All Renewable Energy Credits;

(o)      A copy of the books and records of Seller which relate to the Acquired Assets or the Assumed Liabilities in the possession or reasonable control of the Chief Restructuring Officer of Seller (including, to the extent relevant, any Tax Returns and other Tax records relating primarily to the Acquired Assets or Assumed Liabilities to the extent that such information is reasonably necessary for Purchaser to prepare and/or file its Tax Returns and pay its Taxes and is in the possession or reasonable control of the Chief Restructuring Officer of Seller);

(p)      All rights under or pursuant to all warranties, representations and guarantees made by vendors, suppliers, manufacturers, contractors and any other Person to the extent relating to products sold, or services provided, to Seller in connection with the Project or to the extent affecting any Acquired Assets, other than any warranties, representations and guarantees pertaining to any Excluded Assets;

(q)      All claims, rights, or interests to any refund, credit, rebate, abatement or other recovery for Taxes which are capable of being conveyed, and any other Tax assets (including any Tax attributes) which are capable of being conveyed, together with any interest due thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof) related to the Acquired Assets or Assumed Liabilities, which, for the avoidance of doubt, shall exclude any Tax assets (including any Tax attributes) attributable to the Acquired Assets for a Pre-Closing Tax Period reflected on or which would reasonably be expected to be reflected on a Consolidated Tax Return;

(r)      All rights to applicable claims and proceeds under any insurance policies , solely to the extent relating to damage to the Acquired Assets occurring after the date hereof and prior to the Closing, and only to the extent such proceeds are actually received by Seller (or credited at Closing) (the "**Insurance Claims**"), provided, that (i) Seller shall retain all rights to insurance claims and proceeds in respect of any occurrences prior to the date hereof (which, for the avoidance of doubt, include all insurance claims related to Winter Storm Uri), and (ii) Seller shall have the right to control the adjustment, settlement and collection of any such Insurance Claims, subject to the provisions of Section 5.14; and

(s)      All other assets of Seller (other than Excluded Assets and Excluded Liabilities) which relate to Acquired Assets or the Project.

Section 1.2     **Excluded Assets**. Notwithstanding anything to the contrary in this Agreement, in no event shall Seller be deemed to sell, transfer, assign, convey or deliver, and Seller shall retain all right, title and interest to, in and under any assets, properties, and rights of Seller other than the Acquired Assets (collectively, the "Excluded Assets"). Excluded Assets mean and include only the following items:

(a)      All cash and cash equivalents, bank accounts, trust accounts held for Seller's benefit, and securities of Seller and all rights to applicable proceeds therefrom;

3

(b) All Accounts Receivable of Seller to the extent not related to the Acquired Assets or the Project;

(c) All of Seller's rights under this Agreement and any other Transaction Document;

(d) All records pertaining to the organization or existence of Seller, other than those that are necessary for operation of the Project, and a copy of the books and records of Seller which relate to the Acquired Assets or the Assumed Liabilities in the possession or reasonable control of the Chief Restructuring Officer of Seller or the current asset manager of the Project which are needed for the limited purpose of winding-down and terminating the organization or existence of Seller;

(e) All of Seller's rights under any Excluded Asset;

(f) All avoidance claims and causes of action available to Seller under chapter 5 of title 11 of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code or under similar or related state or federal statutes and common law, other than any such claims and causes of action that are against either (a) the Purchaser or Purchaser's Affiliates or (b) any counterparties to any Assigned Contracts or any such counterparty's Affiliates;

(g) All Contracts for utilities which relate to the Project;

(h) All other Contracts to which Seller is a party other than the Assigned Contracts or Assumed Real Property Interests;

(i) All insurance policies of Seller and all rights to applicable claims and proceeds thereunder (other than rights to applicable Insurance Claims);

(j) All prepaid insurance premiums, prepaid bank fees, retainers held by Seller's Representatives to secure payment for services rendered or to be rendered to Seller, prepaid board member fees, and deposits for utilities used in connection with the Acquired Assets;

(k) All Tax assets (including duty and Tax refunds and prepayments) of Seller Tax Group, Seller, or any Affiliate thereof for any taxable period (or portion thereof) ending on or before the Effective Time, to the extent not described in Section 1.1(q); and

(l) Any and all defenses, claims, causes of actions, choses in action, rights of recovery, and counterclaims of Seller, whether or not arising under or in respect of any contracts, torts, or otherwise, whether known or unknown, accrued or contingent, other than those defenses, claims, causes of action, choses in action, rights of recovery, and counterclaims that are primarily related to or arise from (i) any Acquired Asset set forth in 1.1(a) through (r), (ii) any of the Assumed Liabilities, and (iii) any Assigned Contract or Assumed Real Property Interest; provided Seller retains all other claims.

**Section 1.3     Assumed Liabilities**. On the terms and subject to the conditions set forth herein and in the Sale Order effective as of the Closing, Purchaser shall irrevocably assume from Seller (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance

4

with their respective terms), and Seller shall transfer, assign, convey, and deliver to Purchaser the following Liabilities, to be assumed exclusively as they relate to the Acquired Assets or Project (collectively, the "Assumed Liabilities"):

(a)    all Liabilities arising out of or relating to the ownership and operation of the Acquired Assets or Project, not to include debt-like or financing liabilities, solely to the extent such Liabilities arise on or after the Effective Time, including without limitation (i) all trade accounts payable of Seller to third parties in connection with the Project that remain unpaid as of the Effective Time, and (ii) all Liabilities arising under or relating to the Assigned Contracts;

(b)    All Decommissioning Obligations first arising at or after the Closing;

(c)    All reclamation-related Liabilities existing, reclamation obligations to be performed, and reclamation activities required, in each case, arising at any time and from time to time after the Closing which arise from or relate to the Acquired Assets or the Project;

(d)    All valid contract-related cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts and Assumed Real Property Interests (collectively, the "Cure Costs") in an amount not to exceed the Cure Cap;

(e)    All Liabilities for Taxes (including filing requirements and the payment thereof) attributable to the Acquired Assets for a taxable period (or portion thereof) beginning at or after the Effective Time;

(f)    All Transfer Taxes for which Purchaser is responsible (as described in Section 5.9);

(g)    All Liabilities arising from and after the Effective Time in connection with the Project's participation in the market administered by ERCOT, including:

(i)    All settlement statements, invoices, and charges (including resettlements) to the extent attributable to intervals from and after the Effective Time;

(ii)    All imbalance energy, deviation, and related charges incurred from and after the Effective Time;

(iii)    All Liabilities under any QSE agreement applicable to Purchaser following Closing (including the QSE Agreement described in Section 5.11(a)); and

(iv)    All obligations to post or maintain collateral or other credit support required for post-Closing market participation;

(h)    All Liabilities arising from and after the Closing relating to Renewable Energy Credits generated by the Project, including obligations to transfer, deliver, or retire

5

Renewable Energy Credits to the extent associated with generation from and after the Effective Time, including under any Assigned Contracts; and

(i)      All Liabilities arising from and after the Closing under any Permits assigned to Purchaser, including ongoing compliance obligations.

**Section 1.4**    **Excluded Liabilities**. Except for the Assumed Liabilities, Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of Seller other than the Assumed Liabilities set forth in Section 1.3 (collectively, the "Excluded Liabilities").

**Section 1.5**    **Assumption/Rejection of Certain Contracts**.

(a)      Pursuant to the terms of the Bidding Procedures Order, Seller has or shall provide timely and proper written notice of the proposed sale and assignment of Contracts as contemplated herein to all parties to any executory Contracts or unexpired leases to which Seller is a party that Seller in its discretion believes may be Assigned Contracts and Assumed Real Property Interests, or that Purchaser may designate as Assigned Contracts and Assumed Real Property Interests, and Seller shall take all other actions reasonably necessary to cause such Contracts and Assumed Real Property Interests to be assumed by Seller pursuant to Section 365 of the Bankruptcy Code and assigned to Purchaser to the extent that such Contracts are Assigned Contracts or Assumed Real Property Interests at the Closing. The Sale Order shall provide that as of and conditioned on the occurrence of the Closing, Seller shall assign or cause to be assigned to Purchaser the Assigned Contracts and Assumed Real Property Interests, each of which shall be identified by the name or appropriate description and date of the Assigned Contract and Assumed Real Property Interest (if available), the other party to the Assigned Contract and the address of such party for notice purposes, all included in a notice or notices filed with the Bankruptcy Court (the "Cure Notice"). The Cure Notice shall also set forth Seller's estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts and Assumed Real Property Interests as determined by Seller based on its books and records or as otherwise determined by the Bankruptcy Court. Any disputes regarding the amounts necessary to cure defaults under Assigned Contracts and Assumed Real Property Interests shall be resolved pursuant to the procedures set forth in the Bidding Procedures Order, as provided in the Sale Order, or as otherwise agreed by the Purchaser, the Seller, and the affected counterparty. Notwithstanding anything to the contrary contained herein, from time to time prior to the Closing, Seller and Purchaser may, by mutual agreement, (i) agree to amend, supplement, waive, or otherwise modify the terms of any Assigned Contract or Assumed Real Property Interest (including in connection with obtaining any required consent or resolving any cure or adequate assurance issues) or (ii) agree on revised cure amounts or other economic adjustments with respect thereto; provided, however, that (A) no such agreement shall impose any additional liabilities or obligations on Seller or Purchaser following the Closing without such Party's prior written consent, (B) any such modification shall be reflected in an updated Cure Notice or other filing with the Bankruptcy Court to the extent required, and (C) Seller shall not be required to agree to any such modification that would reasonably be expected to adversely affect Seller or its estates. At the Closing, Seller shall, pursuant to the Sale Order, an Assignment and Assumption Agreement (as defined in Section 2.6(c)), an Assignment and Assumption of Interconnection Agreement (as defined in Section 2.6(d)), an Assignment and Assumption of Leases (as defined in Section 2.6(e)) and an Assignment and Assumption of

Easement (as defined in Section 2.6(f)), assign to Purchaser (the consideration for which is included in the Purchase Price), all Assigned Contracts and Assumed Real Property Interests that may be assigned by Seller to Purchaser pursuant to sections 363 and 365 of the Bankruptcy Code.

(b)     Seller shall transfer and assign, or shall cause to be transferred or assigned, all Assigned Contracts and Assumed Real Property Interests to Purchaser, and Purchaser shall assume all Assigned Contracts and Assumed Real Property Interests, as of the Effective Time pursuant to section 365 of the Bankruptcy Code and the Sale Order. Promptly following submission of this Agreement by Purchaser, Seller shall provide a schedule of estimated cure costs for each of its Contracts.  The actual amount of the Cure Costs shall be set forth on the Closing Statement (defined in Section 2.3(a)) in an amount consistent with the Cure Notice, as determined by the Bankruptcy Court pursuant to the Bidding Procedures Order, or as otherwise agreed by the Purchaser, the Seller, and the affected counterparty.

(c)     Purchaser shall have the right to notify Seller in writing of any Assigned Contract (other than purchase orders) or Assumed Real Property Interests that it does not wish to assume up to two (2) Business Days prior to the Closing and any such previously considered Assigned Contract that Purchaser no longer wishes to assume shall be automatically deemed removed from the Disclosure Schedules related to Assigned Contracts and automatically deemed added to the Excluded Assets, in each case, without any adjustment to the Purchase Price. Purchaser shall be solely responsible for the payment, performance and discharge when due of the Liabilities under the Assigned Contracts and Assumed Real Property Interests that are Assumed Liabilities or otherwise arise from the time of and after the Closing in respect of the Assigned Contracts and Assumed Liabilities.

(d)     Notwithstanding anything to the contrary in this Agreement, a Contract shall not be assigned to, or assumed by, Purchaser to the extent that such Contract has been, prior to the date hereof, rejected by Seller in accordance with the terms hereof or validly terminated by Seller, or any party thereto, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract hereunder and is not continued or otherwise extended upon assumption.

## ARTICLE II
## PURCHASE PRICE; DEPOSIT; ADJUSTMENT; PRORATIONS; AND CLOSING

**Section 2.1     Purchase Price**. The aggregate purchase price for the Acquired Assets shall be one hundred and twenty-nine million and five hundred thousand United States Dollars ($129,500,000) (the "Closing Date Payment"), subject to the adjustments pursuant to Section 2.3 hereof (the "Purchase Price"), *plus* the amount of any Unused Cure Cap, and the assumption of the Assumed Liabilities. The Purchase Price is subject to the prorations set forth in Section 2.4 and shall be paid as provided in Section 2.7(a).

**Section 2.2     Deposit**.

(a)     Purchaser has made or will, within two (2) Business Days of the date hereof, make an earnest money deposit with Verita Global, LLC (the "Escrow Agent") in a cash amount equal to 10% of the Closing Date Payment (the "Deposit"), by wire transfer of immediately

available funds for deposit into a separate, segregated, interest bearing escrow account maintained by Escrow Agent in accordance with the Bidding Procedures Order. The Deposit (together with any and all interest thereon) shall be applied against payment of the Closing Date Payment on the Closing Date.

(b)  If, prior to the Closing, this Agreement has been terminated by Seller pursuant to Section 7.1(d) or Section 7.1(f), in each case in circumstances where Seller would be entitled to terminate this Agreement pursuant to Section 7.1(d) or Section 7.1(f), then the Deposit together with all interest thereon, if any, shall be paid or transferred to Seller.

(c)  If, prior to the Closing, this Agreement has been terminated by any Party, other than as contemplated by Section 2.2(b), then the Deposit, together with all received investment income, if any, shall promptly, but in any event within five (5) Business Days after such termination hereof, be returned to Purchaser.

(d)  The Parties agree that Seller's right to retain the Deposit, as set forth in Section 2.2(b), solely for purposes of establishing the basis for the Deposit, and without in any way increasing the amount of the Deposit or expanding the circumstances in which the Deposit may be retained or received by Seller, is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Seller for its efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Transaction, which amount would otherwise be impossible to calculate with precision.

(e)  If (i) Seller is entitled to the Deposit pursuant to Section 2.2(b) hereof; or (ii) the Closing occurs, the Parties shall promptly, but in any event within five (5) Business Days after such termination hereof or on the date of the Closing, as applicable, deliver joint written instructions to Escrow Agent directing Escrow Agent to transfer to Seller by wire transfer of immediately available funds the entire amount of the Deposit (together with any and all interest thereon, if any) to such account(s) as may be designated by Seller.

(f)  If Purchaser is entitled to the Deposit as contemplated by Section 2.2(c), the Parties shall promptly, but in any event within five (5) Business Days after such termination hereof, deliver joint written instructions to Escrow Agent directing Escrow Agent to transfer to Purchaser by wire transfer of immediately available funds the entire amount of the Deposit (together with any and all interest thereon, if any) to such account(s) as may be designated by Purchaser.

(g)  The right to retain or receive payment of the Deposit shall be the sole and exclusive remedy of Seller and any of its respective, direct or indirect, former, current or future general or limited partners, managers, members, stockholders, officers, directors, Affiliates, employees, representatives, agents, successors and assigns (collectively, the "Seller Related Parties") against Purchaser and any of its respective, direct or indirect, former, current or future general or limited partners, managers, members, stockholders, officers, directors, Affiliates, employees, representatives, agents, successors and assigns (collectively, the "Purchaser Related Parties"), including for any Damages or other Liability of any kind suffered as a result of any breach of any representation, warranty, covenant or agreement in this Agreement, and upon such termination and retaining or payment of the Deposit none of the Purchaser, or any of the Purchaser

Related Parties shall have any further liability or obligation relating to or arising out of this Agreement including any knowing and intentional breach of any representation, warranty, covenant or agreement by any Purchaser Related Party or the failure of the transaction contemplated herein to be consummated. Notwithstanding anything herein to the contrary, if the Purchaser fails to effect the Closing for any or no reason or otherwise breaches this Agreement or fails to perform hereunder (in any case, whether willfully, intentionally, unintentionally or otherwise) the Seller Related Parties sole and exclusive remedy (whether at law, in equity, in contract, in tort or otherwise) against any Purchaser Related Party shall be to (i) terminate this Agreement and retain or receive the Deposit as provided in this Section 2.2, or (ii) to seek specific performance, injunctive relief, or other equitable remedies from a court of competent jurisdiction to compel Purchaser to consummate the Closing in accordance with the terms hereof. Notwithstanding anything to the contrary set forth in this Agreement, while the Seller Related Parties may be entitled to seek payment of all or any portion of the Deposit and the remedy of specific performance prior to the time at which a termination of this Agreement has occurred, under no circumstances shall the Seller be entitled to pursue the remedy of specific performance after a valid termination of this Agreement has occurred pursuant to Article VII.

**Section 2.3    Purchase Price Adjustment**.

(a)    At least five (5) Business Days before Closing, Seller shall prepare and deliver to Purchaser a statement (the "Closing Statement"), which shall be calculated accurately and in good faith and consistent with past practices, setting forth Seller's calculation of the following items as of the Closing: (i) GE Liquidated Damages (ii) GE Prepaid Assets, (iii) ERCOT Short-Pay Amounts, (iv) Renewable Energy Credits (based on electricity generated prior to the Effective Time), and (v) Annual Land Fees (collectively, the "Closing Credits"); provided, that Seller shall provide reasonable supporting documentation to support Seller's calculation of the Closing Credits; provided, further, that such Closing Credits (including as adjusted pursuant to Section 2.3) shall not exceed four million United States Dollars ($4,000,000) in the aggregate. Seller's calculation of Renewable Energy Credits shall be attributable to electricity generated from the Acquired Assets before the Effective Time (based on megawatt-hours of electricity generation). Seller shall reasonably cooperate with Purchaser in good faith to respond to any reasonable questions regarding the Closing Statement raised by Purchaser and consider in good faith any comments made in good faith by Purchaser to the Closing Statement.

(b)    Within sixty (60) days after the Closing Date, Purchaser shall prepare and deliver to Seller a statement (the "Post-Closing Statement") setting forth Purchaser's calculation of the Closing Credits. Purchaser's calculation of GE Liquidated Damages shall be prepared using the same format and accounting methods, practices, and procedures used to calculate the GE Liquidated Damages set forth in the Closing Statement.

(c)    The post-closing adjustment (the "Post-Closing Adjustment") shall be an amount equal to (i) the final Closing Credits (as finally determined in accordance with Section 2.3(e), Section 2.3(f), or Section 2.3(h), as the case may be) minus (ii) the Seller's calculation of the estimated Closing Credits set out in the Closing Statement .

(d)  After receipt of the Post-Closing Statement, Seller shall have thirty (30) days (the "Review Period") to review the Post-Closing Statement. During the Review Period, Seller and its Representatives shall have reasonable access (including electronic access, to the extent available) to the books and records of the Project, the personnel of, and work papers (subject to the satisfactory execution of customary access letters, where relevant, which shall not be unreasonably withheld, conditioned or delayed) prepared by, Purchaser or its Representatives to the extent that they relate to the Post-Closing Statement and to such historical financial information (to the extent in Purchaser's possession or control) relating to the Post-Closing Statement as Seller may reasonably request upon reasonable advance notice for the purpose of reviewing the Post-Closing Statement and to prepare a Statement of Objections (defined below), provided, that such access shall be conducted in at the Seller's expense, during normal business hours, under the supervision of the Purchaser's personnel and in a manner that does not interfere with the normal business operations of Purchaser or the Project.

(e)  On or prior to the last day of the Review Period, Seller may object to the Post-Closing Statement by delivering to Purchaser a written statement setting forth Seller's objections in reasonable detail, indicating each disputed item or amount and the basis for Seller's disagreement therewith (the "Statement of Objections"). If Seller fails to deliver the Statement of Objections before the expiration of the Review Period, the Post-Closing Statement and the Post-Closing Adjustment, as the case may be, reflected in the Post-Closing Statement shall be deemed to have been accepted by Seller. If Seller delivers the Statement of Objections before the expiration of the Review Period, Purchaser and Seller shall negotiate in good faith to resolve such objections within thirty (30) days after the delivery of the Statement of Objections (the "Resolution Period"), and, if the same are so resolved within the Resolution Period, the Post-Closing Adjustment and the Post-Closing Statement with such changes as may have been previously agreed in writing by Purchaser and Seller, shall be final and binding.

(f)  If Seller and Purchaser fail to reach an agreement with respect to all of the matters set forth in the Statement of Objections before expiration of the Resolution Period, then any amounts remaining in dispute ("Disputed Amounts" and any amounts not so disputed, the "Undisputed Amounts") shall be submitted for resolution to the office of Forvis Mazars, LLP or, if Forvis Mazars, LLP is unable to serve, Purchaser and Seller shall appoint by mutual agreement the office of an impartial nationally recognized firm of independent certified public accountants other than Seller's Accountants or Purchaser's Accountants (the "Independent Accountants") who, acting as experts and not arbitrators, shall resolve the Disputed Amounts only and make any adjustments to the Post-Closing Adjustment, as the case may be, and the Post-Closing Statement. The Parties agree that all adjustments shall be made without regard to materiality. The Independent Accountants shall only decide the specific items under dispute by the Parties and their decision for each Disputed Amount must be within the range of values assigned to each such item in the Post-Closing Statement and the Statement of Objections, respectively.  The parties hereto shall not engage in any ex-parte communication with such Independent Accountants.

(g)  The fees and expenses of the Independent Accountant shall be paid by Seller, on the one hand, and by Purchaser, on the other hand, based upon the percentage that the amount actually contested but not awarded to Seller or Purchaser, respectively, bears to the aggregate amount actually contested by Seller and Purchaser.

(h)      The Independent Accountants shall make a determination as soon as practicable within thirty (30) days (or such other time as the Parties shall agree in writing) after their engagement, and their resolution of the Disputed Amounts and their adjustments to the Post-Closing Statement or the Post-Closing Adjustment shall be conclusive and binding upon the Parties.

(i)      If the Post-Closing Adjustment is a negative number (the absolute value of such amount), within five (5) Business Days after the final determination of the Post-Closing Adjustment, Seller shall pay by wire transfer of immediately available funds to Purchaser the amount of the Post-Closing Adjustment; *provided*, *however*, in no event shall Seller be obligated to pay any amount to Purchaser pursuant to this Section in excess of amounts paid by Purchaser to Seller at Closing with respect to Closing Credits.

(j)      If the Post-Closing Adjustment is a positive number, within five (5) Business Days after the final determination of the Post-Closing Adjustment, Purchaser shall pay by wire transfer of immediately available funds to Seller the amount of the Post-Closing Adjustment.

(k)      Following Closing until the Post-Closing Adjustment is finally determined and paid pursuant to this Agreement, Purchaser shall not waive, settle, compromise, or amend any claim relating to such Closing Credits without Seller's prior written consent (such consent not to be unreasonably withheld, delayed or conditioned).

(l)      All amounts payable pursuant to this <u>Section 2.3</u>: (i) constitute an adjustment to the Purchase Price for Tax purposes; and (ii) shall survive the Closing; and (iv) may not be offset, netted, or otherwise reduced by Purchaser.

**Section 2.4      <u>Prorations</u>**.

(a)      Except as expressly contemplated by <u>Section 5.11(d)</u> (ERCOT revenues, credits and payments), all revenues, expenses and other operating items attributable to the Acquired Assets and Assumed Liabilities (collectively, the "<u>Prorated Items</u>") shall be prorated between Seller and Purchaser as of the Effective Time, such that Purchaser shall be entitled to all revenues and shall bear all expenses attributable to the Closing Date and all periods thereafter, and Seller shall be entitled to all revenues, prepaid expenses, and credits and shall bear all expenses attributable to periods prior to the Effective Time.

(b)      Notwithstanding the generality of <u>Section 2.4(a)</u> above, and without duplication of any adjustments made at Closing, the following Prorated Items shall be prorated as of the Effective Time, to the extent applicable: (i) real and personal property Taxes and assessments; (ii) rents, royalties, or other income generated by the Acquired Assets; (iii) utilities and operating expenses; (iv) maintenance and service contract costs under the Assigned Contracts; (v) Renewable Energy Credits attributable to electricity generated from the Acquired Assets before the Effective Time (based on megawatt-hours of electricity generation); (vi) power up costs; and (vii) any other recurring costs or revenues customarily prorated in transactions of this nature.

(c)      Prorations of Renewable Energy Credits (including existing Renewable Energy Credits and those generated between meter read and Closing), and other generation-related

11

revenues capable of being calculated on an hourly basis, shall be based on actual hours elapsed, with all hours prior to the Effective Time allocated to Seller and all hours from and after the Effective Time allocated entirely to Purchaser, provided, that to the extent such items cannot be reasonably calculated on an hourly basis, such prorations shall instead be determined on a daily basis, with the day of Closing allocated to Purchaser. All other prorations shall be made based on the actual number of days elapsed in the applicable period, with the Closing Date allocated entirely to Purchaser. To the extent actual figures are not available as of Closing, prorations shall be made based on Seller's reasonable estimates and set forth on the Closing Statement, and such estimates shall be binding for purposes of Closing.

(d)     Within sixty (60) days after the Closing Date, Seller shall prepare and deliver to Purchaser a statement setting forth a final reconciliation of the prorated items based on actual amounts, to the extent available. Purchaser shall notify Seller of any good-faith dispute within thirty (30) days after receipt of such statement. Any undisputed amounts owed by either Party shall be paid within five (5) Business Days after final determination. If Purchaser fails to object within such 30-day period, the statement shall be deemed accepted and final.

(e)     Real and personal property Taxes relating to the Acquired Assets (and Assumed Liabilities, as applicable) shall be prorated based on the most recently available tax bill or assessment, and Purchaser shall be responsible for all real and personal property Taxes attributable to the Effective Time relating to the Acquired Assets (and Assumed Liabilities, as applicable) and thereafter, with any post-Closing adjustments handled pursuant to the reconciliation procedure set forth above.

(f)     Except as expressly contemplated by Section 5.11(d) (ERCOT revenues, credits and payments), this Section 2.4 constitutes the sole and exclusive agreement of the Parties with respect to Prorated Items. No claim relating to any Prorated Item may be asserted: (i) as a breach of representation or warranty; (ii) by set-off against any payment obligation; or (iii) under any theory of mistake, unjust enrichment, or similar doctrine.

(g)     The obligations under this Section shall survive the Closing until the final determination and payment of all prorations contemplated herein.

**Section 2.5    <u>Closing</u>**. The closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price and the assumption of the Assumed Liabilities in accordance with this Agreement (the "<u>Closing</u>") will take place by telephone conference and electronic exchange on or before the second (2nd) Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in <u>Article VI</u> (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing), or at such other place, time and date as the Parties may agree in writing. The date on which the Closing actually occurs is referred to herein as the "<u>Closing Date</u>." The effective time of the Closing will be deemed to have occurred at the Effective Time.

**Section 2.6    <u>Closing Deliveries by Seller</u>**. At, or prior to the Closing, Seller shall deliver to Purchaser:

(a)     A properly completed and validly executed (i) Internal Revenue Service Form W-9 executed by or on behalf of Seller (or, as applicable, its regarded owner), or (ii) a certification satisfying the requirements of Treasury Regulations Section 1.1445-2(b) (a "FIRPTA Certificate"), duly executed by Seller or on behalf of Seller (or, as applicable, its regarded owner);

(b)     A bill of sale substantially in the form of Exhibit A attached hereto (the "Bill of Sale") duly executed by Seller with respect to the Acquired Assets (including the Assigned Contracts other than the Interconnection Agreement and the Assumed Real Property Interests);

(c)     An assignment and assumption agreement substantially in the form of Exhibit B attached hereto (the "Assignment and Assumption Agreement") duly executed by Seller with respect to the Assigned Contracts (other than as specifically contemplated by Section 2.6(d), Section 2.6(e), and Section 2.6(f));

(d)     An assignment and assumption of the Interconnection Agreement substantially in the form of Exhibit C attached hereto (the "Assignment and Assumption of Interconnection Agreement") duly executed by Seller;

(e)     An assignment and assumption agreement substantially in the form of Exhibit D attached hereto with respect to the Real Estate Leases (the "Assignment and Assumption of Leases") duly executed by Seller and in recordable form;

(f)     An assignment and assumption agreement substantially in the form of Exhibit E attached hereto with respect to the Easement (the "Assignment and Assumption of Easement") duly executed by Seller and in recordable form;

(g)     The TSA duly executed by Seller; and

(h)     An officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Seller certifying that the conditions set forth in Section 6.2(a) and Section 6.2 (b) have been satisfied.

Section 2.7     **Closing Deliveries by Purchaser**. At the Closing, Purchaser shall deliver to Seller:

(a)     (i) the Closing Date Payment (*less* the Deposit) to (or at the direction of) Seller; (ii) an amount equal to the Closing Credits (calculated in accordance with Section 2.3(a) and set forth on the Closing Statement) to (or at the direction of) Seller; (iii) the Cure Costs in an aggregate amount not to exceed the Cure Cap, to the applicable counterparty to each Assigned Contract, and (iv) the amount of any Unused Cure Cap, in each case by wire transfer of immediately available funds to accounts designated in writing by Seller (or the applicable counterparty to the Assigned Contract, in the case of the Cure Costs) to Purchaser;

(b)     The Bill of Sale duly executed by Purchaser;

(c)     With respect to each Assigned Contract (other than as specifically contemplated by Section 2.7(d), Section 2.7(e), and Section 2.7(f) below), the Assignment and Assumption Agreement duly executed by Purchaser;

(d) The Assignment and Assumption of Interconnection Agreement duly executed by Purchaser;

(e) The Assignment and Assumption of Leases duly executed by Purchaser;

(f) The Assignment and Assumption of Easement duly executed by Purchaser;

(g) The TSA duly executed by Purchaser; and

(h) An officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in Section 6.3(a) and Section 6.3(b) have been satisfied.

**Section 2.8** **Closing Deliveries by Escrow Agent**. At the Closing, the Parties shall deliver joint written instructions to Escrow Agent directing Escrow Agent to transfer to Seller the Deposit as set forth in Section 2.2(e). Notwithstanding anything to the contrary in this Agreement, each Party agrees to act promptly, reasonably, and in good faith in connection with any request to deliver joint written instructions to the Escrow Agent for the release of funds under Section 2.2 or this Section 2.8. If a Party fails to deliver such joint written instructions within five (5) Business Days following a written request therefor, or otherwise unreasonably withholds, delays, or conditions its agreement to do so, the requesting Party shall be entitled, in addition to any other rights and remedies available at law or in equity, to seek specific performance, injunctive relief, or other equitable remedies from a court of competent jurisdiction to compel such Party to deliver the required joint written instructions. The Parties acknowledge and agree that irreparable harm would occur in the absence of such relief and that monetary damages would be an inadequate remedy, and each Party hereby waives any requirement to post bond or other security in connection with seeking such relief. All rights and remedies of the Parties are expressly reserved and shall be cumulative.

**Section 2.9** **Withholding**. Notwithstanding anything to the contrary in this Agreement, Purchaser and each of its Affiliates (and any other Person who may have a withholding obligation with respect to payments made under this Agreement) shall be entitled to deduct and withhold from any amount otherwise payable to any Person pursuant to this Agreement such amounts of Tax as the Purchaser or such Affiliate (or such other Person) reasonably determines in good faith that it is required by Law to deduct and withhold with respect to the making of such payment. All amounts that are so deducted or withheld shall be treated for all purposes of this Agreement as having been paid to the applicable Person in respect to which such deduction and withholding was made. Any Person intending to withhold pursuant to this Section 2.9 shall provide the Person subject to such withholding written notice of its intent to withhold at least ten (10) days prior to the Closing, and the Parties shall use commercially reasonable efforts to cooperate to mitigate or eliminate any such withholding to the maximum extent permitted by Law.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

Except as disclosed in any forms, statements or other documents filed with the Bankruptcy Court, as disclosed in any public filings of Seller, or as set forth in the Disclosure Schedules delivered by Seller concurrently herewith and as updated from time to time, Seller represents and

14

warrants to Purchaser as of the date hereof and as of the Closing Date and solely with respect to Seller and the Acquired Assets as follows:

**Section 3.1** **Organization and Qualification**. Seller is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Delaware. Seller is duly licensed or qualified to do business under the Laws of the State of Texas. Subject to the receipt of the Sale Order by the Bankruptcy Court and provisions of the Bankruptcy Code, to Seller's Knowledge, Seller has all requisite limited liability company power and authority to own, lease and operate its properties and to carry on the Project as it is now being conducted.

**Section 3.2** **Authorization of Agreement**. Subject to requisite Bankruptcy Court approvals:

(a) Seller has all necessary power and authority to execute and deliver this Agreement and the other Transaction Documents to which Seller is a party and to perform its obligations hereunder and thereunder and to consummate the Transaction;

(b) The execution, delivery and performance by Seller of this Agreement and the other Transaction Documents to which Seller is a party, and the consummation by Seller of the Transaction, have been duly and validly authorized by all requisite limited liability company action on the part of Seller; and

(c) This Agreement and the other Transaction Documents to which Seller is a party have been, or will be, duly executed and delivered by Seller.

**Section 3.3** **Conflicts; Consents**. Except as related to, or as a result of, the filing or pendency of the Bankruptcy Case, as set forth on Section 3.3 of the Disclosure Schedules and assuming that requisite Bankruptcy Court approvals are obtained, neither the execution and delivery by Seller of this Agreement or the other Transaction Documents, nor the consummation by Seller of the Transaction, nor performance or compliance by Seller with any of the terms or provisions hereof or thereof, will (i) conflict with or violate any provision of Seller's governing documents, (ii) to the Knowledge of Seller, conflict with or violate any Law or Order applicable to the Acquired Assets or Assumed Liabilities; (iii) violate or constitute a breach or default (or an event that, with notice or lapse of time or both become a default) under any Assigned Contract or any Assumed Real Property Interest; or (iv) to the Knowledge of Seller, give rise to a right of termination or modification of any obligation or to the loss of any benefit, or accelerate Seller's obligations, under any Assigned Contract or any Assumed Real Property Interest, or (v) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any Acquired Assets, except in each case, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**Section 3.4** **Title to Assets**. Subject to receipt of the Sale Order, Seller has, to the Knowledge of Seller, Seller has good and valid title to, or, in the case of leased or subleased Acquired Assets, valid and subsisting leasehold interests in, all Acquired Assets, in each case to the extent of Seller's interest therein and subject to the Permitted Encumbrances.

**Section 3.5** **Assigned Contracts and Assumed Real Property Interests**. Section 1.1(a) and Section 1.1(j) of the Disclosure Schedules, respectively, sets forth a list, in all material

respects as of the date hereof and subject to Section 1.5 and Section 5.2 of this Agreement, of the (i) Assigned Contracts and (ii) Assumed Real Property Interests. To the Knowledge of Seller, Seller has made available to Purchaser true and complete copies of each Assigned Contract and Assumed Real Property Interest, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**Section 3.6** **Brokers**. Except for Nomura Securities International, Inc., doing business as Nomura Greentech ("Nomura"), all of whose fees and expenses will be borne solely by Seller subject to approval of the Bankruptcy Court, there is no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the Transaction.

**Section 3.7** **CFIUS**. To the Knowledge of Seller, the Acquired Assets are not involved in the design, fabrication, development, testing, production or manufacture of one or more "critical technologies" within the meaning of Section 721 of the U.S. Defense Production Act of 1950, as amended, including all implementing regulations thereof.

**Section 3.8** **No Other Representations or Warranties**. Except for the representations and warranties expressly contained in this Article III (as qualified by the Disclosure Schedules) and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement (the "Express Representations") (it being understood that Purchaser and Purchaser Group have relied only on such Express Representations and warranties), Purchaser acknowledges and agrees, on its own behalf and on behalf of Purchaser Group, that Seller does not, nor any other Person on behalf of Seller makes, and neither Purchaser nor any member of Purchaser Group has relied on, is relying on, or will rely on the accuracy or completeness of any express or implied representation or warranty with respect to Seller, the Project, the other Acquired Assets, or the Assumed Liabilities or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including in any presentations or other materials prepared by Nomura) or in the data room administered by Nomura through the Ideals group of companies including Ideals Group GmbH and its Affiliates (the "Dataroom") or otherwise to Purchaser Group on behalf of Seller or any of its Advisors. Without limiting the foregoing, Seller does not nor do any of its Advisors or any other Person do or will have or be subject to any Liability whatsoever to Purchaser, or any other Person, resulting from the distribution to Purchaser Group's use of or reliance on, any such information, including any information presentation, any information, statements, memoranda, disclosures, documents, projections, models, forecasts or other material made available to Purchaser Group in the Dataroom or otherwise in expectation of the Transaction or any discussions with respect to any of the foregoing information.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as follows.

**Section 4.1** **Organization and Qualification**. Purchaser is a series limited liability company organized, validly existing, and in good standing under the Laws of Delaware and has

all requisite power and authority necessary to carry on its business as it is now being conducted. At Closing, Purchaser is qualified to do business under the Laws of the State of Texas.

Section 4.2    **Authorization of Agreement**. Subject to requisite Bankruptcy Court approvals:

(a)    Purchaser has all necessary power and authority to execute and deliver this Agreement and the other Transaction Documents to which Purchaser is a party and to perform its obligations hereunder and thereunder and to consummate the Transaction;

(b)    The execution, delivery and performance by Purchaser of this Agreement and the other Transaction Documents to which Purchaser is a party, and the consummation by Purchaser of the Transaction, have been duly authorized by all requisite limited liability company action or similar organizational action on the part of Purchaser; and

(c)    This Agreement and the other Transaction Documents to which Purchaser is a party have been, or will be, duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery hereof and thereof by the other parties hereto and thereto, constitutes, or will constitute, the legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its and their terms, except that such enforceability may be limited by the Enforceability Exceptions.

Section 4.3    **Governmental Approvals**. No notice to, consent, approval, Permit or authorization of or designation, declaration or filing with any Governmental Body is required by Purchaser with respect to Purchaser's execution and delivery of this Agreement or any Transaction Document to which it is (or will become at Closing) a party or the consummation of the Transaction, except (i) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not have a Material Adverse Effect or (ii) as arise as a result of any facts or circumstances relating to the participation of Seller or any of its Affiliates (as opposed to any third party) in the transactions contemplated by this Agreement and the Transaction Documents.  Notwithstanding the generality of the foregoing sentence, Purchaser represents and warrants that Purchaser and its Affiliates are in compliance in all material respects with applicable economic sanctions, export control, and anti-boycott Laws administered by the U.S. Department of the Treasury Office of Foreign Assets Control, the U.S. Department of Commerce Bureau of Industry and Security, and the U.S. Department of State Directorate of Defense Trade Controls. Purchaser further represents that neither Purchaser nor, to the Knowledge of Purchaser, any of its directors, officers, or controlling equity holders is a Person listed on, or owned or controlled by a Person listed on, any sanctions-related list maintained by the U.S. Department of the Treasury Office of Foreign Assets Control, including the Specially Designated Nationals and Blocked Persons List.  Purchaser is acquiring the Acquired Assets for investment purposes and not for resale in violation of applicable Law.

Section 4.4    **Conflicts; Consents**. Except as related to, or as a result of, the filing or pendency of the Bankruptcy Case, and assuming that requisite Bankruptcy Court approvals are obtained, neither the execution and delivery by Purchaser of this Agreement or the other Transaction Documents, nor the consummation by Purchaser of the Transaction, nor performance or compliance by Purchaser with any of the terms or provisions hereof or thereof, will, (i) conflict

with or violate any provision of Purchaser's governing documents, (ii) violate any Law or Order applicable to Purchaser, (iii) violate or constitute a breach of any material loan or credit agreement or other material Contract the Purchaser is a borrower under, or (iv) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Purchaser or any of its Subsidiaries, except in each case, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. For the avoidance of doubt, the representations and warranties set forth in this Section 4.4 are not intended to apply to, and do not constitute any representation or warranty by Purchaser with respect to, any post-Closing registrations or submissions required to be made pursuant to the TSA.

Section 4.5 **No Foreign Government Ownership.** No national or subnational "foreign government" (as defined in 31 C.F.R. § 800.221) holds at signing of this Agreement or will hold at Closing, directly or indirectly, a "substantial interest" (as defined in 31 C.F.R. § 800.244) in Purchaser or in any entity in Purchaser's ownership chain, including by application of the general partner rule and the 100% parent attribution rule set forth in 31 C.F.R. § 800.244(b)–(c), and no such Foreign Government has at signing of this Agreement or will have at Closing special governance or veto rights that would render the transaction a "foreign government-controlled transaction" within the meaning of 31 C.F.R. § 800.222.

Section 4.6 **Sufficiency of Funds**. Purchaser has at signing of this Agreement, sufficient funds to pay the Deposit and has, and will have at the Closing, sufficient funds in an aggregate amount necessary to pay the Purchase Price and Cure Costs (in an amount not to exceed the Cure Cap) and all other fees, obligations, expenses, and other amounts required to be paid by, Purchaser in connection with the Transaction. Purchaser is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Acquired Assets and the Assumed Liabilities. Purchaser's ability to consummate the Transaction is not contingent upon its ability to secure any financing or to complete any public or private placement of securities prior to or upon Closing and it is hereby acknowledged and agreed that Seller has relied upon the representations and warranties of Purchaser under this Section 4.5 in making its decision to enter into this Agreement.

Section 4.7 **Brokers**. Purchaser has no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the Transaction based upon arrangements made by or on behalf of Purchaser.

Section 4.8 **Solvency**. Purchaser is, and immediately after giving effect to the Transaction Purchaser shall be, solvent and at all times shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debt (including a reasonable estimate of the amount of all contingent Liabilities) and (c) have adequate capital to carry on its business and to perform its obligations in connection with the assignment and assumption of the Assigned Contracts and Assumed Real Property Interests. No transfer of property is being made and no obligation is being incurred in connection with the Transaction with the intent to hinder, delay or defraud either present or future creditors of Purchaser. In connection with the Transaction, Purchaser has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

Section 4.9    **ERCOT Representations**. Purchaser is or on the Closing Date has made an application to be duly registered with ERCOT as a market participant eligible to own and operate the Acquired Assets and the Project and participate in the ERCOT market in accordance with the ERCOT Protocols.  Purchaser has the financial capability and credit support necessary to satisfy ERCOT creditworthiness requirements applicable to the Acquired Assets and the Project and Purchaser's participation in the ERCOT market.

Section 4.10    **AS IS, WHERE IS BASIS**. NOTWITHSTANDING ANYTHING CONTAINED IN THIS Section 4.9 OR ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, PURCHASER ACKNOWLEDGES AND AGREES, ON ITS OWN BEHALF AND ON BEHALF OF PURCHASER GROUP, THAT THE EXPRESS REPRESENTATIONS OF SELLER UNDER THIS AGREEMENT ARE THE SOLE AND EXCLUSIVE REPRESENTATIONS, WARRANTIES AND STATEMENTS OF ANY KIND MADE TO PURCHASER OR ANY MEMBER OF PURCHASER GROUP AND ON WHICH PURCHASER AND PURCHASER GROUP MAY RELY IN CONNECTION WITH THE TRANSACTION. PURCHASER ACKNOWLEDGES AND AGREES, ON ITS OWN BEHALF AND ON BEHALF OF PURCHASER GROUP, THAT THE ACQUIRED ASSETS ARE BEING ACQUIRED BY PURCHASER "AS IS" AND "WHERE IS" AND WITH ALL FAULTS AND ALL OTHER REPRESENTATIONS, WARRANTIES AND STATEMENTS OF ANY KIND OR NATURE EXPRESSED OR IMPLIED, WHETHER IN WRITTEN, ELECTRONIC OR ORAL FORM, INCLUDING (A) THE COMPLETENESS OR ACCURACY OF, OR ANY OMISSION TO STATE OR TO DISCLOSE, ANY INFORMATION (OTHER THAN SOLELY TO THE EXTENT EXPRESSLY SET FORTH IN THE EXPRESS REPRESENTATIONS), INCLUDING IN ANY INFORMATION PRESENTATION, THE DATAROOM, ANY PROJECTIONS OR IN ANY MEETINGS, CALLS OR CORRESPONDENCE WITH MANAGEMENT OF SELLER OR ANY OTHER PERSON ON BEHALF OF SELLER OR ANY OF ITS ADVISORS, (B) ANY OTHER STATEMENT RELATING TO THE HISTORICAL, CURRENT OR FUTURE BUSINESSES, FINANCIAL CONDITION, RESULTS OF OPERATIONS, ASSETS, LIABILITIES, PROPERTIES, CONTRACTS, ENVIRONMENTAL COMPLIANCE, EMPLOYEE MATTERS, REGULATORY COMPLIANCE, BUSINESS RISKS AND PROSPECTS OF THE ACQUIRED ASSETS, THE PROJECT OR SELLER, OR THE QUALITY, QUANTITY OR CONDITION OF THE PROJECT, (C) ANY IMPLIED REPRESENTATION OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR USE OR PURPOSE, (D) ANY IMPLIED REPRESENTATION REGARDING THE USE OR OPERATION OF THE ACQUIRED ASSETS OR THE PROJECT AFTER THE CLOSING IN ANY MANNER, AND (E) ANY IMPLIED REPRESENTATION REGARDING THE PROBABLE SUCCESS OR PROFITABILITY OF THE ACQUIRED ASSETS OR THE ACQUIRED ASSETS AFTER THE CLOSING, ARE, IN EACH CASE SPECIFICALLY DISCLAIMED BY SELLER AND THAT NEITHER PURCHASER NOR ANY MEMBER OF PURCHASER GROUP HAS RELIED ON ANY SUCH REPRESENTATIONS, WARRANTIES OR STATEMENTS. PURCHASER HAS NOT RELIED ON, IS NOT RELYING ON, AND WILL NOT RELY ON, ANY MEMBER OF SELLER GROUP OR ANY CREDITOR THEREOF, THE ANY INFORMATION PRESENTATION, ANY PROJECTIONS OR ANY INFORMATION, STATEMENTS, DISCLOSURES, DOCUMENTS, PROJECTIONS, FORECASTS OR OTHER MATERIAL MADE AVAILABLE TO

19

**PURCHASER OR ANY OF ITS AFFILIATES OR ADVISORS IN THE DATAROOM OR OTHERWISE, IN EACH CASE, WHETHER WRITTEN OR ORAL, MADE OR PROVIDED BY, OR AS PART OF, ANY OF THE FOREGOING OR SELLER OR ANY OF ITS ADVISORS, OR ANY FAILURE OF ANY OF THE FOREGOING TO DISCLOSE OR CONTAIN ANY INFORMATION, EXCEPT FOR THE EXPRESS REPRESENTATIONS.**

**Section 4.11** **No Other Representations or Warranties**. Except for the representations and warranties expressly contained in this Article IV, neither Purchaser nor any other Person makes any other express or implied representation or warranty with respect to the Transaction, and Purchaser disclaims any other representations or warranties, whether made by Purchaser, any Affiliate of Purchaser or any of Purchaser's or its Affiliates' respective Representatives.

**ARTICLE V**
**COVENANTS AND AGREEMENTS**

**Section 5.1** **Conduct of Seller**.

(a) Except (A) as required by applicable Law, Order or a Governmental Body, (B) for any limitations or changes on operations as a result of a bankruptcy filing or otherwise imposed by the Bankruptcy Court or the Bankruptcy Code or Seller's use of cash collateral, as the case may be, (C) as expressly contemplated, required or permitted by this Agreement, (D) any repowering, operation or maintenance services related to the wind energy project, or (E) to the extent related to an Excluded Asset or an Excluded Liability, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VII), unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, delayed or conditioned), Seller shall use commercially reasonable efforts to maintain the Acquired Assets in a manner consistent with past practice.

(b) Except as otherwise contemplated by Section 5.1(a), as required by applicable Law or as set forth on Section 5.1(b) of the Disclosure Schedules, without the prior written consent of the Purchase (which consent shall not be unreasonably withheld, conditioned or delayed) or express prior written direction of Purchaser, from the date hereof until the Closing Date (or the earlier termination of this Agreement pursuant to Article VII), Seller shall not:

(i) sell, lease, transfer, assign, or license on an exclusive basis or otherwise create any Encumbrance (other than Permitted Encumbrances) or dispose of any Acquired Assets, in a single transaction or series of related transactions;

(ii) renew, materially amend or modify in any adverse respect, terminate (other than automatically pursuant to its terms), cancel, let lapse or waive any material rights under, or create any Encumbrance (other than a Permitted Encumbrance) on, any of the Contracts set forth on Section 1.1(a) of the Disclosure Schedules or any Permits set forth on Section 1.1(l) of the Disclosure Schedules;

(iii) change in any material respect their policies or practices regarding accounts receivable or accounts payable, except as required by Law or by a Governmental Body;

20

(iv)     incur, assume or guarantee any indebtedness for borrowed money (excluding, for the avoidance of doubt, any factoring arrangements) or guarantee the indebtedness obligations of any other Person in connection with the Acquired Assets, other than any Indebtedness or Liability that will be repaid or assumed by Purchaser under the terms hereof at or prior to the Closing or constitute an Excluded Liability;

(v)     concede, settle, pay, discharge or satisfy any Proceedings that would constitute an Acquired Asset or Assumed Liability;

(vi)     terminate, intentionally let lapse or materially amend or modify any of the insurance policies with respect to any Acquired Assets or any Assumed Liabilities;

(vii)     (A) make, change, rescind, or revoke any material Tax election or method of accounting relating to Taxes in a manner materially inconsistent with past practice, (B) file any Tax Return or amend any Tax Return, (C) surrender any right or claim to a refund of Taxes or commence, settle or compromise any material Tax claim or assessment, (D) consent to any extension or waiver of the statute of limitations period applicable to any Taxes, Tax Returns, or claims for Taxes, or (E) file any ruling or request for a ruling with any Governmental Body, in each case to the extent relating to the Acquired Assets or the Assumed Liabilities; or

(viii)     agree or commit to do any of the foregoing.

Section 5.2     **Bankruptcy Actions**.

(a)     Seller and Purchaser shall comply with the Bidding Procedures Order and Bidding Procedures.  Seller and Purchaser shall take all actions reasonably necessary to seek entry of the Stalking Horse Approval Order, Sale Order and any other necessary orders by the Bankruptcy Court to consummate the Closing as soon as reasonably practicable following the execution of this Agreement, subject to the terms of the Bidding Procedures Order and Sale Order. Seller shall reasonably consult with Purchaser and its Representatives concerning the Sale Order and any other orders of the Bankruptcy Court relating to the Transaction. Purchaser shall promptly take such actions, at its sole expense, as are reasonably requested by Seller to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of future performance by Purchaser (as required under Section 365 of the Bankruptcy Code) for this Agreement, the Assigned Contracts, and the Assumed Real Property Interests, and demonstrating that Purchaser is a "good faith" purchaser; *provided, however,* in no event shall Purchaser or Seller be required to agree to any amendment of this Agreement.

(b)     Seller and Purchaser shall cooperate in good faith to obtain the Bankruptcy Court's entry of the Sale Order and any other Order reasonably necessary in connection with the transactions contemplated by this Agreement as promptly as reasonably practicable, including furnishing affidavits, non-confidential financial information, or other documents or information for filing with the Bankruptcy Court and making such applicable respective representatives of

Purchaser and the Seller and their respective Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things, providing adequate assurances of performance by Purchaser as required under Section 365 of the Bankruptcy Code, demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. Seller and Purchaser acknowledge that in order to obtain such approval Seller must demonstrate that it has taken reasonable steps to obtain the highest or otherwise best offer possible for the Acquired Assets and that such demonstration shall include serving notice of the transactions contemplated by this Agreement to creditors and interested parties as ordered by the Bankruptcy Court.

(c)     Each of Seller and Purchaser (or their applicable respective representatives) shall appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement and keep the other Party reasonably apprised of the status of material matters related to this Agreement, including, upon reasonable request promptly furnishing the other Party with copies of notices or other communications received by such Party from the Bankruptcy Court or any third party or any Governmental Body with respect to the transactions contemplated by this Agreement.

(d)     Subject to entry of the Sale Order and upon consummation of the Closing, Purchaser shall pay, or cause the payment of, the Cure Costs, in an amount not to exceed the Cure Cap, and cure any and all other defaults and breaches under the Purchased Contracts in accordance with the provisions of Section 365 of the Bankruptcy Code, the Bidding  Procedures Order, the Sale Order, and this Agreement.

(e)     The Sale Order shall, among other things, (i) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by Sellers of this Agreement, (B) the sale of the Acquired Assets to Purchaser on the terms set forth herein (including the transfer of Seller's right, title and interest to the Purchaser, on an "as is where is" and "with all faults" basis and to the maximum extent permitted under Section 363(f) of the Bankruptcy Code) and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances) and (C) the performance by Seller of its obligations under this Agreement, (ii) authorize and empower Seller to assume and assign to Purchaser the Assigned Contracts and Assumed Real Property Interests, (iii) find that Purchaser is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to Seller and grant Purchaser the protections of Section 363(m) of the Bankruptcy Code, (iv) find that Purchaser shall have no liability or responsibility for any liability or other obligation of Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement or as required under applicable nonbankruptcy Law, including successor or vicarious liabilities of any kind or character, including any theory of antitrust, successor, or transferee liability, labor law, de facto merger, or substantial continuity and (v) find that Purchaser has provided adequate assurance (as that term is used in Section 365 of the Bankruptcy Code) of future performance in connection with the assumption and assignment of the Assigned Contracts and Assumed Real Property Interests. Without limiting Seller's obligation to take all such actions as are reasonably necessary to obtain Bankruptcy Court approval of the Sale Order, Purchaser agrees that it will promptly take reasonable actions to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x)

22

demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and (y) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code. Nothing in this Agreement shall require Purchaser to give testimony to or submit any pleading, affidavit or information to the Bankruptcy Court or any Person that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or their respective stakeholders.

(f)     Seller acknowledges and agrees, and the Sale Order shall provide that, except with respect to Assumed Liabilities, upon the Effective Time, all then existing or thereafter arising obligations, liabilities and Encumbrances of, against or created by Seller or its bankruptcy estate, to the fullest extent permitted by Section 363 of the Bankruptcy Code, shall be fully released from and with respect to the Acquired Assets. On the Closing Date, the Acquired Assets shall be transferred to Purchaser free and clear of all obligations, liabilities and Encumbrances, other than Permitted Encumbrances and the Assumed Liabilities to the fullest extent permitted by Section 363 of the Bankruptcy Code.

(g)     In the event the entry of the Bidding Procedures Order, the Stalking Horse Approval Order, the Sale Order or any other Orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Bidding Procedures Order, the Stalking Horse Approval Order, the Sale Order or other such Order), Purchaser and Seller shall use commercially reasonable efforts to defend such appeal. Seller shall comply with all notice requirements (i) of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure or (ii) imposed by the Sale Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith.

(h)     Notwithstanding anything contained herein to the contrary, during the pendency of the Chapter 11 Cases and prior to the effective date of any proposed bankruptcy plans, Seller shall not intentionally let lapse, reject or transfer any Contract without first obtaining Purchaser's prior written consent. In the event that any of the Parties to this Agreement discovers a Contract related to the business of Seller, the Acquired Assets or the Assumed Liabilities (whether prior to, on or following the Closing) and such Contract (i) was not an Assigned Contract in accordance with Section 1.05, (ii) is a Contract which Purchaser wishes to assume the rights and obligations of and (iii) has not been rejected by Seller (with Purchaser's prior written consent in compliance with the immediately preceding sentence), Purchaser and Seller shall execute, acknowledge and deliver such other instruments and take such further actions as are reasonably practicable for Purchaser to assume the rights and obligations under such Contract as of the Closing (or, if applicable, as soon as reasonably practicable following the Closing), otherwise in accordance with Section 1.05 the Bidding Procedures Order, and the Sale Order.

(i)     The Parties intend that, to the fullest extent permitted by applicable Law (including under Section 363 of the Bankruptcy Code), upon the Closing, Purchaser shall not be deemed to: (a) be the successor of Seller, (b) have, de facto or otherwise, merged with or into Seller, (c) be a mere continuation or substantial continuation of Seller or the enterprise(s) of Seller or (d) be liable or have any liability for any acts or omissions of Seller in the conduct of its businesses or arising under or related to the Acquired Assets other than as expressly set forth and

agreed in this Agreement. Without limiting the generality of the foregoing, and except as otherwise expressly provided in this Agreement, the Parties intend that Purchaser shall not have any liability for any Encumbrance (other than the Assumed Liabilities and Permitted Encumbrances on the Acquired Assets) against Seller or any of Seller's predecessors or Affiliates, and Purchaser shall not have any successor or vicarious liability of any kind or character whether known or unknown as of the Effective Time or in connection with the transactions contemplated to occur on the Closing, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the businesses of Seller, the Acquired Assets or any liability of Seller arising prior to, or relating to any period occurring prior to, the Effective Time. The Parties agree that the Sale Order shall contain provisions substantially in the form set forth in this Section 5.2(i).

(j)        In connection with the Auction, and as set forth in the Bidding Procedures Order, Seller agrees that any higher bid with respect to some or all of the Acquired Assets and Assumed Liabilities shall be no less than the Purchase Price (including if and as may be increased by Purchaser at the Auction), plus the Breakup Fee, plus the Expense Reimbursement, plus the minimum overbid amount as set forth in the Bidding Procedures.

**Section 5.3**    **Alternative Transactions**.

(a)        Solely in accordance with the Bidding Procedures Order, until the entry of the Sale Order, Seller may, and may cause its Representatives, to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, respond to any unsolicited inquiries, proposals or offers submitted by, and enter into any discussions or negotiations regarding any of the foregoing with, any Person (in addition to Purchaser and its Affiliates and Representatives) in connection with or for purposes of pursuing any alternative transaction in accordance with the Bidding Procedures Order ("Alternative Transaction"); *provided* that, with respect to the provisions of this Agreement governing payment of the Expense Reimbursement or the Breakup Fee an "Alternative Transaction" shall include any transaction (whether or not submitted in accordance with the Bidding Procedures Order), the closing of which would prohibit or interfere with the Closing. In addition, Seller may supply information relating to the Acquired Assets and the Project to any other Person who may be or has expressed interest in being a prospective purchaser under an Alternative Transaction or who proposed to submit an Alternative Transaction.

(b)        If an Auction is conducted, and Purchaser is not the Successful Bidder, Purchaser shall, in accordance with and subject to the Bidding Procedures, be required to serve as the back-up bidder if Purchaser is the next highest or otherwise best bidder at the Auction (such party that is the next highest or otherwise best bidder at the Auction, the "Back-Up Bidder") and, if Purchaser is the Back-Up Bidder, Purchaser shall, notwithstanding Section 7.1(h), be required to keep its bid to consummate the Transaction on the terms and conditions set forth in this Agreement (as the same may be improved upon by Purchaser in the Auction) open and irrevocable until the Back-Up Bid Expiration Date (as defined in the Bidding Procedures as in effect as of the date hereof). Following the Auction, if the Successful Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, then Purchaser, if Purchaser is the Back-Up Bidder, will be deemed to have the new prevailing bid, and Seller may seek authority to consummate the Transaction on the terms and conditions set forth in this Agreement (as the same may be improved upon by Purchaser in the Auction) with the Back-Up Bidder.

(c)     Seller and Purchaser acknowledge that, prior to the Sale Hearing, this Agreement and the sale of the Acquired Assets are subject to higher and better bids and Bankruptcy Court approval. Purchaser acknowledges that Seller must take commercially reasonable steps to demonstrate that it has sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of Seller and other interested parties, providing information about Seller to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets, conducting an Auction.

(d)     Nothing in this Agreement shall prevent Seller from modifying the Bidding Procedures, as allowed under such Bidding Procedures and the Bidding Procedures Order, and as necessary or appropriate to maximize value for Seller's bankruptcy estate in accordance with Seller's fiduciary obligations, provided that such modifications shall not amend or modify the terms hereof.

**Section 5.4     Cure Costs**. Subject to entry of the Sale Order and in connection with the assignment and assumption of the Assigned Contracts and Assumed Real Property Interests, Purchaser shall, at the Closing, pay the Cure Costs, in an amount not to exceed the Cure Cap and cure any and all other defaults and breaches under the Assigned Contracts and Assumed Real Property Interests so that such Contracts may be assumed by Seller and assigned to Purchaser in accordance with the provisions of Section 365 of the Bankruptcy Code and this Agreement. To the extent the Cure Costs exceed the Cure Cap, as between Purchaser and Seller, such excess shall be the responsibility of Seller.

**Section 5.5     Sale Order**. The Sale Order shall (a) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Seller of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (iii) the performance by Seller of its obligations under this Agreement; and (b) the assumption and assignment to Purchaser of the Assigned Contracts and Assumed Real Property Interests.

**Section 5.6     Bankruptcy Court Milestones**. Seller and Purchaser shall comply with the timeline for the solicitation of bids, entry of the Sale Order, and the Closing of the Transaction as set forth in the Bidding Procedures Order and Bidding Procedures, as such deadlines may be amended pursuant to the terms of the Bidding Procedures Order and Bidding Procedures, provided that any such extensions after the date hereof shall require the reasonable consent of the Purchaser.

**Section 5.7     Approval**. Seller's obligations under this Agreement and in connection with the Transaction are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including the Bidding Procedures Order and the Sale Order). Nothing in this Agreement shall require Seller to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

**Section 5.8     Further Assurances**. From time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to

25

be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the Transaction; *provided, however*, that Seller shall have no obligation under this Section 5.8 which results in additional expenses or costs to the estate of Seller.

**Section 5.9    Tax Matters**.

(a)    Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges (including all related interest, penalties, and additions to any of the foregoing) payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the Transaction (the "Transfer Taxes") shall be borne and timely paid fifty percent (50%) by Purchaser and fifty percent (50%) by Seller, and Purchaser shall timely file all Tax Returns related to any Transfer Taxes.

(b)    For U.S. federal and applicable state and local income tax purposes, the Purchase Price (and all other relevant items treated as consideration for U.S. federal income tax purposes) shall be allocated to the Acquired Assets (the "Asset Amount"). The Asset Amount shall be allocated consistent with the methodology set forth on Section 1060 of the Tax Code. Purchaser shall prepare a statement setting forth such allocation of the Asset Amount (the "Purchase Price Allocation Statement"). Purchaser shall deliver the Purchase Price Allocation Statement to Seller within forty-five (45) days after the Closing Date. Seller shall have thirty (30) days after receipt of the Purchase Price Allocation Statement within which to review the Purchase Price Allocation Statement. If Seller does not object in writing to the Purchase Price Allocation Statement during such thirty-day period, the Purchase Price Allocation Statement shall set forth the final allocation of the Asset Amount for all Tax purposes (the "Purchase Price Allocation"). If Seller objects in writing, Purchaser and Seller shall attempt in good faith to resolve such objections within fifteen (15) days thereafter, but if Seller and Purchaser are unable to resolve such objections within such fifteen (15) days, then any remaining items in dispute shall be resolved by a mutually agreeable accounting firm. Once the Purchase Price Allocation is finalized in accordance with the above procedures, the Purchase Price Allocation shall be binding upon the parties hereto for all Tax purposes unless otherwise required by applicable Law. The Parties hereto shall report for Tax purposes, act for Tax purposes, and file Tax Returns, in all respects consistent with the Purchase Price Allocation.

(c)    Without the prior written consent of Seller, Purchaser shall not, and, following the Closing, shall cause its Affiliates not to, to the extent any such actions would affect a Consolidated Tax Return for a Pre-Closing Tax Period (A) approach a Governmental Body with respect to any Taxes with respect to the Acquired Assets for any Pre-Closing Tax Period (including the entrance into any voluntary disclosure or other similar agreement with any Governmental Body), (B) amend, file or re-file any Tax Return with respect to the Acquired Assets for a Pre-Closing Tax Period, (C) agree to waive or extend the statute of limitations relating to any Taxes with respect to the Acquired Assets for any Pre-Closing Tax Period, or (D) make, revoke or change any tax election with respect to the Acquired Assets with respect to, or that has a retroactive effect to, any Pre-Closing Tax Period.

26

(d)     Notwithstanding any other provision in this Agreement to the contrary, Seller shall have the exclusive right to control in all respects, and neither Purchaser nor any of its Affiliates shall be entitled to participate in the preparation or filing of, or any dispute, audit, or other proceeding of any kind, with respect to any Consolidated Tax Return.

(e)     In the case of any Straddle Period, for all applicable purposes of this Agreement, the amount of any Taxes based on or measured by income, gross or net sales, receipts, transactions, proceeds, profits, payroll or similar items for the Pre-Closing Tax Period of such Straddle Period shall be determined based on an interim closing of the books as of the beginning of the day on the Closing Date and the amount of other Taxes for a Straddle Period that relates to the Pre-Closing Tax Period shall be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction, the numerator of which is the number of days in the taxable period ending on the day immediately preceding the Closing Date and the denominator of which is the number of days in such Straddle Period; provided that exemptions, allowances or deductions that are calculated on an annual basis (including depreciation and amortization deductions), other than with respect to property placed in service on or after the Closing Date, shall be allocated on a per diem basis.

(f)     Purchaser and Seller shall cooperate fully with each other, as and to the extent reasonably requested by the other Party, in connection with Tax matters related to the Acquired Assets for a Pre-Closing Tax Period, including the preparation, filing and execution of Tax Returns, and any audit, litigation or other proceeding with respect to Taxes. Such cooperation shall include the retention and (upon the other Party's reasonable request) the provision of records and information that are reasonably relevant to the preparation, filing and execution of Tax Returns and any such audit, litigation or other proceeding during normal business hours and making employees available (as reasonably requested) on a mutually convenient basis to provide additional information and explanation of any materials provided hereunder. Notwithstanding anything in this agreement to the contrary, in no event will Purchaser or any Affiliate of Purchaser have any rights with respect to (including the preparation thereof) or access to any Tax Return (including a Consolidated Tax Return) or other Tax information or workpapers of Seller that do not relate to the Project, an Acquired Asset, or an Assumed Liability.

(g)     To the extent any reduction in assessed value result from any protest, appeal, or other proceeding relating to ad valorem property Taxes for the Straddle Period (or portion thereof), including any protest filed with the Clay County Appraisal District, any determination by the appraisal review board thereof, and any judicial appeal therefrom (each, a "Property Tax Protest") relates to Taxes that were or are to be prorated between Seller and Purchaser pursuant to Section 5.9(e), the Parties shall reconcile such prorations following final resolution of the applicable protest, and any amounts owed as a result thereof shall be paid promptly after such determination.

Section 5.10   **Access to Information**.

(a)     Seller shall, prior to the Closing, provide to Purchaser, through its Advisors, reasonable access, during normal business hours, and upon reasonable advance written request, to the books and records, including work papers, Disclosure Schedules, memoranda, and other documents (for the purpose of examining) which relate to the Project, the Acquired Assets, or the

27

Assumed Liabilities with respect to periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance written notice, to Advisors of Purchaser (including for the purpose of better understanding the books and records). The information provided pursuant to this Section 5.10 will be used solely for the purpose of consummating the transactions contemplated hereby and will be governed by the Confidentiality Agreement. Purchaser will, and will cause its Advisors to, abide by the terms of the Confidentiality Agreement. Nothing in this Agreement requires Seller to provide any diligence materials to Purchaser or its Advisors in a manner that is inconsistent with the Bidding Procedures Order or Bidding Procedures.

(b)     Purchaser will not and will not permit any member of the Purchaser Group to, contact any officer, manager, director, QSE, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder or other material business relation of Seller prior to the Closing with respect to Seller or the Transaction, in each case without the prior written consent of Seller for each such contact.

**Section 5.11     ERCOT and QSE Covenants**.

(a)     Subject to the Sale Order and without prejudice to Section 5.11(b) herein, Purchaser (with the Seller's cooperation as contemplated herein) shall be responsible for (i) obtaining any written consents required to assign the Interconnection Agreement from Oncor Electric Delivery Company, LLC and the Qualified Scheduling Entity Contracts with Tenaska Power Services Co. (identified on Section 1.1(a) of the Disclosure Schedules, collectively, the "QSE Agreement"), and all applicable approvals, if required, from regulatory authorities, including ERCOT; provided that the failure to obtain such consent or approvals prior to Closing shall not delay the Closing (assuming that the QSE Agreement has been duly assigned under the Sale Order); and (ii) as between Purchaser and Seller, the operation of the Acquired Assets and the Assumed Liabilities in accordance with applicable Laws from and after the Closing.

(b)     Purchaser shall use commercially reasonable efforts, at its sole cost and expense, to cause the transfer, re-registration, or replacement of the ERCOT resource registrations, and any related market participation registrations associated with the Acquired Assets and the Project from Seller to Purchaser or Purchaser's designated affiliate as promptly as practicable following the Closing, but in no event later than the term of the TSA. Seller shall reasonably cooperate with Purchaser in connection with such transfer during such period; provided that Seller shall not be required to incur any material cost, assume any liability, or remain liable to ERCOT for any period following the Closing (subject to, and except as otherwise contemplated in, the terms of the TSA).

(c)     Seller shall remain responsible for all ERCOT settlement charges, costs, obligations (interconnection or otherwise), operating and maintenance requirements related to telemetry and transmission, and all other Liabilities attributable to the operation of the Acquired Assets prior to the Effective Time, and Purchaser shall be responsible for all such charges and obligations attributable to periods from and after the Effective Time.

(d)     All revenues, credits, and payments arising from participation of the Acquired Assets and the Project in the ERCOT market, including energy, ancillary services, and

congestion revenues, shall be prorated between Seller and Purchaser as of the Effective Time based on the operating interval in which the Effective Time occurs.

(e)     At the Closing, and pursuant to an Assignment and Assumption Agreement, Seller shall assign to Purchaser, and Purchaser shall assume, all of Seller's right, title and interest in and to the QSE Agreement and the Interconnection Agreement.

(f)     Seller shall reasonably cooperate with Purchaser in connection with the foregoing; provided that Seller shall not be required to incur any material cost or assume any additional liability in connection therewith, without prejudice to what is contemplated in the TSA.

(g)     Subject to the terms and conditions of the TSA, from and after the Effective Time, Seller shall not be responsible for all obligations under the QSE Agreement, the Interconnection Agreement, or for ensuring that the Acquired Assets and the Project is properly represented in the ERCOT market by the Qualified Scheduling Entity.

(h)     Subject to the terms and conditions of the TSA, from and after the Effective Time, Purchaser shall assume sole responsibility for participation of the Acquired Assets and the Project in the ERCOT market, including compliance with the ERCOT Protocols, Operating Guides, and all other ERCOT requirements applicable to the Acquired Assets and the Project. Subject to the terms and conditions of the TSA, from and after the Effective Time, Seller shall have no responsibility or liability for the operation of the Acquired Assets or the Project, participation in the ERCOT market, or compliance with ERCOT Protocols.

(i)     Subject to the terms and conditions of the TSA, Purchaser shall be solely responsible for satisfying any creditworthiness or collateral requirements imposed by ERCOT or otherwise in connection with the Acquired Assets and the Project or Purchaser's participation in the ERCOT market from and after the Effective Time. Purchaser shall be responsible for becoming a registered account holder with respect to all Renewable Energy Credits purchased in connection with the Transaction and the transfer of associated registry accounts. During the term of the TSA, Seller shall reasonably cooperate with Purchaser to cause any applicable renewable energy tracking system accounts associated with the Project to be transferred to Purchaser. Purchaser shall indemnify, defend, and hold the Seller Group harmless from and against any and all Losses arising out of or resulting from (a) any breach of Purchaser's covenants and obligations set forth in Article V and (b) any actions or omissions of any member of the Seller Group taken or not taken at the direction of, or as permitted or required by, Purchaser or any of its Affiliates pursuant to the TSA or in connection with the performance of the services thereunder, provided, that such indemnity obligations shall survive the Closing and may not be offset, netted, or otherwise reduced by Purchaser. For the avoidance of doubt, no member of the Seller Group shall have any liability to Purchaser or any of its Affiliates for any such actions or omissions taken in accordance with the TSA.

**Section 5.12   CFIUS**. Purchaser shall be solely responsible for determining whether the Transaction constitutes a "covered transaction" subject to review by the Committee on Foreign Investment in the United States ("CFIUS"). If Purchaser determines that a filing with CFIUS is required or advisable, Purchaser shall prepare and submit any declaration or notice to CFIUS and shall bear all filing fees and expenses associated therewith; provided that the failure to make any

29

such filing shall not delay the Closing. Seller shall reasonably cooperate with Purchaser in connection with any such filing, including by providing information reasonably requested by Purchaser for inclusion in the submission; provided, that Seller shall not be required to incur any material out-of-pocket costs or disclose competitively sensitive information except pursuant to appropriate confidentiality protections. Purchaser shall take all actions necessary to obtain clearance from CFIUS for the Transaction; provided, however, that Seller shall not be required to agree to any mitigation measures, conditions, or restrictions imposed by CFIUS that would reasonably be expected to impose obligations on Seller or any of its Affiliates after the Closing. Purchaser shall bear all costs associated with any mitigation agreement required by CFIUS.

Section 5.13    **Title Insurance**. In the event that Purchaser elects to obtain, at Purchaser's sole cost and expense, an owner's policy of title insurance (together with any endorsements thereto, the "Title Policy") with respect to any of the Assumed Real Property Interests, to be issued at the Closing by a title insurance company selected by Purchaser (the "Title Company"), Seller shall reasonably cooperate, at no out-of-pocket cost to Seller, with Purchaser and the Title Company in connection with the issuance of the Title Policy and shall execute and deliver to the Title Company, at or prior to the Closing, such customary affidavits, certificates, and instruments (each qualified by Seller's Knowledge), as may be reasonably and customarily required by the Title Company to issue the Title Policy (including any customary endorsements reasonably requested by Purchaser); provided that (a) the issuance of the Title Policy (and Purchaser's election or ability to obtain the Title Policy) shall not be a condition to Closing, it being understood and agreed, however, that the foregoing shall not relieve Seller of its obligation to deliver the affidavits, certificates, and other instruments contemplated by this Section 5.13 at or prior to the Closing, and (b) all premiums, search fees, endorsement charges, examination costs, and other expenses associated with the Title Policy shall be borne solely by Purchaser.

Section 5.14    **Insurance Claims and Proceeds**. At any time before the Closing and for a period of twelve (12) months following the Closing Date, Seller shall, upon reasonable prior written notice from Purchaser, use commercially reasonable efforts to cooperate, and cause the relevant Seller Related Parties to cooperate, with Purchaser in connection with the pursuit of any claim or entitlement to proceeds under any of the Insurance Claims, at the Purchaser's sole cost and expense; provided, (i) such cooperation shall be limited to actions that do not unreasonably interfere with Seller's business or the administration of its estate, (ii) Seller shall have no obligation to commence, prosecute, settle or assign control of any such claim, (iii) Seller shall retain the right to control the adjustment, prosecution and settlement of any Insurance Claims, subject to consultation with Purchaser in good faith, (iv) Purchaser shall reimburse Seller promptly upon request for any and all reasonable, documented out-of-pocket costs and expenses (including reasonable attorneys' fees) incurred in connection with such cooperation, and may be required to advance such amounts, (v) Seller shall not be required to waive or prejudice any rights under its insurance policies or applicable Law, and (vi) for the avoidance of doubt, that Seller shall not bear responsibility for deductibles, coverage gaps, or denied claims in connection with any such claim. Notwithstanding any other provision of this Agreement, Seller shall not enter into a settlement of any Insurance Claim without the prior written consent of Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed).

**ARTICLE VI**
**CONDITIONS TO CLOSING**

**Section 6.1** **Conditions Precedent to the Obligations of Purchaser and Seller**. The respective obligations of each Party to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a) No court of competent jurisdiction shall have issued, enacted, entered, promulgated or enforced any Order (including any temporary restraining Order or preliminary or permanent injunction) restraining, enjoining or otherwise prohibiting the Transaction that is still in effect; and

(b) The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not have been stayed, reversed, made subject to an appeal or modified in a manner not acceptable to the Parties.

**Section 6.2** **Conditions Precedent to the Obligations of Purchaser**. The obligations of Purchaser to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), at the Closing, of each of the following conditions:

(a) (i) the representations and warranties made by Seller in Article III (in each case, other than the Fundamental Representations) shall be true and correct in all respects as of the Effective Time as though made on and as of the Effective Time on the Closing Date, except (A) that representations and warranties that are made as of a specified date need be true and correct only as of such date and (B) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had a Material Adverse Effect and (ii) the representations and warranties set forth in Section 3.1, Section 3.2, Section 3.4, and Section 3.6 (collectively, the "Fundamental Representations") shall be true and correct (without giving effect to any "material", or "materiality" or "Material Adverse Effect" qualification contained in such representations and warranties) in all material respects as of the Closing Date as though made on and as of the Closing Date, except that such Fundamental Representations that are made as of a specified date need be true and correct in all material respects only as of such date;

(b) Seller shall not have breached in a manner that is material with respect to the Transaction, taken as a whole, the covenants required to be performed or complied with by Seller under this Agreement on or prior to Closing without curing such breach prior to the Closing Date;

(c) The Bankruptcy Court shall have entered the Stalking Horse Approval Order and the Stalking Horse Approval Order shall not have been stayed, reversed, made subject to an appeal or modified in a manner not acceptable to the Purchaser;

(d) Purchaser has all contractual rights conveyed under this Agreement to report, register, transfer, sell, or otherwise monetize Renewable Energy Certificates under the Project's applicable renewable energy tracking system or registry; and

31

(e) Seller shall have delivered, or caused to be delivered, to Purchaser all the items set forth in Section 2.6.

**Section 6.3** **Conditions Precedent to the Obligations of Seller**. The obligations of Seller to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller in its sole discretion), at the Closing, of each of the following conditions:

(a) The representations and warranties made by Purchaser in Article IV shall be true and correct in all material respects as of the Effective Time on the Closing Date as though made on and as of the Effective Time on the Closing Date, except (A) that representations and warranties that are made as of a specified date need be true and correct only as of such date and (B) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had a Material Adverse Effect;

(b) Purchaser shall not have breached in a manner that is material with respect to the Transaction, taken as a whole, the covenants required to be performed or complied with by it under this Agreement on or prior to the Closing without curing such breach prior to the Closing; and

(c) Purchaser shall have delivered, or caused to be delivered, to Seller all the items set forth in Section 2.7.

**Section 6.4** **Waiver of Conditions**. Upon the occurrence of the Closing, any condition set forth in this Article VI that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. None of Purchaser or Seller may rely on the failure of any condition set forth in this Article VI, as applicable, to be satisfied if such failure was caused by such Party's failure to perform any of its obligations under this Agreement, including its obligation to use its reasonable best efforts to consummate the Transaction as required under this Agreement.

**ARTICLE VII**
**TERMINATION**

**Section 7.1** **Termination of Agreement**. This Agreement may be terminated at any time prior to the Closing only in accordance with this Section 7.1, and in no other matter:

(a) By the mutual written consent of Purchaser and Seller;

(b) By written notice of either Purchaser or Seller, upon the issuance of an Order by a court of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Closing or declaring unlawful the Transaction, and such Order having become final, binding and non-appealable; provided that no Party may terminate this Agreement under this Section 7.1(b) if the issuance of such Order was caused by such Party's failure to perform any of its obligations under this Agreement;

(c) By written notice of either Purchaser or Seller, if the Closing shall not have occurred on or before June 24, 2026 (the "Outside Date"); provided that a Party shall not be permitted to terminate this Agreement pursuant to this Section 7.1(c) if the failure of the Closing

to have occurred by the Outside Date was caused by such Party's failure to perform any of its obligations under this Agreement; provided further that Seller may extend the Outside Date up to an additional sixty (60) days to the extent approved by the Prepetition Secured Parties under the terms of the Bidding Procedures and as necessary to satisfy the conditions set forth in Section 6.1 so long as the other conditions in Article VI (other than conditions that by their nature are to be satisfied at the Closing) have been satisfied or waived;

(d)     By written notice from Seller to Purchaser, upon a material breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser will have become untrue, in each case, such that any conditions to Closing herein would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; provided that (i) if such breach is curable by Purchaser, then Seller may not terminate this Agreement under this Section 7.1(d) unless such breach has not been cured by the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after Seller notifies Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this Section 7.1(d) will not be available to Seller at any time that Seller is in material breach of, any covenant, representation or warranty hereunder;

(e)     By written notice from Purchaser to Seller, upon a material breach of any covenant or agreement on the part of Seller, or if any representation or warranty of Seller will have become untrue, in each case, such that any conditions to Closing herein would not be satisfied; provided that (i) if such breach is curable by Seller then Purchaser may not terminate this Agreement under this Section 7.1(e) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after Purchaser notifies Seller of such breach and (ii) the right to terminate this Agreement pursuant to this Section 7.1(e) will not be available to Purchaser at any time that Purchaser is in material breach of, any covenant, representation or warranty hereunder;

(f)     By written notice from Seller to Purchaser, if all of the conditions set forth in Section 6.1 and Section 6.2 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived, Seller has confirmed to Purchaser by irrevocable written notice that Seller is ready, willing and able to consummate the transactions contemplated hereby as of such date, and Purchaser fails to complete the Closing on or before the Outside Date, provided, that Purchaser shall not be entitled to assert the failure of any condition set forth in Section 6.1 or Section 6.2 as a basis for not consummating the Closing to the extent such failure results from or arises out of Purchaser's breach of this Agreement;

(g)     By written notice from Purchaser to Seller, if all of the conditions set forth in Section 6.1 and Section 6.3 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived, Purchaser has confirmed to Seller by irrevocable written notice that Purchaser is ready, willing and able to consummate the transactions contemplated hereby as of such date, and Seller fails to complete the Closing on or before the Outside Date, provided, that Seller shall not be entitled to assert the failure of any condition set forth in Section 6.1 or Section 6.3 as a basis for not consummating the Closing to the extent such failure results from or arises out of Seller's breach of this Agreement;

33

(h) By written notice of either Purchaser or Seller, if (i) Seller enters into or announces its support for one or more Alternative Transactions with one or more Persons other than Purchaser or the Successful Bidder or the Back-Up Bidder at the Auction (ii) the Bankruptcy Court approves an Alternative Transaction other than with the Successful Bidder or the Back-Up Bidder, or (iii) Seller consummates an Alternative Transaction with the Successful Bidder;

(i) By written notice from Purchaser to Seller if (i) the Seller does not file the Stalking Horse Supplement (as defined in the Bidding Procedures) with the Bankruptcy Court on or before April 30, 2026; (ii) in the event there is no objection to the Stalking Horse Supplement, the Bankruptcy Court does not enter an order approving the Stalking Horse Bid within five (5) Business Days of the filing and service of the Stalking Horse Supplement; or (iii) in the event there is an objection to the Stalking Horse Supplement, the Bankruptcy Court does not enter the Stalking Horse Approval Order within ten (10) Business Days of the filing and service of the Stalking Horse Supplement; *provided, however*, the deadlines for the Bankruptcy Court to enter the Stalking Horse Approval Order are subject to the Bankruptcy Court' availability to hold any hearing ordered by the Bankruptcy Court or required by the Bidding Procedures Order and shall be automatically extended a reasonable period of time to accommodate the Bankruptcy Court's schedule and availability;

(j) By either Purchaser or Seller, if an Order of the Bankruptcy Court is entered denying approval of the Sale Order or the Stalking Horse Approval Order and such Order shall have become a Final Order;

(k) By either Purchaser or Seller, (i) if the Bankruptcy Court enters an Order dismissing, or converting the Chapter 11 Case into a case under Chapter 7 of the Bankruptcy Code, without the prior approval of the Purchaser, that is not reversed or vacated within fourteen (14) days after entry thereof or (ii) if the Bankruptcy Court enters an Order appointing a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Seller that is not reversed or vacated within fourteen (14) days after entry thereof;

(l) By either Purchaser or Seller, if, following the Sale Hearing, Purchaser is not the Successful Bidder or the Back-Up Bidder; or

(m) By Purchaser, if (i) the Bidding Procedures Order is voided, reversed or vacated or is subject to a stay and is not re-issued or re-instated or (ii) following entry by the Bankruptcy Court of the Sale Order, the Sale Order is voided, reversed or vacated or is subject to a stay and is not re-issued or re-instated.

**Section 7.2     Effect of Termination**.

(a) In the event of termination of this Agreement pursuant to Section 7.1, this Agreement shall forthwith become null and void and no Party or any of its partners, officers, directors, managers or equityholders will have any Liability under this Agreement; provided that Section 2.2(e), Section 2.2(f), Section 5.10(b), Section 7.2 and Article VIII shall survive any such termination; provided further that no termination will relieve Purchaser from any Liability for damages, losses, costs or expenses resulting from any Willful Breach of this Agreement prior to

the date of such termination (which, for the avoidance of doubt, will be deemed to include any failure by Purchaser to consummate the Closing if and when it is obligated to do so hereunder).

(b)    In consideration of Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof, if this Agreement is terminated and Purchaser is entitled to receipt of the Deposit pursuant to Section 2.2, then Seller will pay to Purchaser by wire transfer of immediately available funds within two (2) Business Days following such termination of this Agreement an amount equal to the reasonable and documented out-of-pocket costs and expenses (including fees and expenses of counsel) incurred by Purchaser in connection with the negotiation, diligence, execution, performance and enforcement of this Agreement, which amount will shall not exceed one hundred thousand United States Dollars ($100,000) ("Expense Reimbursement").

(c)    In consideration of Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof, if this Agreement is terminated pursuant to Section 7.1(h), Seller shall pay to Purchaser a break-up fee in an amount equal to 2.5% of the Closing Date Payment, prior to giving any credit for the Deposit (the "Breakup Fee"); provided that the Breakup Fee shall be payable concurrently with the consummation of, and only out of the cash proceeds of, an Alternative Transaction, to an account designated by Purchaser in writing to Seller; provided, further, that the Breakup Fee shall also be payable if this Agreement is terminated pursuant to Section 7.1(l) to the extent that any Alternative Transaction which replaces (as opposed to prohibits or interferes with) the Closing is consummated within six (6) months following the date of termination of this Agreement pursuant to Section 7.1(l). Each of the Parties acknowledges and agrees that the agreements contained in this Section 7.2(c) are an integral part of this Agreement and that the Expense Reimbursement and the Breakup Fee are not a penalty, but rather represent liquidated damages in a reasonable amount that will reasonably compensate Purchaser in the circumstances in which such Expense Reimbursement or Breakup Fee, as applicable, is payable for the efforts and resources expended and opportunities foregone by Purchaser while negotiating and pursuing this Agreement and in reasonable reliance on this Agreement and on the reasonable expectation of the consummation of the Transaction, which amount would otherwise be impossible to calculate with precision.

(d)    Prior to the Closing, in the event of any breach by Seller of this Agreement, the sole and exclusive remedy of Purchaser shall be to terminate this Agreement in accordance with Section 7.1 and, if applicable, to receive the Deposit and the Expense Reimbursement or the Breakup Fee, as applicable, in accordance with Section 2.2(c) and Section 7.2(c). Pursuant to the Bidding Procedures Order and subject to approval by the Bankruptcy Court and entry of any Agreement Order, the claim of Purchaser in respect of the Expense Reimbursement or the Breakup Fee is and constitutes an allowed administrative expense claim against Seller under Sections 503 and 507(b) of the Bankruptcy Code in the Chapter 11 Case.

## ARTICLE VIII
## MISCELLANEOUS

**Section 8.1    Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers**. Each of the representations and warranties and the covenants (to the extent such covenant contemplates or requires performance by such Party prior to the Closing)

of the Parties set forth in this Agreement or in any other document contemplated hereby will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. All other covenants and agreements of the Parties contained herein shall survive the Closing indefinitely or for the period explicitly specified therein.

Section 8.2 **Expenses**. Whether or not the Closing takes place, except as otherwise provided herein, all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the Transaction will be paid by the Party incurring such fees, costs and expenses.

Section 8.3 **Notices**. Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail (having obtained electronic delivery confirmation thereof), if delivered by 5:00 P.M. local time of the recipient on a Business Day and otherwise on the following Business Day, (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the fifth Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

> Notices to Purchaser:
> 1370 Clean Energy LLC
> 4200 Wilson Boulevard, Suite 420,
> Arlington Virginia 22230
> Attention: Todd Wynn, Olivia Genereux
> Email: twynn@dauntless-energy.com; Olivia.genereux@ardian.com
>
> with a copy to (which shall not constitute notice):
>
> Gibson, Dunn & Crutcher LLP
> 200 Park Avenue
> New York, New York 10166
> Attention: Tomer Pinkusiewicz; Marwan Azzi
> Email: TPinkusiewicz@gibsondunn.com; Mazzi@gibsondunn.com
>
> Notices to Seller:
> Shannon Wind, LLC
> c/o Accordion Partners, LLC
> One Vanderbilt Avenue, 24th Floor
> New York, NY 10017
> Attention: John Shepherd, Chief Restructuring Officer

Email: john.shepherd@accordion.com and legal@accordion.com

with copies to (which shall not constitute notice):

Bradley Arant Boult Cummings LLP
600 Travis St., Ste 5600
Houston, Texas 77057
Attention: Jarrod Martin and David Sheinbein
Email: jmartin@bradley.com and dsheinbein@bradley.com

Section 8.4     **Binding Effect; Assignment**. This Agreement shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Sale Order, Seller, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any member of the Seller Group who is a trustee or other Representative of the estate appointed in the Chapter 11 Case of Seller or any successor Chapter 7 cases; provided that neither this Agreement nor any of the rights or obligations hereunder may be assigned, delegated or otherwise transferred without the prior written consent of Purchaser and Seller, and any attempted assignment or delegation without such prior written consent shall be null and void ab initio. Notwithstanding the foregoing, Purchaser may assign this Agreement and its rights hereunder, without the prior written consent of, but with written notice to, Seller to any Affiliate of Purchaser or cause one or more of its Affiliates to perform its obligations hereunder (such Affiliate or Affiliates of Purchaser, a "Designated Buyer") provided, however, that no such assignment or designation shall relieve Purchaser of any of its obligations or liabilities under this Agreement, and Purchaser shall remain primarily liable, jointly and severally with any Designated Buyer, for the full and timely performance of all obligations of Purchaser hereunder. Any such assignment shall be conditioned upon the Designated Buyer expressly assuming, in a written instrument reasonably acceptable to Seller, all of the obligations of Purchaser hereunder applicable to the portion so assigned.  After giving effect to any such assignment, all of Purchaser's rights and obligations under this Agreement shall transfer to such Designated Buyer; provided, that Seller shall be entitled to enforce this Agreement against Purchaser and any Designated Buyer, jointly and severally, in respect of all such obligations. No assignment or designation shall (a) delay, impair or adversely affect Seller's rights or remedies hereunder, (b) require Seller to incur any additional liability or obligation, or (c) be effective if such assignment is made to avoid Purchaser's obligations hereunder.

Section 8.5     **Amendment and Waiver**. Any provision of this Agreement or the Disclosure Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and Seller or (b) waived only in a writing executed by the Party against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default. No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by Law.

**Section 8.6     Third-Party Beneficiaries**. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than (a)(i) for purposes of Section 2.3, Section 5.11, and Section 8.20, the Seller Group, (ii) for purposes of Section 8.7, the Non-Recourse Persons, and (iii) for purposes of Section 2.2(g), the Seller Related Parties and the Purchaser Related Parties, and (b) the Parties hereto and such permitted assigns, any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.  The Parties acknowledge and agree that they are intended and express beneficiaries of this Agreement and the other Transaction Documents, and the rights created thereunder, and shall have the right, exercisable in their discretion, to enforce the terms and conditions of this Agreement against the Parties, as applicable, or to prevent the breach thereof, or to exercise any other right, or seek any other remedy, which may be available to them as third-party beneficiaries of this Agreement.

**Section 8.7     Non-Recourse**. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as Parties to this Agreement. Except to the extent named as a Party to this Agreement, and then only to the extent of the specific obligations of such Parties set forth in this Agreement, no past, present or future direct or indirect shareholder, member, partner, manager, director, officer, employee, Affiliate, creditor, agent or Advisor of any Party (each, a "Non-Recourse Person") will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Agreement Dispute and in no event shall any Party have any shared or vicarious liability, or otherwise be the subject of legal or equitable claims, for the actions, omissions or fraud (including through equitable claims (such as unjust enrichment) not requiring proof of wrongdoing committed by the subject of such claims) of any other Person, and each of such Persons are intended third-party beneficiaries of this Section 8.7 and shall be entitled to enforce this Section 8.7 as if a party directly hereto.

**Section 8.8     Severability**. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

**Section 8.9     Construction**. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person.

**Section 8.10     Complete Agreement**. This Agreement, together with the Confidentiality Agreement and any other agreements expressly referred to herein or therein, contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transaction and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transaction. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any

purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

Section 8.11    **Jurisdiction and Exclusive Venue**. Each of the Parties irrevocably agrees that any Action of any kind whatsoever, including a counterclaim, cross-claim, or defense, regardless of the legal theory under which any Liability or obligation may be sought to be imposed, whether sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Agreement or the negotiation, execution, or performance of this Agreement or the Transaction and any questions concerning the construction, interpretation, validity and enforceability of this Agreement (each, an "Agreement Dispute") brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Texas Business Courts sitting in Houston, Texas (or if such court declines to accept jurisdiction over a particular matter, in which case, in any state or federal court located in Harris County, Texas) (the "Chosen Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute. Each of the Parties agrees not to commence any Agreement Dispute except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Courts, and no Party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of any Agreement Dispute. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 8.3. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

Section 8.12    **Governing Law; Waiver of Jury Trial.**

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and any Agreement Dispute will be governed by and construed in accordance with the internal Laws of the State of Texas applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Texas or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Texas to apply.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY AGREEMENT DISPUTE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW THAT CANNOT BE WAIVED, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY AGREEMENT DISPUTE WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN TORT OR CONTRACT OR OTHERWISE. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH AGREEMENT DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND

THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY AGREEMENT DISPUTE, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 8.12(B)</u>.

**Section 8.13** **<u>No Right of Set-Off</u>**. Purchaser, on its own behalf and on behalf Purchaser Group and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment or similar rights that Purchaser, any member of Purchaser Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith.

**Section 8.14** **<u>Counterparts and PDF</u>**. This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. No party hereto or to any such Contract will raise the use of a .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

**Section 8.15** **<u>Publicity</u>**. Neither Seller nor Purchaser shall issue any press release or public announcement concerning this Agreement or the Transaction without obtaining the prior written approval of the other Party, which approval will not be unreasonably conditioned, withheld or delayed, unless, in the reasonable judgment of Purchaser or Seller, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement; <u>provided</u> that the Party intending to make such release shall use its reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof. Seller and Purchaser shall use reasonable efforts to resolve any objections to any press release or public announcement within twenty-four (24) hours after the request. Notwithstanding the foregoing, no such limitations will apply to Seller and its Affiliates or Purchaser and its Affiliates with respect to any communications with their Affiliates, Representatives, limited partners, clients or prospective investors or disclosing information about the Transaction on their websites in the ordinary course of business.

**Section 8.16** **<u>Bulk Sales Laws</u>**. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances

(except Permitted Encumbrances) in the Acquired Assets including any Encumbrances or claims arising out of the bulk transfer laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the Transaction.

**Section 8.17** **Fiduciary Obligations**. Nothing in this Agreement, or any document related to the Transaction, will require Seller or any of its managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations or applicable Law. For the avoidance of doubt, Seller retains the right to pursue any transaction or restructuring strategy that, in Seller's business judgment, will maximize the value of its estate.

**Section 8.18** **Seller's Representative.** Each Party agrees that John Shepherd as Chief Restructuring Officer of Seller (the "CRO") has the power and authority to unilaterally act on behalf of Seller for the purposes specified under this Agreement. Such power will include the power to make all decisions, actions, consents and determinations on behalf of Seller, including to make any waiver of any closing condition or agree to any amendment to this Agreement. Seller shall not have any right to object, dissent, protest or otherwise contest the same. Purchaser shall be entitled to rely on any action or omission taken by the CRO on behalf of Seller.

**Section 8.19** **Disclosure Schedules.**

(a) The Disclosure Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; provided that each section of the Disclosure Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Disclosure Schedules, and any disclosure in the Disclosure Schedules will be deemed a disclosure against any representation or warranty set forth in this Agreement so long as the applicability of such disclosure is reasonably apparent on its face. Capitalized terms used in the Disclosure Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Disclosure Schedules or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Disclosure Schedules or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Disclosure Schedules or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course. No information set forth in the Disclosure Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item which terms will be deemed disclosed for all purposes of this Agreement. The information contained in this Agreement, in the Disclosure Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and

no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

(b)     Seller shall supplement or amend the Disclosure Schedules with new information that, if known on the date hereof, would have been included on the date hereof (each a "Schedule Supplement"). Any disclosure in any such Schedule Supplement shall not be deemed to give rise to any Purchaser termination rights pursuant to Article VII, provided that such Schedule Supplement does not result in a material breach of this agreement and would not be reasonably expected to have a Material Adverse Effect.

**Section 8.20    Releases**.

(a)     Effective from and after the Closing, Purchaser, on behalf of itself, and Purchaser Group, and their respective past, present or future successors, assigns, beneficiaries, heirs, administrators, executors, employees, agents, equityholders, partners, Affiliates and representatives (including their past, present or future officers and directors), hereby knowingly, voluntarily, irrevocably, unconditionally and forever acquit, release and discharge, and covenant not to sue Seller and its predecessors, successors (other than Purchaser), estate, trust, trustee of any liquidating trust, and all of their respective current and former officers, directors, members, managers, shareholders, employees, agents and representatives (the "Seller Group"), from any and all Actions, causes of action, Liabilities, obligations, damages, losses, costs, expenses (including attorneys' fees), penalties, fines and judgments (at equity or at law, including statutory and common) and damages, asserted or unasserted, express or implied, foreseen or unforeseen, suspected or unsuspected, known or unknown, matured or unmatured, contingent or vested, liquidated or unliquidated, of any kind or nature or description whatsoever, in each case arising from any matter, cause or event occurring from the beginning of time to the Closing (collectively, the "Released Claims") that Purchaser, or Purchaser Group, presently has, has ever had, or may hereafter have; *provided, however*, that the release given under this Section 8.20(a) shall not apply to any Action arising under this Agreement or any Transaction Documents.

(b)     Effective from and after the Closing, Seller, on behalf of itself, and its respective past, present or future successors, assigns, beneficiaries, heirs, administrators, executors, employees, agents, equityholders, partners, Affiliates and representatives (including their past, present or future officers and directors), hereby knowingly, voluntarily, irrevocably, unconditionally and forever acquit, release and discharge, and covenant not to sue Purchaser and its predecessors, successors, estate, and all of their respective current and former officers, directors, members, managers, shareholders, employees, agents and representatives, from any and all Released Claims that Seller or its respective past, present or future successors, assigns, beneficiaries, heirs, administrators, executors, employees, agents, equityholders, partners, Affiliates and representatives (including their past, present or future officers and directors), presently has, has ever had, or may hereafter have; *provided, however*, that the release given under this Section 8.20(b) shall not apply to any Action arising under this Agreement or any Transaction Documents.

**Section 8.21    Mutual Drafting**. This Agreement is the result of the joint efforts of Purchaser and Seller, and each provision hereof has been subject to the mutual consultation,

negotiation and agreement of the Parties and there is to be no construction against any Party based on any presumption of that Party's involvement in the drafting thereof.

## ARTICLE IX
## ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

**Section 9.1** **Certain Definitions**.

(a) "Accounts Receivable" means, (a) the trade accounts receivable, and other rights to payment, of Seller and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable arising from bona fide transactions entered into in the Ordinary Course, (b) the other accounts or notes receivable of Seller and the full benefit of all security for such accounts or notes, and (c) any claim, cause of action, remedy or other right related to any of the foregoing, in each case, which are solely related to the Project and the Acquired Assets.

(b) "Acquired Assets" shall have the meaning set forth in Section 1.1.

(c) "Action" means any action, suit, litigation, arbitration, mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding) or prosecution of any kind whatsoever whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before any Governmental Body.

(d) "Advisors" means, with respect to any Person as of any relevant time, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

(e) "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management, affairs and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(f) "Agreement" shall have the meaning set forth in the Preamble.

(g) "Agreement Dispute" shall have the meaning set forth in Section 8.11.

(h) "Allocation Statement" shall have the meaning set forth in Section 5.9.

(i) "Alternative Transaction" shall have the meaning set forth in Section 5.3.

(j) "Annual Land Fees" means all prepaid real estate obligations under the Assumed Real Property Interests;

(k) "Asset Amount" shall have the meaning set forth in Section 5.9.

(l)    "Assigned Contracts" shall have the meaning set forth in Section 1.1(a).

(m)    "Assignment and Assumption Agreement" shall have the meaning set forth in Section 2.6(a).

(n)    "Assignment and Assumption of Easement" shall have the meaning set forth in Section 2.6(a).

(o)    "Assignment and Assumption of Interconnection Agreement" shall have the meaning set forth in Section 2.6(a).

(p)    "Assignment and Assumption of Leases" shall have the meaning set forth in Section 2.6(a).

(q)    "Assumed Liabilities" shall have the meaning set forth in Section 1.3.

(r)    "Assumed Real Property Interests" shall have the meaning set forth in Section 1.1(j).

(s)    "Auction" shall have the meaning ascribed to it in the Bidding Procedures.

(t)    "Back-Up Bidder" shall have the meaning set forth in Section 5.3.

(u)    "Bankruptcy Code" shall have the meaning set forth in the Recitals.

(v)    "Bankruptcy Court" shall have the meaning set forth in the Recitals.

(w)    "Bidding Procedures" means the bidding procedures approved by the Bankruptcy Court pursuant to the Bidding Procedures Order.

(x)    "Bidding Procedures Order" means the Bankruptcy Court's Order (I) Scheduling a Hearing on the Approval of the Sale of All or Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests, and the Assumption and Assignment of Executory Contracts and Unexpired Leases and (II) Approving Certain Bidding Procedures, Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof [Docket No. 66].

(y)    "Breakup Fee" shall have the meaning set forth in Section 7.2(c).

(z)    "Business Day" means any day other than a Saturday, Sunday or other day on which banks in Houston, Texas are authorized or required by Law to be closed.

(aa)    "CFIUS" shall have the meaning set forth in Section 5.12.

(bb)    "Chapter 11 Case" shall have the meaning set forth in the Recitals.

(cc)    "Chosen Courts" shall have the meaning set forth in Section 8.11.

(dd)    "Closing" shall have the meaning set forth in Section 2.5.

(ee)    "Closing Credits" shall have the meaning set forth in Section 2.3(a).

(ff)    "Closing Date" shall have the meaning set forth in Section 2.5.

(gg)    "Closing Date Payment" shall have the meaning set forth in Section 2.1.

(hh)    "Closing Statement" shall have the meaning set forth in shall have the meaning set forth in Section 2.3(a).

(ii)    "CRO" shall have the meaning set forth in Section 8.18.

(jj)    "Confidentiality Agreement" means that certain letter agreement, dated as of February 9, 2026 by and between Seller and Ardian Americas Infrastructure Fund V S.C.S., SICAV-RAIF and ARDIAN Americas Infrastructure Fund V L.P., in each case, for and on behalf of itself and Purchaser Group.

(kk)    "Consolidated Tax Return" means any Tax Return of Seller Tax Group with respect to any U.S. federal, state or local or non-U.S. Taxes (including income Taxes) that are paid on an affiliated, consolidated, combined, unitary or similar group basis.

(ll)    "Contract" means any written contract, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, or other agreement that is binding upon a Person or its property, in each case, other than a purchase order, service order, or sales order.

(mm)    "Cure Cap" means a cap on the aggregate amount of all Cure Costs to be paid by the Purchaser, which shall be (and never exceed) $300,000.

(nn)    "Cure Costs" shall have the meaning set forth in Section 1.3(b).

(oo)    "Cure Notice" shall have the meaning set forth in Section 1.5(a).

(pp)    "Dataroom" shall have the meaning set forth in Section 3.6.

(qq)    "Decommissioning Obligations" means all costs, obligations or Liabilities of or for abandonment and re-abandonment, equipment removal, disposal, or restoration associated with any Acquired Assets.

(rr)    "Deposit" shall have the meaning set forth in Section 2.2(a).

(ss)    "Disclosure Schedules" means the Disclosure Schedules delivered by Seller concurrently with the execution and delivery of this Agreement.

(tt)    "Disputed Amounts" shall have the meaning set forth in shall have the meaning set forth in Section 2.3(f).

(uu)    "Easement" shall have the meaning set forth in Section 1.1(j).

(vv)    "Effective Time" means 12:00 a.m. local time on the Closing Date.

(ww) "<u>Encumbrances</u>" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, Interest, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, encumbrance, lien, pledge, option to purchase or lease, right of first offer or refusal, conditional sale or other title retention agreement or lease in the nature thereof, preemptive right (whether statutory or contractual), adverse claim (as defined in Section 8-102(a)(1) of the Uniform Commercial Code), any subordination arrangement in favor of another Person, security interest or agreement, easement or similar encumbrance, other than restrictions on transfer arising under applicable securities Laws, leases and licenses granted in the Ordinary Course, and any encroachment, defect in title, or right of way, including any agreement to give any of the foregoing in the future.

(xx) "<u>ERCOT</u>" means the Electric Reliability Council of Texas and is generally referred to as the area in Texas served by electric utilities, municipally owned utilities, and electric cooperatives that is not synchronously interconnected with electric utilities outside the state.

(yy) "<u>ERCOT Operating Guides</u>" means those operating guides promulgated by ERCOT, as the independent system and grid operator of the State of Texas, relating to practices to be followed in the operation of the interconnected systems of the member utilities of ERCOT, as in effect from time to time, and any successor guides or rules of ERCOT applicable to the same subject matter.

(zz) "<u>ERCOT Protocols</u>" means the document adopted by ERCOT, including any attachments or exhibits referenced in that document, as amended from time to time, that contains the scheduling, operating, planning, reliability, and settlement (including customer registration) policies, rules, guidelines, procedures, standards, and criteria of ERCOT.

(aaa) "<u>ERCOT Short Pay Amounts</u>" means all amounts that ERCOT has not yet paid to Seller as a result of a short payment of Brazos Brazos Electric Power Cooperative.

(bbb) "<u>Escrow Agent</u>" shall have the meaning set forth in <u>Section 2.2(a)</u>.

(ccc) "<u>Excluded Assets</u>" shall have the meaning set forth in <u>Section 1.2</u>.

(ddd) "<u>Excluded Liabilities</u>" shall have the meaning set forth in <u>Section 1.4</u>.

(eee) "<u>Existing Title Policy</u>" shall have the meaning set forth in <u>Section 6.2(d)</u>.

(fff) "<u>Expense Reimbursement</u>" shall have the meaning set forth in <u>Section 7.2(a)</u>.

(ggg) "<u>Express Representations</u>" shall have the meaning set forth in <u>Section 3.6</u>.

(hhh) "<u>Fundamental Representations</u>" shall have the meaning set forth in <u>Section 6.2(a)</u>.

(iii) "<u>GE</u>" means GE Vernova International LLC.

46

(jjj)　"GE FSA" means that certain Full Service Agreement, made and entered into as of October 1, 2019, by and between Seller and GE, and as amended by that certain Amendment No.1 to the Full Service Agreement, dated as of May 27, 2020, and that certain Amendment No.2 to the Full Service Agreement, dated as of August 1, 2022.

(kkk)　"GE Liquidated Damages" means all liquidated damages payable or which may become payable to Seller or Purchaser for calendar year 2026 pursuant to the GE FSA, and to the extent relating to GE not meeting or exceeding guaranteed performance commitments under such agreement on or prior to the Closing Date. GE Liquidated Damages shall be calculated using consistent estimation methodologies used by Seller or its Representatives in calculating liquidated damages under the GE FSA for calendar years 2024 and 2025 and consistent with the formulae and performance metrics set forth in the GE FSA.

(lll)　"GE Prepaid Assets" means all payments made under the GE FSA by Seller for the second and third quarter periods of the 2026 calendar year.

(mmm)"Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator of applicable jurisdiction.

(nnn)　"Independent Accountants" shall have the meaning set forth in Section 2.3(f).

(ooo)　"Insurance Claims" shall have the meaning set forth in Section 2.3(f).

(ppp)　"Interconnection Agreement" means that certain ERCOT Standard Generation Interconnection Agreement, dated as of April 4, 2013, by and between Seller and Oncor Electric Delivery Company, LLC, and as amended on October 21, 2013 and June 2, 2014.

(qqq)　"Interest" means any interest within the meaning of section 363(f) of the Bankruptcy Code, including any interest of a Governmental Body, and all other interests, pledges, security interests, rights of setoff, restrictions or limitations on use, successor liabilities, conditions, rights of first refusal, options to purchase, obligations to allow participation, agreements or rights, rights asserted in litigation matters, competing rights of possession, obligations to lend, matters filed of record that relate to, evidence or secure an obligation of Seller (and all created expenses and charges) of any type under, among other things, any document, instrument, agreement, affidavit, matter filed of record, cause, or state or federal Law, whether known or unknown, legal or equitable, and all liens, rights of offset, replacement liens, adequate protection liens, charges, obligations, or claims granted, allowed or directed in any Law.

(rrr)　"Knowledge of Seller" means the actual knowledge, as of the date of this Agreement, without independent verification (and in no event encompass constructive, imputed or similar concepts of knowledge) of John Shepherd, acting solely in his capacity as Chief Restructuring Officer of Seller, *provided, however*, that for the sake of clarity and avoidance of doubt, such individual shall not have any personal Liability or obligations regarding such knowledge.

(sss) "Knowledge of Purchaser" means the actual knowledge, as of the date of this Agreement, without independent verification (and in no event encompass constructive, imputed or similar concepts of knowledge) of Todd Wynn, Stefano Mion, and Olivia Genereux, *provided, however*, that for the sake of clarity and avoidance of doubt, such individuals shall not have any personal Liability or obligations regarding such knowledge.

(ttt) "Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, ordinance, code, decree, treaty, convention, rule, regulation or Order issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body, including for the avoidance of doubt, the ERCOT Protocols and ERCOT Operating Guides.

(uuu) "Liability" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, Tax, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(vvv) "Losses" means, with respect to any Person, any and all losses, damages, liabilities, deficiencies, claims, interest, awards, judgments, penalties, costs and expenses (including attorneys' fees, costs and other out-of-pocket expenses incurred in investigating, preparing or defending the foregoing) incurred by such Person, but excluding, unless owed to third party by such Person, consequential damages, lost revenue, income or profits, diminution in value, lost opportunity damages, damages measured by a multiple of earnings and punitive damages.

(www) "Material Adverse Effect" means a material adverse effect on the Acquired Assets or Assumed Liabilities, taken as whole; provided that none of the following (or consequences thereof), either alone or in combination, shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: (i) any matter, event, change, development, occurrence, circumstance or effect (each, an "Effect") in, arising from or relating to general business or economic conditions affecting the industry in which Seller operates, including Effects arising from or relating to competition or Ordinary Course matters and other Effects within such industry, new entrants into such industry, new products from other participants in such industry, changes in product pricing due to such competition, changes in market share or financial results due to such competition, and other related changes resulting from such competition; (ii) Effects in, arising from or relating to national or international political or social conditions, including tariffs, riots, protests, the engagement by the United States or other country in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist (whether or not state-sponsored) attack upon the United States or any other country, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, equipment or personnel of the United States or of any other country; (iii) Effects in, arising from or relating to any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), viral or disease outbreaks or the worsening thereof, or any quarantine or

48

trade restrictions related thereto or any other *force majeure*; (iv) Effects in, arising from or relating to the decline or rise in price of any currency or any equipment or supplies necessary to or used in connection with the Project (including any resulting inability to meet customer demands or fulfill purchase orders and any resulting breaches of Contracts); (v) Effects in, arising from, or relating to financial, banking, or securities markets (including (A) any disruption of any of the foregoing markets, (B) any change in currency exchange rates, (C) any decline or rise in the price of any security, commodity, Contract, or index, and (D) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transaction); (vi) Effects in, arising from or relating to changes in, GAAP or the interpretation thereof; (vii) Effects in, arising from or relating to changes in, Laws or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Body and any increase (or decrease) in the terms or enforcement of (or negotiations or disputes with respect to) any of the foregoing; (viii) Effects in, arising from or relating to (A) the taking of any action permitted or contemplated by this Agreement or at the request of Purchaser or its Affiliates, (B) the failure to take any action if such action is prohibited by this Agreement, (C) Purchaser's failure to consent to any of the actions restricted in <u>Section 5.1</u> or (D) the negotiation, announcement, or pendency of this Agreement or the Transaction, the identity, nature, or ownership of Purchaser or Purchaser's plans with respect to the Acquired Assets and Assumed Liabilities, including the impact thereof on the relationships, contractual or otherwise, of the business of Seller with employees, customers, lessors, suppliers, vendors, or other commercial partners or litigation arising from or relating to this Agreement or the Transaction; (ix) Effects in, arising from, or relating to any existing event, occurrence or circumstance that is publicly known or disclosed or with respect to which Purchaser has knowledge as of the date hereof, including any matter set forth in the Disclosure Schedules; (x) Effects in, arising from or relating to any action required to be taken under any existing Contract to which Seller (or any of its assets or properties) is bound; (xi) Effects that arise from any seasonal fluctuations in the business of Seller; (xii) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Advisors) and any other failure to win or maintain customers or business; (xiii) the Effect of any action taken by Purchaser or its Affiliates with respect to the Transaction or the financing thereof or any breach by Purchaser of this Agreement; (xiv) the matters set forth on the Disclosure Schedules and any changes or developments in, or Effects or results arising from or relating to, matters set forth on the Disclosure Schedules; or (xv) (A) the commencement or pendency of the Chapter 11 Case; (B) any objections in the Bankruptcy Court to (1) this Agreement or any part of the Transaction, (2) the Sale Order or the reorganization or liquidation of Seller, or (3) the assumption or rejection of any Contract or Assumed Real Property Interests; or (C) any Order of the Bankruptcy Court or any actions or omissions of Seller in compliance therewith.

(xxx)   "<u>Nomura</u>" shall have the meaning set forth in <u>Section 3.6</u>.

(yyy)   "<u>Non-Recourse Person</u>" shall have the meaning set forth in <u>Section 8.7</u>.

(zzz)   "<u>Order</u>" means any order, injunction, judgment, decree, ruling, writ or arbitration award of a Governmental Body of competent jurisdiction, including any order entered by the Bankruptcy Court in the Chapter 11 Case (including the Sale Order).

(aaaa) "Ordinary Course" means the ordinary and usual course of operations of the business of Seller with respect to the Acquired Assets, as applicable and taken as a whole, taking into account the contemplation, commencement and pendency of the Chapter 11 Case and past practice.

(bbbb) "Outside Date" shall have the meaning `set forth in Section 7.1(c).

(cccc) "Party" or "Parties" shall have the meaning set forth in the Preamble.

(dddd) "Permit" means any permit, license, franchise, clearance, registration, certificate, approval, qualification, or authorization issued by any Governmental Body or accrediting organization.

(eeee) "Permitted Encumbrances" means (i) Encumbrances for utilities, assessments, and Taxes that arise from and after the Effective Time, or that are not yet due and payable or are being contested in good faith by appropriate proceedings, (ii) easements, rights of way, restrictive covenants, encroachments, title defects, survey matters, exceptions, reservations, conditions, limitations and similar non-monetary Encumbrances or non-monetary impediments against any of the Acquired Assets (whether or not of record) as of the date hereof and which do not, and would not be reasonably anticipated to, individually or in the aggregate, materially interfere with the current use, occupancy, access, operation, or maintenance of the Project (taken as a whole), or a repowering of the Project, (iii) zoning, building, and other similar restrictions imposed by any Governmental Body, including any variances or nonconforming uses relating thereto, that are not violated by the current use or operation of the Project, (iv) solely prior to Closing, any Encumbrances that will be removed or released by operation of the Sale Order, and (v) any Encumbrances approved, or waived by Purchaser in accordance with this Agreement, including any Encumbrances expressly disclosed on any schedules, title reports, or surveys made available by Seller to Purchaser.  For the avoidance of doubt, Purchaser shall be deemed to have accepted the Acquired Assets subject to all Permitted Encumbrances and shall have no right to object thereto or delay the Closing by reason thereof.

(ffff) "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body or other entity or group.

(gggg) "Post-Closing Adjustment" shall have the meaning set forth in shall have the meaning set forth in Section 2.3(c).

(hhhh) "Post-Closing Statement" shall have the meaning set forth in shall have the meaning set forth in Section 2.3(b).

(iiii) "Pre-Closing Tax Period" means any taxable period (or portion thereof) ending on or prior to the Effective Time and the portion through the Effective Time as applicable for any Straddle Period.

(jjjj) "Prepetition Secured Parties" means Citigroup Energy Inc. as Seller's energy hedge provider and Citibank as first lien administrative and collateral agent and second lien collateral agent.

(kkkk) "Project" shall have the meaning set forth Section 1.1.

(llll)  "Property Tax Protest" shall have the meaning set forth Section 5.9(g).

(mmmm)  "Prorated Items" shall have the meaning set forth in Section 2.4.

(nnnn) "PUCT" (as that term is used in the TSA) means the Public Utility Commission of Texas.

(oooo) "Purchase Price" shall have the meaning set forth in Section 2.1.

(pppp) "Purchaser" shall have the meaning set forth in the Preamble.

(qqqq) "Purchaser Group" means Purchaser, any Affiliate of Purchaser and each of their respective Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns.

(rrrr)  "Purchaser Related Parties" shall have the meaning set forth in Section 2.2(g).

(ssss)  "Purchase Price Adjustment Escrow Fund" shall have the meaning set forth in Section 2.8.

(tttt)  "Purchase Price Allocation" shall have the meaning set forth in Section 5.9.

(uuuu) "Purchase Price Allocation Statement" shall have the meaning set forth in Section 5.9.

(vvvv) "QSE Agreement" shall have the meaning set forth in Section 5.11(e).

(wwww)  "Qualified Scheduling Entity" or "QSE" means an entity authorized by ERCOT to submit Disclosure Schedules, manage dispatch instructions, and financially settle electricity market transactions on behalf of power generators, loads, and other market participants in the Texas wholesale electricity market.

(xxxx) "Real Estate Leases" shall have the meaning set forth in Section 1.1(j).

(yyyy) "Release" means any release, spill, emission, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, disposal, dumping, dispersing, leaching or migrating in, into, onto or through the indoor or outdoor environment.

(zzzz) "Renewable Energy Credits" means all renewable energy credits, green tags, renewable energy certificates, or similar environmental attributes representing the environmental benefits associated with the generation of one megawatt hour of electricity from renewable resources, including all rights to report, register, transfer, sell, or otherwise monetize such attributes under any applicable renewable energy tracking system or registry.

(aaaaa) "Resolution Period" shall have the meaning set forth in shall have the meaning set forth in Section 2.3(e).

(bbbbb) "Review Period" shall have the meaning set forth in shall have the meaning set forth in Section 2.3(d).

(ccccc) "Seller Group" shall have the meaning set forth in Section 8.20.

(ddddd) "Representatives" of a Person means any officer, director, manager or employee of such Person or any investment banker, attorney, accountant, consultant, agent or other advisor or representative of such Person.

(eeeee) "Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the Transaction contemplated by this Agreement.

(fffff) "Sale Order" means the sale Order or Orders (i) approving this Agreement and the terms and conditions hereof, including pursuant to sections 363 and 365 of the Bankruptcy Code including as set out in Section 5.2, (ii) approving the assumption and assignment of the Assigned Contracts to the Purchaser in accordance with the terms hereof, and (iii) approving and authorizing Seller to consummate the Transaction, in form and substance reasonably acceptable to the Parties.

(ggggg) "Seller" and "Seller" shall have the meaning set forth in the Preamble.

(hhhhh) "Seller Related Parties" shall have the meaning set forth in Section 2.2(g).

(iiiii) "Seller Tax Group" means any consolidated, combined, unitary or similar Tax group of which Seller or any of its Affiliates is the common parent.

(jjjjj) "Stalking Horse Approval Order" means an order designating this Agreement as the Stalking Horse Bid in accordance with the Bidding Procedures and Bidding Procedures Order in form and substance reasonably acceptable to the Parties.

(kkkkk) "Statement of Objections" shall have the meaning set forth in shall have the meaning set forth in Section 2.3(e).

(lllll) "Straddle Period" means any taxable period that includes (but does not end on) the Closing Date.

(mmmmm) "Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company or other entity, whether incorporated or unincorporated, of which such first Person directly or indirectly owns or controls a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions.

(nnnnn) "Successful Bidder" means, if an Auction is conducted, the prevailing party at the conclusion of such Auction.

(ooooo)    "Tax" or "Taxes" means any (a) any and all U.S. federal, state, local, non-U.S. or other tax of any kind, including income, gross receipts, capital, capital stock, indirect capital gain, franchise, profits, withholding, social security, production, employment, severance, registration, unemployment, disability, real property, ad valorem/personal property, stamp, excise, occupation, sales, use, transfer, value added, customs, duties, import, export, alternative minimum or estimated tax, license, lease, service, service use, goods and services, environmental, recording, documentary, inventory, escheat, unclaimed property, windfall profits, gains, payroll, intangibles or other taxes, together with any interest, penalty or addition thereto, whether disputed or not, (b) any liability for payment of amounts described in clause (a) whether as a result of transferee liability, of being a member of an affiliated, consolidated, combined, or unitary group for any period or otherwise through operation of Law, and (c) any liability for the payment of amounts described in clauses (a) or (b) as a result of any tax sharing, tax indemnity, tax receivable, tax allocation, or similar agreement or any other express or implied agreement to indemnify any other Person.

(ppppp)    "Tax Code" means the United States Internal Revenue Code of 1986, as amended.

(qqqqq)    "Tax Return" means any return, claim for refund, report, statement, or information return (including elections, declarations, disclaimers, notices, disclosures, schedules, and estimates) relating to Taxes required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof (or any other related or supporting information required by Law to be maintained).

(rrrrr)    "Transaction Documents" means this Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement.

(sssss)    "Transaction" means, collectively, the transactions contemplated by this Agreement and the other Transaction Documents.

(ttttt)    "Transfer Taxes" shall have the meaning set forth in Section 5.9.

(uuuuu)    "TSA" means that certain Transition Services Agreement, by and between Seller and Purchaser, entered into as of the date hereof and to be effective as of the Closing.

(vvvvv)    "Undisputed Amounts" shall have the meaning set forth in shall have the meaning set forth in Section 2.3(f).

(wwwww)    "Unused Cure Cap" means the amount by which the Cure Cap exceeds the actual Cure Costs.

(xxxxx)    "Willful Breach" shall mean a deliberate act or a deliberate failure to act regardless of whether breaching was the conscious object of the act or failure to act.

**Section 9.2    Rules of Interpretation**. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Disclosure Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)     The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, Schedule and exhibit references contained in this Agreement are references to sections, clauses, Disclosure Schedules and exhibits in or to this Agreement, unless otherwise specified. All exhibits and Disclosure Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or exhibits but not otherwise defined therein shall be defined as set forth in this Agreement.

(b)     Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(c)     The words "to the extent" shall mean "the degree by which" and not simply "if."

(d)     When calculating the period before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(e)     Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(f)     The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(g)     All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(h)     Any document or item will be deemed "delivered," "provided" or "made available" by Seller, within the meaning of this Agreement if such document or item is (i) included in the Dataroom, (ii) delivered or provided to Purchaser or any of Purchaser's Advisors or (iii) made available upon request, including at Seller's offices.

(i)     Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(j)     A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and assigns, but only if such successors and assigns are not prohibited by this Agreement.

(k)     A reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

4926-1833-5650

*[Signature pages follow.]*

54

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the date first above written.

**SELLER:**

**SHANNON WIND, LLC**,
a Delaware limited liability company


By: _____
Name: John Shepherd
Title:  Chief Restructuring Officer



**PURCHASER:**

**1370 CLEAN ENERGY LLC**

By: _____
Name:  Stefano Mion
Title:   Authorized Person

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**SELLER:**

**SHANNON WIND, LLC,**
a Delaware limited liability company

By: _____
Name: John Shepherd
Title: Chief Restructuring Officer

**PURCHASER:**

**1370 CLEAN ENERGY LLC**

By: _____
Name: _____
Title: _____

**EXHIBIT A**
**BILL OF SALE**

[ATTACHED]

# BILL OF SALE

This Bill of Sale (this "<u>Bill of Sale</u>") is made and entered into as of [●], 2026 (the "<u>Effective Date</u>") by and between by and between Shannon Wind, LLC, a Delaware limited liability company ("<u>Seller</u>"), and [●], a [●] ("<u>Purchaser</u>"). The capitalized terms used in this Bill of Sale and not otherwise defined herein shall have the meanings set forth in the Purchase Agreement (defined below).

WHEREAS, on January 25, 2026 (the "<u>Petition Date</u>"), Seller filed a voluntary chapter 11 petition, commencing the case styled *In re Shannon Wind, LLC*, Case No. 26-90124 (the "<u>Bankruptcy Case</u>"), in the Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>");

WHEREAS, Seller is operating its businesses and managing its property as chapter 11 debtor and debtor-in-possession pursuant to sections 1107(a) and 1108 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>");

WHEREAS, on February 13, 2026, Seller filed its *Emergency Motion for Entry of (A) Order (I) Scheduling a Hearing on the Approval of the Sale of All or Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, and the Assumption and Assignment of Executory Contracts and Unexpired Leases, (II) Approving Certain Bidding Procedures, Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof, (B) Order (I) Approving a Final Asset Purchase Agreement, (II) Authorizing the Sale or Substantially All of the Debtor's Assets Free and Clear of all Liens, Claims, Encumbrances, and other Interests, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Docket No. 55] (the "<u>Bid Procedures Motion</u>") in the Bankruptcy Case;

WHEREAS, on February 18, 2026, the Court entered its first order on the Bid Procedures Motion [Docket No. 66] (the "<u>Bid Procedures Order</u>") authorizing Seller to implement certain bid procedures in connection with efforts to sell substantially all of its assets;

WHEREAS, on [●], 2026 Seller designated Purchaser as Successful Bidder (as that term is defined in the Bid Procedures Order) in accordance with the Bid Procedures Order;

WHEREAS, on [**June 3, 2026**] the Court entered its second order on the Bid Procedures Motion [Docket No. [[●]] which, among other things, approved the Successful Bid and Backup Bid (as those terms are defined in the Bid Procedures Order) and authorized Seller to consummate a sale of the Acquired Assets;

WHEREAS, Seller and Purchaser are parties to that certain Asset Purchase Agreement of even date herewith (the "<u>Purchase Agreement</u>"); and

WHEREAS, Pursuant to the terms of the Purchase Agreement, Seller has agreed to transfer to Purchaser all of the Acquired Assets and Purchaser has agreed to assume all of the Assumed Liabilities;

NOW, THEREFORE, for and in consideration of the premises, the mutual covenants and agreements contained herein and in the Purchase Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser hereby agree as follows:

1.     Bill of Sale. Seller hereby grants, bargains, sells, conveys, assigns, transfers, sets over and delivers unto Purchaser and its successors and assigns all of the Acquired Assets. It is expressly acknowledged and agreed that the Acquired Assets do not include the Excluded Assets. Purchaser hereby accepts the Acquired Assets and, as part of the consideration therefor, hereby assumes, and agrees to pay, perform, satisfy and discharge as and when due, the Assumed Liabilities. It is hereby expressly acknowledged and agreed that such Assumed Liabilities do not include any Excluded Liabilities.

2.     **AS IS, WHERE IS BASIS**. **PURCHASER ACCEPTS THIS BILL OF SALE, THE RIGHTS UNDER THE PURCHASE AGREEMENT AND IN AND TO THE ACQUIRED ASSETS, AND ANY AND ALL IMPROVEMENTS AND FACILITIES LOCATED THEREON, IN THEIR PRESENT CONDITION AND ON AN "AS IS" BASIS. ASSIGNEE ACKNOWLEDGES THAT ITS ACCEPTANCE ON AN "AS IS" BASIS FORMS A MATERIAL PART OF THE CONSIDERATION OF THIS ASSIGNMENT.**

3.     Purchase Agreement. This Bill of Sale is executed and delivered in accordance with and is subject to all of the terms and conditions of the Purchase Agreement. Nothing contained in this Bill of Sale shall be deemed to supersede, enlarge on or modify any of the obligations, agreements, covenants or warranties of Seller or Purchaser, as purchaser, contained in the Purchase Agreement. To the extent that any provision of this Bill of Sale conflicts or is inconsistent with the terms of the Purchase Agreement, the Purchase Agreement shall govern.

4.     Governing Law; Jurisdiction. Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Bill of Sale shall be governed by and construed in accordance with the Laws of the State of Texas without regard to applicable principles of conflicts of law. Except as otherwise provided in this Section, the parties hereto agree that any legal action, suit, or proceeding arising in connection with this Bill of Sale will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Texas Business Courts sitting in Houston, Texas (or if such court declines to accept jurisdiction over a particular matter, in which case, in any state or federal court located in Harris County, Texas), and the parties hereto waive any objection to venue or forum non conveniens in such court. Each party irrevocably waives, to the fullest extent permitted by applicable law, any objection it may now or hereafter have to the laying of venue of any such dispute in any such federal or state court, as applicable. Purchaser acknowledges that any legal action, suit, or proceeding arising in connection with this Bill of Sale shall be submitted to the exclusive jurisdiction of the Court, and Purchaser hereby waives any defenses or objections based on lack of jurisdiction, improper venue, or forum non conveniens.

5.     Counterparts. This Bill of Sale may be executed in two or more counterparts (including by electronic mail, facsimile or other electronic means), each of which shall be deemed

2

4925-2415-7077, v. 1

3

an original, but all of which together shall be deemed one and the same agreement, and it shall not be necessary in making proof of this Bill of Sale or the terms hereof to produce or account for more than one of such counterparts.

[SIGNATURES ON FOLLOWING PAGE]

4925-2415-7077, v. 1

**IN WITNESS WHEREOF**, the parties hereto have executed this Bill of Sale to be effective as of the Effective Date.

**SELLER:**

**SHANNON WIND, LLC**,
a Delaware limited liability company

By: _____
    John Shepherd, *Chief Restructuring Officer*

**PURCHASER:**

[●]

By:     _____
Name:   _____
Title:    _____

4

4925-2415-7077, v. 1

**EXHIBIT B**
**ASSIGNMENT AND ASSUMPTION AGREEMENT**

[ATTACHED]

# ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (this "Assignment") is made effective as of as of [●], 2026 (the "Effective Date"), by and between Shannon Wind, LLC, a Delaware limited liability company (the "Assignor"), and [●], a [●] ("Assignee").

WHEREAS, on January 25, 2026 (the "Petition Date"), Assignor filed a voluntary chapter 11 petition, commencing the case styled *In re Shannon Wind, LLC*, Case No. 26-90124 (the "Bankruptcy Case"), in the Bankruptcy Court for the Southern District of Texas (the "Court");

WHEREAS, Assignor is operating its businesses and managing its property as chapter 11 debtor and debtor-in-possession pursuant to sections 1107(a) and 1108 of title 11 of the United States Code (the "Bankruptcy Code");

WHEREAS, on February 13, 2026, Assignor filed its *Emergency Motion for Entry of (A) Order (I) Scheduling a Hearing on the Approval of the Sale of All or Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, and the Assumption and Assignment of Executory Contracts and Unexpired Leases, (II) Approving Certain Bidding Procedures, Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof, (B) Order (I) Approving a Final Asset Purchase Agreement, (II) Authorizing the Sale or Substantially All of the Debtor's Assets Free and Clear of all Liens, Claims, Encumbrances, and other Interests, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Docket No. 55] (the "Bid Procedures Motion") in the Bankruptcy Case;

WHEREAS, on February 18, 2026, the Court entered its first order on the Bid Procedures Motion [Docket No. 66] (the "Bid Procedures Order") authorizing Assignor to implement certain bid procedures in connection with efforts to sell substantially all of its assets;

WHEREAS, on [●], 2026, Assignor designated Assignee as Successful Bidder (as that term is defined in the Bid Procedures Order) in accordance with the Bid Procedures Order;

WHEREAS, on [**June 3, 2026**] the Court entered its second order on the Bid Procedures Motion [Docket No. [●]] which, among other things, approved the Successful Bid and Backup Bid (as those terms are defined in the Bid Procedures Order) and authorized Assignor to consummate a sale of the Acquired Assets;

WHEREAS, Assignor, as seller, and Assignee, as purchaser, are parties to that certain Asset Purchase Agreement of even date herewith (the "Purchase Agreement"); and

WHEREAS, Assignor hereby sells, transfers, assigns and conveys to Assignee all right, title and interest of Assignor in and under the [CONTRACT NAME] set forth on Exhibit A hereto and made a part hereof ("Assigned Contract");

NOW, THEREFORE, for and in consideration of the mutual covenants contained herein and in the Purchase Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.     <u>Assignment and Assumption</u>. As of the Effective Date, Assignor does hereby assign and transfer all of its right, title and interest in and under the Assigned Contract unto Assignee. Assignee hereby assumes all of the obligations of Assignor under the Assigned Contract arising on and after the Effective Date and agrees to be bound by and to perform all of the terms, conditions, and covenants thereunder. Each of Assignor and Assignee hereby confirms that it intends for this Assignment to be a complete assignment to Assignee of all of Assignor's rights, title, and interest in, to and under the Assigned Contract, and all of Assignor's obligations thereunder.

2.     <u>Successors in Interest</u>. This Assignment and the terms and provisions hereof shall inure to the benefit of, and shall be binding upon, the respective successors and assigns of Assignor and Assignee.

3.     <u>Notices</u>. All notices or other communications or deliveries provided for hereunder shall be given as provided in the Purchase Agreement.

4.     <u>Purchase Agreement</u>. This Assignment is executed and delivered in accordance with and is subject to all of the terms and conditions of the Purchase Agreement. Nothing contained in this Assignment shall be deemed to supersede, enlarge on or modify any of the obligations, agreements, covenants or warranties of Assignor, as seller, or Assignee, as purchaser, contained in the Purchase Agreement. To the extent that any provision of this Assignment conflicts or is inconsistent with the terms of the Purchase Agreement, the Purchase Agreement shall govern.

5.     <u>Governing Law; Jurisdiction</u>. Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Assignment shall be governed by and construed in accordance with the Laws of the State of Texas without regard to applicable principles of conflicts of law. Except as otherwise provided in this Section, the parties hereto agree that any legal action, suit, or proceeding arising in connection with this Assignment will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Texas Business Courts sitting in Houston, Texas (or if such court declines to accept jurisdiction over a particular matter, in which case, in any state or federal court located in Harris County, Texas), and the parties hereto waive any objection to venue or forum non conveniens in such court. Each party irrevocably waives, to the fullest extent permitted by applicable law, any objection it may now or hereafter have to the laying of venue of any such dispute in any such federal or state court, as applicable. Assignee acknowledges that any legal action, suit, or proceeding arising in connection with this Assignment shall be submitted to the exclusive jurisdiction of the Court, and Assignee hereby waives any defenses or objections based on lack of jurisdiction, improper venue, or forum non conveniens.

6.     <u>Counterparts</u>. This Assignment may be executed in two or more counterparts (including by electronic mail, facsimile or other electronic means), each of which shall be deemed an original, but all of which together shall be deemed one and the same agreement, and it shall not

2

4920-6375-9253, v. 1

3

be necessary in making proof of this Assignment or the terms hereof to produce or account for more than one of such counterparts.

[SIGNATURES ON FOLLOWING PAGE]

4920-6375-9253, v. 1

**IN WITNESS WHEREOF**, the parties hereto have executed this Assignment to be effective as of the Effective Date.

ASSIGNOR:

**SHANNON WIND, LLC**,
a Delaware limited liability company

By: _____

John Shepherd, *Chief Restructuring Officer*

ASSIGNEE:

[●]

By: _____
Name: _____
Title: _____

4

5

**EXHIBIT A**
Assigned Contract

**[**CONTRACT DESCRIPTION**]**

5

**EXHIBIT C**
**ASSIGNMENT AND ASSUMPTION OF INTERCONNECTION AGREEMENT**

[ATTACHED]

**ASSIGNMENT OF ERCOT STANDARD GENERATION INTERCONNECTION AGREEMENT**

This Assignment of ERCOT Standard Generation Interconnection Agreement and Generation Interconnection Study Reports (this "Assignment"), is made and entered into to be effective as of [●], 2026 (the "Effective Date"), by and between Shannon Wind, LLC, a Delaware limited liability company ("Assignor") and [●], a [●] ("Assignee").

WHEREAS, on January 25, 2026 (the "Petition Date"), Assignor filed a voluntary chapter 11 petition, commencing the case styled *In re Shannon Wind, LLC*, Case No. 26-90124 (the "Bankruptcy Case"), in the Bankruptcy Court for the Southern District of Texas (the "Court");

WHEREAS, Assignor is operating its businesses and managing its property as chapter 11 debtor and debtor-in-possession pursuant to sections 1107(a) and 1108 of title 11 of the United States Code (the "Bankruptcy Code");

WHEREAS, on February 13, 2026, Assignor filed its *Emergency Motion for Entry of (A) Order (I) Scheduling a Hearing on the Approval of the Sale of All or Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, and the Assumption and Assignment of Executory Contracts and Unexpired Leases, (II) Approving Certain Bidding Procedures, Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof, (B) Order (I) Approving a Final Asset Purchase Agreement, (II) Authorizing the Sale or Substantially All of the Debtor's Assets Free and Clear of all Liens, Claims, Encumbrances, and other Interests, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Docket No. 55] (the "Bid Procedures Motion") in the Bankruptcy Case;

WHEREAS, on February 18, 2026, the Court entered its first order on the Bid Procedures Motion [Docket No. 66] (the "Bid Procedures Order") authorizing Assignor to implement certain bid procedures in connection with efforts to sell substantially all of its assets;

WHEREAS, on [●], 2026, Assignor designated Assignee as Successful Bidder (as that term is defined in the Bid Procedures Order) in accordance with the Bid Procedures Order;

WHEREAS, on [**June 3, 2026**] the Court entered its second order on the Bid Procedures Motion [Docket No. [●]] which, among other things, approved the Successful Bid and Backup Bid (as those terms are defined in the Bid Procedures Order) and authorized Assignor to consummate a sale of the Acquired Assets;

WHEREAS, Assignor, as generator, and Oncor Electric Delivery Company LLC**,** a Delaware limited liability company ("Oncor"), as transmission service provider, are parties to that certain ERCOT Standard Generation Interconnection Agreement for ERCOT Generation Interconnection Request 11INR0079 dated April 4, 2013, as amended by Amendment No. 1 to ERCOT Standard Generation Interconnection Agreement dated October 21, 2013, that certain Amendment No. 2 to ERCOT Standard Generation Interconnection Agreement dated June 2, 2014, and that certain Amendment No. 3, dated July 1, 2022 (collectively, the "SGIA"). All capitalized

terms used herein but not otherwise defined in this Assignment shall have the meaning assigned to such terms in the SGIA;

WHEREAS, Assignor, as seller, and Assignee, as purchaser, are parties to that certain Asset Purchase Agreement of even date herewith (the "Purchase Agreement");

WHEREAS, pursuant to the terms of the Purchase Agreement, Assignor and Assignee desire to evidence the assignment of Assignor's interest under the SGIA by Assignor to Assignee, the assumption by Assignee of the rights and obligations of Assignor under the SGIA; and

WHEREAS, Assignor desires to assign any interest that Assignor may have in and to the Generation Interconnection Study Reports set forth on Exhibit A to Assignee;

NOW, THEREFORE, for and in consideration of the mutual covenants contained herein and in the Purchase Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.      Assignment and Assumption. As of the Effective Date, Assignor hereby transfers and assigns unto Assignee all of its right, title and interest in and to its rights as Generator under the SGIA and all of its right, title and interest in the Generation Interconnection Study Reports. Assignee hereby assumes all of Assignor's rights and obligations as Generator under the SGIA and agrees to be bound by and to perform all of the terms, conditions, and covenants by which the Generator is bound thereunder.

2.      Successors in Interest. This Assignment and the terms and provisions hereof shall inure to the benefit of, and shall be binding upon, the respective successors and assigns of Assignor and Assignee.

3.      Notice of Closing. Within two business days of the closing of the Purchase Agreement, Assignor shall provide written notice to Oncor of said closing.

4.      Notices. All notices or other communications or deliveries provided for hereunder shall be given as provided in the Purchase Agreement.

5.      Purchase Agreement. This Assignment is executed and delivered in accordance with and is subject to all of the terms and conditions of the Purchase Agreement. Nothing contained in this Assignment shall be deemed to supersede, enlarge on or modify any of the obligations, agreements, covenants or warranties of Assignor, as seller, or Assignee, as purchaser, contained in the Purchase Agreement. To the extent that any provision of this Assignment conflicts or is inconsistent with the terms of the Purchase Agreement, the Purchase Agreement shall govern.

6.      Governing Law; Jurisdiction. Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Assignment shall be governed by and construed in accordance with the Laws of the State of Texas without regard to applicable principles of conflicts of law. Except as otherwise provided in this Section, the parties hereto agree that any legal action, suit, or proceeding arising in connection with this Assignment will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the

2

Texas Business Courts sitting in Houston, Texas (or if such court declines to accept jurisdiction over a particular matter, in which case, in any state or federal court located in Harris County, Texas), and the parties hereto waive any objection to venue or forum non conveniens in such court. Each party irrevocably waives, to the fullest extent permitted by applicable law, any objection it may now or hereafter have to the laying of venue of any such dispute in any such federal or state court, as applicable. Assignee acknowledges that any legal action, suit, or proceeding arising in connection with this Assignment shall be submitted to the exclusive jurisdiction of the Court, and Assignee hereby waives any defenses or objections based on lack of jurisdiction, improper venue, or forum non conveniens.

7.      Counterparts. This Assignment may be executed in two or more counterparts (including by electronic mail, facsimile or other electronic means), each of which shall be deemed an original, but all of which together shall be deemed one and the same agreement, and it shall not be necessary in making proof of this Assignment or the terms hereof to produce or account for more than one of such counterparts.

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties hereto have executed this Assignment to be effective as of the Effective Date.

ASSIGNOR:

SHANNON WIND, LLC,
a Delaware limited liability company


By: _____

　　John Shepherd, *Chief Restructuring Officer*


ASSIGNEE:

[●]


By:　　　_____
Name:　　_____
Title:　　_____

**EXHIBIT A**
Generation Interconnection Study Reports.

1. ONCOR, February 2, 2011, "Steady State Analysis Report - Horn Wind, LLC (111NR0079)."

2. ONCOR, April 7, 2011, "Circuit Breaker Interrupting Duty Study for Generation Interconnection Request No. 111NR0079 - Horn Wind - Clay County - 200 MW."

3. ONCOR, November 30, 2011, "Stability Study - South Clay Wind Farm, GIR 111NR0079."

4. ONCOR, March 2012, "Facilities Study Report for the Interconnection of Horn Wind, LLC - South Clay Wind Project at ONCOR's Cobb Switching Station in Clay County, Texas - 200MW Generation - GIR 111NR0079."

5. ONCOR, October 14, 2013, "Circuit Breaker Interrupting Duty Study for Generation Interconnection Request No. 111NR0079 - Horn Wind - Clay County - 345kV 223MVA Generation."

6. ONCOR, December 20, 2013, "South Clay Wind Power Plant - Generation Interconnect Steady-State Study Report."

7. ONCOR, January 23, 2014, "South Clay Generation Interconnect Stability Study (GIR 111NR0079)."

**EXHIBIT D**
**ASSIGNMENT AND ASSUMPTION OF LEASE**

[ATTACHED]

WHEN RECORDED OR FILED RETURN TO:
[●]
Attn: [●]
[●]

_____

(Space above for Recorder's use only.)

## ASSIGNMENT AND ASSUMPTION OF REAL ESTATE AGREEMENTS

This Assignment and Assumption of Real Estate Agreements (this "<u>Assignment</u>") is made effective as of as of [●], 2026 (the "<u>Effective Date</u>"), by and between Shannon Wind, LLC, a Delaware limited liability company (the "<u>Assignor</u>"), and [●], a [●] ("<u>Assignee</u>").

WHEREAS, on January 25, 2026 (the "<u>Petition Date</u>"), Assignor filed a voluntary chapter 11 petition, commencing the case styled *In re Shannon Wind, LLC*, Case No. 26-90124 (the "<u>Bankruptcy Case</u>"), in the Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>");

WHEREAS, Assignor is operating its businesses and managing its property as chapter 11 debtor and debtor-in-possession pursuant to sections 1107(a) and 1108 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>");

WHEREAS, on February 13, 2026, Assignor filed its *Emergency Motion for Entry of (A) Order (I) Scheduling a Hearing on the Approval of the Sale of All or Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, and the Assumption and Assignment of Executory Contracts and Unexpired Leases, (II) Approving Certain Bidding Procedures, Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof, (B) Order (I) Approving a Final Asset Purchase Agreement, (II) Authorizing the Sale or Substantially All of the Debtor's Assets Free and Clear of all Liens, Claims, Encumbrances, and other Interests, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Docket No. 55] (the "<u>Bid Procedures Motion</u>") in the Bankruptcy Case;

WHEREAS, on February 18, 2026, the Court entered its first order on the Bid Procedures Motion [Docket No. 66] (the "<u>Bid Procedures Order</u>") authorizing Assignor to implement certain bid procedures in connection with efforts to sell substantially all of its assets;

WHEREAS, on [●], 2026, Assignor designated Assignee as Successful Bidder (as that term is defined in the Bid Procedures Order) in accordance with the Bid Procedures Order;

WHEREAS, on [**June 3, 2026**] the Court entered its second order on the Bid Procedures Motion [Docket No. [●]] which, among other things, approved the Successful Bid and Backup Bid (as those terms are defined in the Bid Procedures Order) and authorized Assignor to consummate a sale of the Acquired Assets;

WHEREAS, Assignor, as seller, and Assignee, as purchaser, are parties to that certain Asset Purchase Agreement of even date herewith (the "Purchase Agreement"); and

WHEREAS, Assignor hereby sells, transfers, assigns and conveys to Assignee all right, title and interest of Assignor in and under each of the agreements set forth on Exhibit A[1] hereto and made a part hereof (the "Agreements");

NOW, THEREFORE, for and in consideration of the mutual covenants contained herein and in the Purchase Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.      Assignment and Assumption. As of the Effective Date, Assignor hereby transfers and assigns unto Assignee all of the right, title, and interest of Assignor in, to and under the Agreements. Assignee hereby assumes all of the obligations of Assignor under the Agreements arising on and after the Effective Date and agrees to be bound by and to perform all of the terms, conditions, and covenants by which Assignor is bound thereunder. Each of Assignor and Assignee hereby confirms that it intends for this Assignment to be a complete assignment to Assignee of all of Assignor's rights, title, and interest in, to and under the Agreements, and all of Assignor's obligations thereunder, and is not a sublease of the leased premises.

2.      **AS IS, WHERE IS BASIS**. **ASSIGNEE ACCEPTS THIS ASSIGNMENT, THE RIGHTS UNDER THE AGREEMENTS, AND ANY AND ALL IMPROVEMENTS AND FACILITIES LOCATED THEREON, IN THEIR PRESENT CONDITION AND ON AN "AS IS" BASIS. ASSIGNEE ACKNOWLEDGES THAT ITS ACCEPTANCE ON AN "AS IS" BASIS FORMS A MATERIAL PART OF THE CONSIDERATION OF THIS ASSIGNMENT.**

3.      Successors in Interest.  This Assignment and the terms and provisions hereof shall inure to the benefit of, and shall be binding upon, the respective successors and assigns of Assignor and Assignee.

4.      Notices.  All notices or other communications or deliveries provided for hereunder shall be given as provided in the Purchase Agreement.

5.      Purchase Agreement.  This Assignment is executed and delivered in accordance with and is subject to all of the terms and conditions of the Purchase Agreement. Nothing contained in this Assignment shall be deemed to supersede, enlarge on or modify any of the obligations, agreements, covenants or warranties of Assignor, as seller, or Assignee, as purchaser, contained in the Purchase Agreement. To the extent that any provision of this Assignment conflicts or is inconsistent with the terms of the Purchase Agreement, the Purchase Agreement shall govern.

6.      Governing Law; Jurisdiction. Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Assignment shall be governed by and construed in accordance with the Laws of the State of Texas without regard to applicable principles of conflicts of law. Except

---

[1] NTD: Exhibit A to list all Assumed Real Property Interests listed on Section 1.1(j) of the APA Disclosure Schedules, except for the Conrady Easement, which will be addressed in a separate assignment.

2

4920-6375-9253, v. 1

as otherwise provided in this Section, the parties hereto agree that any legal action, suit, or proceeding arising in connection with this Assignment will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Texas Business Courts sitting in Houston, Texas (or if such court declines to accept jurisdiction over a particular matter, in which case, in any state or federal court located in Harris County, Texas), and the parties hereto waive any objection to venue or forum non conveniens in such court. Each party irrevocably waives, to the fullest extent permitted by applicable law, any objection it may now or hereafter have to the laying of venue of any such dispute in any such federal or state court, as applicable. Assignee acknowledges that any legal action, suit, or proceeding arising in connection with this Assignment shall be submitted to the exclusive jurisdiction of the Court, and Assignee hereby waives any defenses or objections based on lack of jurisdiction, improper venue, or forum non conveniens.

7.     Counterparts. This Assignment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall be deemed one and the same agreement, and it shall not be necessary in making proof of this Assignment or the terms hereof to produce or account for more than one of such counterparts.

[SIGNATURES ON FOLLOWING PAGE]

4920-6375-9253, v. 1

**IN WITNESS WHEREOF**, the parties hereto have executed this Assignment to be effective as of the Effective Date.

**ASSIGNOR:**

**SHANNON WIND, LLC**,
a Delaware limited liability company

By: _____

John Shepherd, *Chief Restructuring Officer*

STATE OF TEXAS
COUNTY OF CLAY

Personally appeared before me, the undersigned authority, a Notary Public within and for said State and County, duly commissioned and qualified, John Shepherd, with whom I am personally acquainted, or proved to me on the basis of satisfactory evidence, and who, upon oath, acknowledged himself to be the Chief Restructuring Officer of Shannon Wind, LLC, a Delaware limited liability company, and that he as such Chief Restructuring Officer, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the partnership by himself as such Chief Restructuring Officer.

Witness my hand seal at office this ____ day of _____, 2026.

_____

Notary Public

My Commission Expires: _____

4

**ASSIGNEE:**

[●]

By: _____

Name: _____

Title: _____


STATE OF TEXAS
COUNTY OF COUNTY

Personally appeared before me, the undersigned, a Notary Public within and for said State and County, duly commissioned and qualified, _____, with whom I am personally acquainted, or proved to me on the basis of satisfactory evidence, and who, upon oath, acknowledged himself/herself to be the _____ of [●], a [●], and that he/she as such _____, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the [●] by himself/herself as such _____.

Witness my hand seal at office this _____ day of _____, 2026.

_____

Notary Public

My Commission Expires: _____

5

4920-6375-9253, v. 1

**EXHIBIT A**
Agreements

[DESCRIPTION OF AGREEMENTS]

**EXHIBIT E**
**ASSIGNMENT AND ASSUMPTION OF EASEMENT**

[ATTACHED]

WHEN RECORDED OR FILED RETURN TO:
[●]
Attn: [●]
[●]

---

(Space above for Recorder's use only.)

## ASSIGNMENT AND ASSUMPTION OF EASEMENT AGREEMENT

This Assignment and Assumption of Easement Agreement (this "Assignment") is made and entered into and effective as of this [●], 2026 (the "Assignment Date"), by and between Shannon Wind, LLC, a Delaware limited liability company (the "Assignor"), and [●], a [●] ("Assignee").

WHEREAS, on January 25, 2026 (the "Petition Date"), Assignor filed a voluntary chapter 11 petition, commencing the case styled *In re Shannon Wind, LLC*, Case No. 26-90124 (the "Bankruptcy Case"), in the Bankruptcy Court for the Southern District of Texas (the "Court");

WHEREAS, Assignor is operating its businesses and managing its property as chapter 11 debtor and debtor-in-possession pursuant to sections 1107(a) and 1108 of title 11 of the United States Code (the "Bankruptcy Code");

WHEREAS, on February 13, 2026, Assignor filed its *Emergency Motion for Entry of (A) Order (I) Scheduling a Hearing on the Approval of the Sale of All or Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, and the Assumption and Assignment of Executory Contracts and Unexpired Leases, (II) Approving Certain Bidding Procedures, Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof, (B) Order (I) Approving a Final Asset Purchase Agreement, (II) Authorizing the Sale or Substantially All of the Debtor's Assets Free and Clear of all Liens, Claims, Encumbrances, and other Interests, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Docket No. 55] (the "Bid Procedures Motion") in the Bankruptcy Case;

WHEREAS, on February 18, 2026, the Court entered its first order on the Bid Procedures Motion [Docket No. 66] (the "Bid Procedures Order") authorizing Assignor to implement certain bid procedures in connection with efforts to sell substantially all of its assets;

WHEREAS, on [●], 2026 Assignor designated Assignee as Successful Bidder (as that term is defined in the Bid Procedures Order) in accordance with the Bid Procedures Order;

WHEREAS, on [**June 3, 2026**] the Court entered its second order on the Bid Procedures Motion [Docket No. [●]] which, among other things, approved the Successful Bid and Backup Bid (as those terms are defined in the Bid Procedures Order) and authorized Assignor to consummate a sale of the Acquired Assets

WHEREAS, Assignor, as seller, and Assignee, as purchaser, are parties to that certain Asset Purchase Agreement of even date herewith (the "Purchase Agreement");

WHEREAS, by Easement Agreement dated March 13, 2015 and recorded on March 25, 2015 as Instrument No. 11311 in Volume 69, Page 619 of the Official Public Records of Clay County, Texas, attached hereto as Exhibit A (the "Wind Easement"), Teddy W. Conrady and Adanna J. Conrady, as owners, granted to Assignor, as grantee, an exclusive easement over certain real property located in Clay County, Texas (the "Easement Property"), for the right to permit the rotors of wind turbines installed on adjoining property to overhang the Easement Property and for the non-obstruction of wind;and

WHEREAS, Assignor desires to assign to Assignee, its successors and assigns, and Assignee desires to assume, all of Assignor's rights, title, interest, obligations and restrictions in, to, and under the Wind Easement;

NOW, THEREFORE, for and in consideration of the mutual covenants contained herein and in the Purchase Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.      Assignment and Assumption.  Assignor hereby transfers and assigns to Assignee, its successors and assigns, all of Assignor's right, title, and interest arising under the Wind Easement. Assignee hereby assumes and agrees to observe and perform all of Assignor's obligations, restrictions and duties as the grantee under the Wind Easement and arising with respect to the period from and after the Assignment Date.

2.      **AS IS, WHERE IS BASIS**. **ASSIGNEE ACCEPTS THIS ASSIGNMENT, THE EASEMENT RIGHTS UNDER THE WIND EASEMENT IN THE EASEMENT PROPERTY, AND ANY AND ALL IMPROVEMENTS AND FACILITIES LOCATED THEREON, IN THEIR PRESENT CONDITION AND ON AN "AS IS" BASIS. ASSIGNEE ACKNOWLEDGES THAT ITS ACCEPTANCE ON AN "AS IS" BASIS FORMS A MATERIAL PART OF THE CONSIDERATION OF THIS ASSIGNMENT.**

3.      Liability. As part of the consideration for this Assignment, Assignee expressly assumes all liabilities, obligations and duties of Assignor pertaining to the Wind Easement under the Easement Agreement. By assuming such liabilities, obligations and duties, Assignee hereby expressly releases and discharges Assignor from all liabilities, obligations and duties pertaining to the Wind Easement, in each case, arising from and after the Assignment Date. It is acknowledged and agreed that Assignor shall not be responsible for the discharge and performance of any duties or obligations to be performed or discharged in connection with the Wind Easement from and after the Assignment Date. 4.      Successors in Interest.  This Assignment and all of the provisions hereof shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.

5.      Notices.  All notices or other communications or deliveries provided for hereunder shall be given as provided in the Purchase Agreement.

6.      Purchase Agreement.  Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Assignment is executed and delivered in accordance with and is subject to all of the terms and conditions of the Purchase Agreement. Nothing contained in this Assignment shall be deemed to supersede, enlarge on or modify any of the obligations, agreements, covenants or warranties of Assignor, as seller, or Assignee, as purchaser, contained in the Purchase

2

4914-3992-0277, v. 1

Agreement. To the extent that any provision of this Assignment conflicts or is inconsistent with the terms of the Purchase Agreement, the Purchase Agreement shall govern.

7. <u>Governing Law; Jurisdiction</u>. This Assignment shall be governed by and construed in accordance with the Laws of the State of Texas without regard to applicable principles of conflicts of law. Except as otherwise provided in this Section, the parties hereto agree that any legal action, suit, or proceeding arising in connection with this Assignment will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Texas Business Courts sitting in Houston, Texas (or if such court declines to accept jurisdiction over a particular matter, in which case, in any state or federal court located in Harris County, Texas), and the parties hereto waive any objection to venue or forum non conveniens in such court. Each party irrevocably waives, to the fullest extent permitted by applicable law, any objection it may now or hereafter have to the laying of venue of any such dispute in any such federal or state court, as applicable. Assignee acknowledges that any legal action, suit, or proceeding arising in connection with this Assignment shall be submitted to the exclusive jurisdiction of the Court, and Assignee hereby waives any defenses or objections based on lack of jurisdiction, improper venue, or forum non conveniens.

8. <u>Counterparts</u>. This Assignment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall be deemed one and the same agreement, and it shall not be necessary in making proof of this Assignment or the terms hereof to produce or account for more than one of such counterparts.

[SIGNATURES ON FOLLOWING PAGE]

3

4914-3992-0277, v. 1

**IN WITNESS WHEREOF**, the parties hereto have executed this Assignment to be effective as of the Effective Date.

**ASSIGNOR:**

**SHANNON WIND, LLC**,
a Delaware limited liability company

By: _____

John Shepherd, *Chief Restructuring Officer*

STATE OF TEXAS
COUNTY OF CLAY

Personally appeared before me, the undersigned authority, a Notary Public within and for said State and County, duly commissioned and qualified, John Shepherd, with whom I am personally acquainted, or proved to me on the basis of satisfactory evidence, and who, upon oath, acknowledged himself to be the Chief Restructuring Officer of Shannon Wind, LLC, a Delaware limited liability company, and that he as such Chief Restructuring Officer, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the partnership by himself as such Chief Restructuring Officer.

Witness my hand seal at office this _____ day of _____, 2026.

_____
Notary Public

My Commission Expires: _____

4

4914-3992-0277, v. 1

**ASSIGNEE:**

[●]

By: _____
Name: _____
Title: _____

STATE OF TEXAS
COUNTY OF COUNTY

      Personally appeared before me, the undersigned, a Notary Public within and for said State and County, duly commissioned and qualified, _____, with whom I am personally acquainted, or proved to me on the basis of satisfactory evidence, and who, upon oath, acknowledged himself/herself to be the _____ of [●], a [●], and that he/she as such _____, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the [●] by himself/herself as such _____.

      Witness my hand seal at office this ____ day of _____, 2026.

_____
Notary Public

My Commission Expires: _____

5

**EXHIBIT A**
Attached.

6

**DISCLOSURE SCHEDULES AND SCHEDULE SUPPLEMENTS**

# DISCLOSURE SCHEDULES

## TO

## ASSET PURCHASE AGREEMENT

This document constitutes the Disclosure Schedules (the "Disclosure Schedules") to that certain Asset Purchase Agreement (the "Agreement"), dated as of April 29, 2026, by and between, 1370 Clean Energy LLC, a Delaware series limited liability company ("Purchaser") and Shannon Wind, LLC, a Delaware limited liability company ("Seller"). Capitalized terms used herein and not otherwise defined shall have their respective meanings ascribed to them in the Agreement.

The Disclosure Schedules are arranged in sections corresponding to the numbered and lettered sections and subsections contained in the Agreement and the disclosures in any section or subsection of the Disclosure Schedules shall qualify the section or subsection of the Agreement to which such disclosure corresponds and shall be deemed disclosed with respect to, and shall qualify, any other sections and subsections of the Agreement, regardless of whether such disclosure is specifically referenced therein.

The paragraphs corresponding to the numbered sections contained in the Agreement may include sections not specifically referenced in the text of the section. Any disclosure made in any section or schedule of the Disclosure Schedules shall be deemed disclosed with respect to the section or schedule referenced and shall be deemed disclosed with respect to, and shall qualify, any other section or schedule of the Disclosure Schedules and any other representations or warranties contained in the Agreement, regardless of whether such disclosure is specifically referenced therein if it is reasonably apparent on the face of such disclosure that such disclosure is applicable to such other section or schedule of the Disclosure Schedules. The Disclosure Schedules are not intended to constitute, and shall not be construed as constituting, representations or warranties of Seller, except as and to the extent provided in the Agreement. Inclusion of information herein shall not be construed as an admission that such information is material to the business, operations or financial condition of Seller, except as and to the extent provided in the Agreement.

The Disclosure Schedules may include items or information that are not required to be disclosed under the Agreement; disclosure of those items or information is not an indication that those items meet the disclosure threshold applicable to the portion of the Disclosure Schedules on which they are reported. The disclosure of any information herein shall not be construed as an admission that any such information is material. None of the disclosures contained herein shall be construed as constituting representations and warranties except as specifically provided in the Agreement. In disclosing this information, the Seller does not waive any attorney-client privilege associated with such information or any protection afforded by the work-product doctrine with respect to any of the matters disclosed or discussed in the Disclosure Schedules. No disclosure in the Disclosure Schedules relating to any possible breach or violation of any law or contract shall be construed as an admission or indication to any third party that any such breach or violation exists or has actually occurred.

From time to time prior to the Closing, Seller may supplement or amend any of the Disclosure Schedules. Any disclosure in any such Schedule Supplement shall not be deemed to give rise to any Purchaser termination rights pursuant to Article VII of the Purchase Agreement.

4935-3330-9077.9

**Section 1.1(a)**

**Assigned Contracts**

1. That certain Full Service Agreement dated October 1, 2019, by and between General Electric International, Inc. (now known as GE Vernova International LLC) and Shannon Wind, LLC as amended by that certain Amendment No. 1 to the Full Service Agreement, dated May 27, 2020, and that certain Amendment No. 2 to the Full Service Agreement, dated August 1, 2022.

2. That certain Contract for the Sale of Power Generation Equipment and Related Services, dated July 18, 2014, by and between General Electric Company and Shannon Wind, LLC, as amended by that certain First Amendment to Contract for the Sale of Power Generation Equipment and Related Services, dated December 25, 2014, that certain Second Amendment to Contract for the Sale of Power Generation Equipment and Related Services, dated April 8, 2015 (effective as of March 31, 2015), that certain Third Amendment to Contract for the Sale of Power Generation Equipment and Related Services, dated May 7, 2015 (effective as of April 30, 2015), that certain Fourth Amendment to Contract for the Sale of Power Generation Equipment and Related Services, dated June 10, 2015, and that certain Fifth Amendment to Contract for the Sale of Power Generation Equipment and Related Services, dated June 11, 2015.

3. That certain Asset Management Agreement, dated March 4, 2022, by and among Shannon Wind, LLC, CAMS Renewable Services, LLC, and Shannon Wind Holdings, LLC, as amended by that certain Letter Agreement for the Provision of On-Site Services, dated August 15, 2022, by and among Shannon Wind, LLC, Shannon Wind Holdings, LLC, and CAMS Renewables Services, LLC.

4. That certain Agreement to Provide REP and Marketing Services, dated May 25, 2015, by and between Shannon Wind, LLC, as customer, and Tenaska Power Services Co., as service provider.

5. That certain Agreement to Provide QSE and Energy Management Services, dated June 29, 2015, by and between Shannon Wind, LLC and Tenaska Power Services Co., including that certain Guarantee of Tenaska Energy, Inc. and Tenaska Energy Holdings, LLC, dated June 27, 2015, by Tenaska Energy, Inc. and Tenaska Energy Holdings, LLC in favor of Shannon Wind, LLC.

6. That certain ISDA Master Agreement, dated June 29, 2015, by and between Tenaska Power Services Co. and Shannon Wind, LLC, including that certain ISDA Schedule to the ISDA Master Agreement, dated June 29, 2015, between Tenaska Power Services Co. and Shannon Wind, LLC (as supplemented by that certain ISDA Credit Support Annex to the Schedule to the ISDA Master Agreement, dated June 29, 2015, between Tenaska Power Services Co. and Shannon Wind, LLC).

7. That certain Account Control Agreement, dated June 29, 2015, by and among Shannon Wind, LLC, Tenaska Power Services Co., Citibank N.A., and Wilmington Trust National Association.

8. That certain ERCOT Standard Generation Interconnection Agreement, dated April 4, 2013, by and between South Clay Wind Farm, LLC and Oncor Electric Delivery Company, LLC, as assigned to Shannon Wind, LLC pursuant to that certain Assignment of ERCOT Standard Generation Interconnection Agreement and Generation Interconnection Study Reports, dated November 4, 2014, by and among South Clay Wind Farm, LLC, Shannon Wind, LLC and Oncor Electric Delivery Company, LLC, and as amended by that certain Amendment No. 1, dated October 21, 2013, that certain Amendment No. 2, dated June 2, 2014, and that certain Amendment No. 3, dated July 1, 2022.

9. That certain Agreement for Limitation on Appraised Value of Property for School District Maintenance and Operations Taxes, dated as of December 19, 2013, by and among Midway Independent School District, Horn Wind, LLC, South Clay Wind Farm, LLC and Shannon-1 Wind, LLC, as assigned to Shannon Wind, LLC pursuant to that certain Assignment and Assumption Agreement, dated as of February 25, 2015, by and among Horn Wind, LLC, South Clay Wind Farm, LLC, Shannon-1 Wind Farm, LLC and Shannon Wind, LLC.

10. The Contracts listed in Section 1.1(j) are incorporated herein by reference.

**Section 1.1(b)**

**Wind Turbine Generator Equipment**

1. 119 GE 1.7-103 wind turbine generators, including tabular steel towers and wind turbine generator foundations

2. Substation, including feeder circuit breakers, isolation switches, capacitor bank, reactor, GSU transformer, protective relay and metering equipment, and other substation equipment

3. Generator step-up and pad-mounted transformers

4. Collector systems

5. Measurement towers

6. Transmission lines, including the 345 kV gen-tie line

7. SCADA, control and communications systems

**Section 1.1(g)**

**Forklift**

1. 2015 Genie GTH-5519 (forklift)

**Section 1.1(j)**

**Assumed Real Property Interests**

1. That certain Surface Lease dated June 1, 2009, by and between Kaye Schreiber Nichols and Bob Schreiber, as owners, and Shannon Wind, LLC, as lessee, for certain premises located at TE&L Survey, Block 2631, Abstract 490, Parcel 8844, Clay County, Texas, as amended by that certain First Amendment to Surface Lease dated June 1, 2009.

2. That certain Surface Lease dated September 1, 2009, by and between Michael Dale Jackson and Judy Kay Jackson, as owners, and Shannon Wind, LLC, as lessee, for certain premises located at TE&L Survey, Block 2626, Abstract 485, Parcel 8822, Clay County, Texas and TE&L Survey, Block 2626, Abstract 485, Parcel 8825, Clay County, Texas.

3. That certain Surface Lease dated January 29, 2010, by and between Prairie Grove Ranch Partnership, a Texas general partnership, as attorney-in-fact for J. Patrick Garrett, Michael L. Garrett, Kelly Garrett Abbott and Meredith Garrett Landin, as owners, and Shannon Wind, LLC, as lessee, for certain premises located at Newton Subdivision Gilleland Survey, Abstract 162, Clay County, Texas; TE&L Survey, Block 2673 and 2674, Abstract 508 and 509, Clay County, Texas; R. B. Cobb Survey, Abstract 978, Clay County, Texas; TE&L Survey, Block 2618, Abstract 477, Clay County, Texas; TE&L Survey, Block 2604, Abstract 463, Clay County, Texas; TE&L Survey, Block 2617, Abstract 476, Clay County, Texas; TE&L Survey, Block 2624, Abstract 483, Clay County, Texas; TE&L Survey, Block 2633, Abstract 492, Clay County, Texas; TE&L Survey, Block 2633, Abstract 492, Clay County, Texas; TE&L Survey, Block 2608, Abstract 467, Clay County, Texas; TE&L Survey, Block 2613, Abstract 472, Clay County, Texas; TE&L Survey, Block 2614, Abstract 473, Clay County, Texas; TE&L Survey, Block 2677, Abstract 510, Clay County, Texas; TE&L Survey, Block 2690, Abstract 523, Clay County, Texas; and TE&L Survey, Block 2690, Abstract 523, Clay County, Texas.

4. That certain Surface Lease dated May 1, 2010, by and between Edward C. Moer and Debra K. Moer, as owners, and Shannon Wind, LLC, as lessee, for certain premises located at TE&L Survey, Block 2618, Abstract 477, Parcel 36388, Clay County, Texas; TE&L Survey, Block 2603, Abstract 462, Parcel 8749, Clay County, Texas; TE&L Survey, Block 2603, Abstract 462, Parcel 8750, Clay County, Texas; and TE&L Survey, Block 2603, Abstract 462, Parcel 8751, Clay Count, Texas, as amended by that certain First Amendment to Surface Lease dated May 1, 2013.

5. That certain Surface Lease dated May 1, 2010, by and between Terence Lee Schroeder and Scott Lea Schroeder, as owners, and Shannon Wind, LLC, as lessee, for certain premises located at TE&L Survey, Block 2643 Abstract 502, Clay County, Texas; J ROBBINS Survey Abstract 490, Parcel No. 0010327, Jack County, Texas; and TE&L Co. Survey Abstract 2316, Parcel No. 0010329, Jack County, Texas.

6. That certain Surface Lease dated June 1, 2010, by and between Jerome T. Horn and Virgie M. Horn, as owners, and Shannon Wind, LLC, as lessee, for certain premises located at TE&L Survey, Block 2629, Abstract 488, Clay County, Texas.

7. That certain Surface Lease dated June 1, 2010, by and between Arthur H. Litteken and Shirley D. Litteken, as owners, and Shannon Wind, LLC, as lessee, for certain premises located at TE&L Survey, Block 2671, A-506, Clay County, Texas; TE&L Survey, Block 2672, A-507, Clay County, Texas; McKinney & Williams Survey, A-359, Clay County, Texas; W. Wells Survey A-711, Clay County, Texas; and W. FORRIS Survey A-148, Clay County, Texas, East 148.55 acres of 4445, and 387,81 acres of 4446.

8. That certain Surface Lease dated September 1, 2010, by and between Edward C. Moer and Debra K. Moer, as owners, and Shannon Wind, LLC, as lessee, for certain premises located at W. Wells Survey, A-711, Clay County, Texas, as amended by that certain First Amendment of Surface Lease dated May 30, 2014.

9. That certain Surface Lease dated September 1, 2010, by and between Cletus James Schroeder and Darla Jo Schroeder, as owners, and Shannon Wind, LLC, as lessee, for certain premises located at TE&L Survey, Block 2644 Abstract 503, Clay County, Texas; TE&L Survey, Parcel 1716 Abstract 231 7, Jack County, Texas; and Brooks Survey, Parcel 50150, Abstract 64, Jack County, Texas.

10. That certain Surface Lease dated September 1, 2010, by and between Robert Alvin Schroeder and Rebecca Lynn Schroeder, as owners, and Shannon Wind, LLC, as lessee, for certain premises located at TE&L Survey, Block 2644 Abstract 503, Clay County, Texas; and TE&L Survey, parcel 9083 Abstract 2317, Jack County, Texas.

11. That certain Surface Lease dated September 1, 2010, by and between David Lynn Jackson and Cheryl Jackson, as owners, and Shannon Wind, LLC, as lessee, for certain premises located at TE&L Survey 2612 Abstract 471 Parcel 8798 Clay County, Texas; and TE&L Survey 2609 Abstract 468, Parcel 8789 Clay County, Texas.

12. That certain Surface Lease dated June 26, 2014, by and between Michael L. Garrett and Antoinette I. Garrett, Trustees of the Garrett Family Trust UTA dated March 11, 2011, as owners, and Shannon Wind, LLC, as lessee, for certain premises located at TE&L Co. Survey No. 2607, Abstract No. 466, Clay County, Texas.

13. That certain Surface Lease dated June 1, 2013, by and between Douglas J. Wolf and Betty S. Wolf, as owners, and Shannon Wind, LLC, as lessee, for certain premises located at TE&L Survey, Block 2627, Abstract 486, Parcel 8827, Clay County, Texas; and South-East 60 Acres, of the West 160 acres, located in TE&L Survey, Block 2630 Abstract 489, Parcel 8843, Clay County, Texas, as amended by that certain First Amendment to Surface Lease dated May 19, 2014.

14. That certain Surface Lease dated June 1, 2013, by and between Joey R. Horn and Jessica Juan Wang, as owners, and Shannon Wind, LLC, as lessee, for certain premises located at The West 1/2 (one half) of the West 160 acres located in TE&L Survey, Block 2627 Abstract 486, Parcel 8826, Clay County, Texas.

15. That certain Surface Lease dated May 16, 2013, by and between Jimmy M. Horn, as owner, and Shannon Wind, LLC, as lessee, for certain premises located at The East 1/2 (one half) of the West 160 acres located in TE&L Survey, Block 2627, Abstract 486, Parcel 8826, Clay County, Texas, less 5 acres in the North East comer described in TRACT TWO; and y 5 acres located in TE&L Survey, Block 2627 Abstract 486, Parcel 8826, Clay County, Texas.

16. That certain Surface Lease dated May 1, 2010, by and between Lloyd Wolf Sr., as owner, and Shannon Wind, LLC, as lessee, for certain premises located at TE&L Survey, Block 2606, A-465, Clay County, Texas and TE&L Survey, Block 2605, A-464, Clay County, Texas.

17. That certain Surface Lease dated October 1, 2010, by and between Robert E. Steinberger Sr. and Carolyn Sue Cox Steinberger, as owners, and Shannon Wind, LLC, as lessee, for certain premises located at all of Texas Emigration and Land Company Survey No. 2615, Abstract 474, containing 320 acres of land, more or less, and all of Texas Emigration and Land Company Survey 2616, Abstract No. 475, containing 320 acres of land, more or less, in Clay County, Texas, as amended by that certain First Amendment of Surface Lease dated June 10, 2014.

18. That certain Easement Agreement dated March 13, 2015, by and between Teddy W. Conrady and Adanna J. Conrady, as owner, and Shannon Wind, LLC, as grantee.

19. That certain Estoppel Certificate dated March 13, 2015, by and between Teddy W. Conrady and Adanna J. Conrady, as owners, and Shannon Wind, LLC, as project company.

20. Letter Approving Line Crossings Across Easement dated January 16, 2015 from Brazos Electric Power Cooperative, Inc.

21. Letter of No Objection dated March 30, 2015 from Enterprise Crude Pipeline, LLC.

22. Encroachment on Easement dated December 26, 2014, by and between Oncor Electric Delivery Company LLC and Shannon Wind, LLC (Distribution).

23. Encroachment on Easement dated December 16, 2014, by and between Oncor Electric Delivery Company LLC and Shannon Wind, LLC (Transmission).

24. Unsigned Copy of Release of Easements by Phillips 66 Pipeline LLC.

25. Letter of No Objection dated August 12, 2014 from J-A-C Electric Cooperative Inc.

26. Letter of No Objection dated April 16, 2015 from Edward Veitenheimer Sr.

27. Letter dated February 24, 2015 from Kenneth Liggett, County Judge, Clay County.

**Section 1.1(l)**

**Permits**

1. Self-Certification of Exempt Wholesale Generator Status filed with the Federal Energy Regulatory Commission (FERC) on March 23, 2015 (Docket No. EG14-58-000).

2. Registration as a Resource Entity with the Electric Reliability Council of Texas (ERCOT) pursuant to the ERCOT Protocols on August 1, 2014.

3. Ten (10) Orders Granting Permit and Right-of-Way to Construct Pipeline, Road Crossing and/or Road Cut, each issued by Clay County on February 9, 2015.

4. Letter dated February 24, 2015 from Kenneth Liggett, County Judge, Clay County.

**Section 3.3**

**Conflicts; Consents**

1. By contract, Seller is required to obtain the consent of the counterparties to the following Assigned Contracts in connection with the transactions contemplated by the Agreement:

   (a) That certain Full Service Agreement dated October 1, 2019, by and between General Electric International, Inc. (now known as GE Vernova International LLC) and Shannon Wind, LLC as amended by that certain Amendment No. 1 to the Full Service Agreement, dated May 27, 2020, and that certain Amendment No. 2 to the Full Service Agreement, dated August 1, 2022.

   (b) That certain Contract for the Sale of Power Generation Equipment and Related Services, dated July 18, 2014, by and between General Electric Company and Shannon Wind, LLC, as amended by that certain First Amendment to Contract for the Sale of Power Generation Equipment and Related Services, dated December 25, 2014, that certain Second Amendment to Contract for the Sale of Power Generation Equipment and Related Services, dated April 8, 2015 (effective as of March 31, 2015), that certain Third Amendment to Contract for the Sale of Power Generation Equipment and Related Services, dated May 7, 2015 (effective as of April 30, 2015), that certain Fourth Amendment to Contract for the Sale of Power Generation Equipment and Related Services, dated June 10, 2015, and that certain Fifth Amendment to Contract for the Sale of Power Generation Equipment and Related Services, dated June 11, 2015.

   (c) That certain Asset Management Agreement, dated March 4, 2022, by and among Shannon Wind, LLC, CAMS Renewable Services, LLC, and Shannon Wind Holdings, LLC, as amended by that certain Letter Agreement for the Provision of On-Site Services, dated August 15, 2022, by and among Shannon Wind, LLC, Shannon Wind Holdings, LLC, and CAMS Renewables Services, LLC.

   (d) That certain Agreement to Provide REP and Marketing Services, dated May 25, 2015, by and between Shannon Wind, LLC, as customer, and Tenaska Power Services Co., as service provider.

   (e) That certain Agreement to Provide QSE and Energy Management Services, dated June 29, 2015, by and between Shannon Wind, LLC and Tenaska Power Services Co., including that certain Guarantee of Tenaska Energy, Inc. and Tenaska Energy Holdings, LLC, dated June 27, 2015, by Tenaska Energy, Inc. and Tenaska Energy Holdings, LLC in favor of Shannon Wind, LLC.

   (f) That certain ISDA Master Agreement, dated June 29, 2015, by and between Tenaska Power Services Co. and Shannon Wind, LLC, including that certain ISDA Schedule to the ISDA Master Agreement, dated June 29, 2015, between Tenaska Power Services Co. and Shannon Wind, LLC (as supplemented by that certain ISDA Credit Support Annex to the Schedule to the ISDA Master Agreement, dated June 29, 2015, between Tenaska Power Services Co. and Shannon Wind, LLC).

(g) That certain Account Control Agreement, dated June 29, 2015, by and among Shannon Wind, LLC, Tenaska Power Services Co., Citibank N.A., and Wilmington Trust National Association.

(h) That certain ERCOT Standard Generation Interconnection Agreement, dated April 4, 2013, by and between South Clay Wind Farm, LLC and Oncor Electric Delivery Company, LLC, as assigned to Shannon Wind, LLC pursuant to that certain Assignment of ERCOT Standard Generation Interconnection Agreement and Generation Interconnection Study Reports, dated November 4, 2014, by and among South Clay Wind Farm, LLC, Shannon Wind, LLC and Oncor Electric Delivery Company, LLC, and as amended by that certain Amendment No. 1, dated October 21, 2013, that certain Amendment No. 2, dated June 2, 2014, and that certain Amendment No. 3, dated July 1, 2022.

**Section 5.1(b)**

**Conduct of Seller**

None.

**SCHEDULE SUPPLEMENT**

**TO**

**ASSET PURCHASE AGREEMENT**

by and between

**1370 CLEAN ENERGY LLC**,

as Purchaser

and

**SHANNON WIND, LLC**,

as Seller

**DATED AS OF APRIL 30, 2026**

## EXPLANATORY STATEMENT

The following schedule supplement (this "**Schedule Supplemen**t") supplement and amend the original "**Disclosure Schedules**", dated April 29, 2026 ("**Execution Date**") to the Asset Purchase Agreement dated of even date therewith (the "**Agreement**") with respect to certain matters arising after the Execution Date, or of which the Seller has become aware of after the Execution Date. The sections of the Schedule Supplement correspond to certain section references contained in the Agreement by and between 1370 Clean Energy LLC, a Delaware series limited liability company ("**Purchaser**") and Shannon Wind, LLC, a Delaware limited liability company ("**Seller**"). The Purchaser and Seller may sometimes be referred to herein individually as a "Party", and collectively as the "Parties".

Capitalized terms not otherwise defined in these Schedule Supplement shall have the same meanings as assigned to them in the Agreement or the Disclosure Schedule, and this Schedule Supplement shall be interpreted in accordance with the other definitional provisions as set out in Section 9.1 of the Agreement. The specific disclosures set forth in this Schedule Supplement have been organized to correspond to Section references in the Agreement to which each of the disclosures relate.

This Schedule Supplement and the Disclosure Schedules shall constitute the entire Disclosure Schedules of Seller. Where a conflict exists between this Schedule Supplement and the Disclosure Schedule, this Schedule Supplement shall prevail.

Nothing in this Schedule Supplement is intended to broaden the scope of any representation or warranty contained in the Agreement or to create any covenant. Inclusion of any item in this Schedule Supplement (1) does not represent a determination that such item is material or establish a standard of materiality, (2) does not represent a determination that such item did not arise in the ordinary course of business, and (3) shall not constitute, or be deemed to be, an admission to any third party concerning such item, unless, in each instance, specifically set forth as such. This Schedule Supplement includes brief descriptions or summaries of certain agreements and instruments. Such descriptions do not purport to be comprehensive and are qualified in their entirety by reference to the text of the documents described, true and complete copies of which have been provided or made available to Purchaser or its counsel or representatives. The information provided herein is being provided solely for the purpose of making disclosures under the Agreement. In disclosing this information, Seller does not waive any attorney-client privilege associated with such information or any protection afforded by the work-product doctrine with respect to any of the matters disclosed or discussed herein.

**Section 3.3**

**Conflicts; Consents**

Section 3.3 of the Disclosure Schedules are hereby amended and restated as follows:

(iii)

1. That certain Account Control Agreement, dated June 29, 2015, by and among Shannon Wind, LLC, Tenaska Power Services Co., Citibank N.A., and Wilmington Trust National Association.

2. That certain ERCOT Standard Generation Interconnection Agreement, dated April 4, 2013, by and between South Clay Wind Farm, LLC and Oncor Electric Delivery Company, LLC, as assigned to Shannon Wind, LLC pursuant to that certain Assignment of ERCOT Standard Generation Interconnection Agreement and Generation Interconnection Study Reports, dated November 4, 2014, by and among South Clay Wind Farm, LLC, Shannon Wind, LLC and Oncor Electric Delivery Company, LLC, and as amended by that certain Amendment No. 1, dated October 21, 2013, that certain Amendment No. 2, dated June 2, 2014, and that certain Amendment No. 3, dated July 1, 2022.

3. That certain Agreement to Provide QSE and Energy Management Services, dated June 29, 2015, by and between Shannon Wind, LLC and Tenaska Power Services Co., including that certain Guarantee of Tenaska Energy, Inc. and Tenaska Energy Holdings, LLC, dated June 27, 2015, by Tenaska Energy, Inc. and Tenaska Energy Holdings, LLC in favor of Shannon Wind, LLC.

(iv)

1. That certain Full Service Agreement dated October 1, 2019, by and between General Electric International, Inc. (now known as GE Vernova International LLC) and Shannon Wind, LLC as amended by that certain Amendment No. 1 to the Full Service Agreement, dated May 27, 2020, and that certain Amendment No. 2 to the Full Service Agreement, dated August 1, 2022.

2. That certain Contract for the Sale of Power Generation Equipment and Related Services, dated July 18, 2014, by and between General Electric Company and Shannon Wind, LLC, as amended by that certain First Amendment to Contract for the Sale of Power Generation Equipment and Related Services, dated December 25, 2014, that certain Second Amendment to Contract for the Sale of Power Generation Equipment and Related Services, dated April 8, 2015 (effective as of March 31, 2015), that certain Third Amendment to Contract for the Sale of Power Generation Equipment and Related Services, dated May 7, 2015 (effective as of April 30, 2015), that certain Fourth Amendment to Contract for the Sale of Power Generation Equipment and Related

Services, dated June 10, 2015, and that certain Fifth Amendment to Contract for the Sale of Power Generation Equipment and Related Services, dated June 11, 2015.

3. That certain Agreement to Provide REP and Marketing Services, dated May 25, 2015, by and between Shannon Wind, LLC, as customer, and Tenaska Power Services Co., as service provider.

4. That certain Agreement to Provide QSE and Energy Management Services, dated June 29, 2015, by and between Shannon Wind, LLC and Tenaska Power Services Co., including that certain Guarantee of Tenaska Energy, Inc. and Tenaska Energy Holdings, LLC, dated June 27, 2015, by Tenaska Energy, Inc. and Tenaska Energy Holdings, LLC in favor of Shannon Wind, LLC.

5. That certain ERCOT Standard Generation Interconnection Agreement, dated April 4, 2013, by and between South Clay Wind Farm, LLC and Oncor Electric Delivery Company, LLC, as assigned to Shannon Wind, LLC pursuant to that certain Assignment of ERCOT Standard Generation Interconnection Agreement and Generation Interconnection Study Reports, dated November 4, 2014, by and among South Clay Wind Farm, LLC, Shannon Wind, LLC and Oncor Electric Delivery Company, LLC, and as amended by that certain Amendment No. 1, dated October 21, 2013, that certain Amendment No. 2, dated June 2, 2014, and that certain Amendment No. 3, dated July 1, 2022.

6. That certain ISDA Master Agreement, dated June 29, 2015, by and between Tenaska Power Services Co. and Shannon Wind, LLC, including that certain ISDA Schedule to the ISDA Master Agreement, dated June 29, 2015, between Tenaska Power Services Co. and Shannon Wind, LLC (as supplemented by that certain ISDA Credit Support Annex to the Schedule to the ISDA Master Agreement, dated June 29, 2015, between Tenaska Power Services Co. and Shannon Wind, LLC).

4

**SECOND SCHEDULE SUPPLEMENT**

**TO**

**ASSET PURCHASE AGREEMENT**

by and between

**1370 CLEAN ENERGY LLC**,

as Purchaser

and

**SHANNON WIND, LLC**,

as Seller

**DATED AS OF MAY [●], 2026**

# EXPLANATORY STATEMENT

The following schedule supplement (this "**Second Schedule Supplemen**t") supplement and amend the original "**Disclosure Schedules**", to that certain Asset Purchase Agreement (the "**Agreement**") dated April 29, 2026 (the "**Execution Date**"), as supplemented and amended by that certain Schedule Supplement dated April 30, 2026 (the "**First Schedule Supplement**"), with respect to certain matters arising after the Execution Date, or of which the Seller has become aware of after the Execution Date. The sections of this Second Schedule Supplement correspond to certain section references contained in the Agreement by and between 1370 Clean Energy LLC, a Delaware series limited liability company ("**Purchaser**") and Shannon Wind, LLC, a Delaware limited liability company ("**Seller**"). The Purchaser and Seller may sometimes be referred to herein individually as a "Party", and collectively as the "Parties".

Capitalized terms not otherwise defined in this Second Schedule Supplement shall have the same meanings as assigned to them in the Agreement or the Disclosure Schedules, and this Second Schedule Supplement shall be interpreted in accordance with the other definitional provisions as set out in Section 9.1 of the Agreement. The specific disclosures set forth in this Second Schedule Supplement have been organized to correspond to Section references in the Agreement to which each of the disclosures relate.

This Second Schedule Supplement, the First Schedule Supplement, and the Disclosure Schedules shall constitute the entire Disclosure Schedules of Seller. Where a conflict exists between this Second Schedule Supplement, the First Schedule Supplement or the original Disclosure Schedules, this Second Schedule Supplement shall prevail.

Nothing in this Second Schedule Supplement is intended to broaden the scope of any representation or warranty contained in the Agreement or to create any covenant. Inclusion of any item in this Second Schedule Supplement (1) does not represent a determination that such item is material or establish a standard of materiality, (2) does not represent a determination that such item did not arise in the ordinary course of business, and (3) shall not constitute, or be deemed to be, an admission to any third party concerning such item, unless, in each instance, specifically set forth as such. This Second Schedule Supplement includes brief descriptions or summaries of certain agreements and instruments. Such descriptions do not purport to be comprehensive and are qualified in their entirety by reference to the text of the documents described, true and complete copies of which have been provided or made available to Purchaser or its counsel or representatives. The information provided herein is being provided solely for the purpose of making disclosures under the Agreement. In disclosing this information, Seller does not waive any attorney-client privilege associated with such information or any protection afforded by the work-product doctrine with respect to any of the matters disclosed or discussed herein.

## Section 1.1(a)

## Assigned Contracts

Section 1.1(a) of the Disclosure Schedules is hereby supplemented by adding the following Assigned Contract immediately following item 10 thereof:

11. That certain Engagement Letter to Provide Property Tax Consulting Services dated as of March 11, 2026, by and between Shannon Wind, LLC and Cummings Westlake, LLC.

Except as expressly supplement hereby, Section 1.1(a) of the Disclosure Schedules shall remain unchanged and in full force and effect.

3